UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TONA SOUTHARDS-NARANJO, individually and as representative of the Estate of Jon Southards; | § § § | |
| | § | |
| ELIZABETH BANDA SALAZAR, individually and as representative of the Estate of Elizabeth Hagerty; | § § § | |
| | § | |
| CLARA VIRGINIA SKINNER and SHELBY SKINNER, individually and as representatives of the Estate of John Skinner; | § § § § | |
| | § | CIVIL ACTION NO. |
| *Plaintiffs*, | § | 1:25-cv-990 |
| v. | § | |
| | § | |
| TEXAS DEPARTMENT OF CRIMINAL JUSTICE, UNIVERSITY OF TEXAS MEDICAL BRANCH, TEXAS BOARD OF CRIMINAL JUSTICE, BRYAN COLLIER, LANETTE LINTHICUM, MICHAEL BRITT, AUDREY ENGLAND, DONALD MUNIZ, DANIEL DICKERSON, JERRY SANCHEZ, OWEN MURRAY, AUSTINE AIGBOKHAN, and MAHOGANY WALKER, | § § § § § § § § § § § § § | JURY DEMANDED |
| | § | |
| *Defendants*. | § | |

**PLAINTIFFS' COMPLAINT**

Plaintiffs Tona Southards-Naranjo, individually and on behalf of the Estate of Jon Southards; Elizabeth Banda Salazar, individually and on behalf of the Estate of Elizabeth Hagerty; and Clara Virginia Skinner and Shelby Skinner, individually and on behalf of the Estate of John Skinner, file this suit for the denial of reasonable accommodations, and the infliction of cruel and unusual punishment, which their loved ones suffered and that led to their deaths in brutally hot, un-air-conditioned cells inside Texas Department of Criminal Justice (TDCJ) prisons.

## I.    STATEMENT OF CLAIMS

1.      TDCJ, the Texas Board of Criminal Justice (TBCJ), and the University of Texas Medical Branch at Galveston (UTMB), as well as their respective staff, knew Jon Southards, Elizabeth Hagerty, and John Skinner were persons with multiple disabilities that made each of them vulnerable to heat stroke and other heat-related illnesses; knew TDCJ's un-air-conditioned prisoner living areas exposed prisoners with disabilities to an increased risk of suffering and dying from the heat; knew Mr. Southards, Ms. Hagerty, and Mr. Skinner needed reasonable accommodations because of their disabilities, including, but not limited to, air-conditioned housing; and yet denied Mr. Southards, Ms. Hagerty, and Mr. Skinner these reasonable, necessary, and obvious accommodations.

2.      As a result of Defendants' denial of reasonable accommodations, in particular air-conditioned housing, Mr. Southards, Ms. Hagerty, and Mr. Skinner suffered more pain and punishment than other TDCJ prisoners without disabilities and died.

3.      TDCJ, TBCJ, and UTMB receive federal funding. Their denial of reasonable accommodations to Mr. Southards, Ms. Hagerty, and Mr. Skinner constituted violations of Section 504 of the 1973 Rehabilitation Act, 29 U.S.C. § 794 and the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.

4.      Bryan Collier, the executive director of TDCJ and agent of TBCJ, as well as Lannette Linthicum, Owen Murray, Michael Britt, Audrey England, Donald Muniz, Daniel Dickerson, and Jerry Sanchez further violated Mr. Southards, Ms. Hagerty, and Mr. Skinner's Eighth Amendment rights to be free from cruel and unusual punishment by exposing them to the dangerous conditions of confinement in TDCJ prisons, where they intentionally enacted policies that failed to house them in available air-conditioned housing and deliberately failed and refused

to enact practices to sufficiently mitigate the danger from extreme heat despite knowing of their substantial risk of serious harm, so they are liable under 42 U.S.C. § 1983.

5.    Finally, Officers Austine Aigbokhan and Mahogany Walker are also liable under 42 U.S.C. § 1983 for deliberately shirking their duty to care for and provide access to medical care to Mr. Southards and Mr. Skinner respectively; instead, each officer chose to refuse each man water, access to air conditioning, or even regular checks to see if they were still alive, despite knowing they were particularly sensitive to the heat and needed assistance during an ongoing heat wave.

## II.    JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

7.    Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b)(1), as Defendants TDCJ, TBCJ, UTMB, Collier, and Murray maintain offices in, employ agents who work in, and store records directly related to this case and other heat-related deaths which Defendants were aware of in Austin, Texas.

8.    Venue is also proper in this district as a significant portion of the relevant policy decisions as well as communications among and by Collier, Linthicum, Murray, as well as TDCJ, TBCJ, and UTMB's policymakers were made in Austin, Texas.

## III.    PARTIES

### A.  Plaintiffs

*1.  Jon Southards' family*

9.    Tona Southards-Naranjo is Mr. Jon Southards' mother and heir. She sues in her personal, individual capacity and as heir-at-law to Mr. Southards' estate and as a statutory beneficiary under the Texas Wrongful Death Act. Mr. Southards died intestate and there were no probate proceedings arising from his death as none were necessary. In an abundance of caution,

Tona Southards-Naranjo sues on behalf of all wrongful death beneficiaries. She is a resident of Kaufman County, Texas.

### 2. Elizabeth Hagerty's family

10.    Plaintiff Elizabeth Salazar is Ms. Elizabeth Hagerty's natural mother. Ms. Salazar sues in her personal, individual capacity as a statutory beneficiary under the Texas Wrongful Death Act and as heir at law to Ms. Hagerty's estate. Ms. Salazar lives in Nueces County, Texas.

11.    Ms. Hagerty died unmarried and intestate, and there were no probate proceedings arising from her death as none were necessary. In an abundance of caution, Elizabeth Salazar sues on behalf of all wrongful death beneficiaries.

### 3. John Skinner's family

12.    Clara Virginia Skinner is Mr. John Skinner's natural mother. She sues in her personal, individual capacity as a statutory beneficiary under the Texas Wrongful Death Act. Clara Skinner lives in Liberty County, Texas.

13.    Shelby Skinner is Mr. John Skinner's natural daughter and heir. She sues in her personal, individual capacity and as heir-at-law to Mr. Skinner's estate and as a statutory beneficiary under the Texas Wrongful Death Act. Shelby Skinner lives in Harris County, Texas.

14.    Mr. Skinner died unmarried and intestate, and there were no probate proceedings arising from his death as none were necessary. In an abundance of caution, Ms. Clara Skinner and Ms. Shelby Skinner sue on behalf of all wrongful death beneficiaries.

### B. Defendants

15.    The Texas Department of Criminal Justice (TDCJ) is the state prison system, an agency of the State of Texas. The State capitol and legislature are in Austin, and TDCJ maintains offices and conducts significant business in Austin, Texas. At all relevant times, it operated the Lane Murray Unit prison, a public facility with programs and services for which Ms. Hagerty and

other prisoners with disabilities were otherwise qualified. The Lane Murray Unit is located in the Western District of Texas. At all relevant times, TDCJ also operated the J. Dale Wainwright Unit and W.J. "Jim" Estelle Unit prisons, which are located in Huntsville, Texas and are both public facilities with programs and services for which Mr. Southards, Mr. Skinner, and other prisoners with disabilities were otherwise qualified. TDCJ is a recipient of federal funds. TDCJ is sued for compensatory relief, under federal law. TDCJ can be served through its executive director, Bryan Collier, at 861-A IH-45 North, Huntsville, Texas 77320.

16.     The University of Texas Medical Branch at Galveston a/k/a University of Texas Medical Branch (UTMB) is a component of the University of Texas System. UTMB is governed by the University of Texas Board of Regents which is headquartered in Austin, Texas at 210 West 7th Street, Austin, Texas 78701. UTMB employs multiple providers in much of the state including in the Western District and has an office in Austin, Texas. Through its Correctional Managed Care program, UTMB partners with TDCJ to provide health care to 80 percent of TDCJ prisoners, including prisoners at the Estelle, Lane Murray, and Wainwright Units. UTMB participates with TDCJ in formulating policies governing medical care. Thus, TDCJ and UTMB are jointly responsible for ensuring that Texas state prisoners' serious medical needs are not treated with deliberate indifference and that prisoners are not subjected to dangerous conditions as a consequence of their disabilities and serious medical needs. UTMB is a recipient of federal funds, and is sued for compensatory relief under federal law. UTMB can be served through its agent and president Jochen Reiser at 301 University Blvd., Galveston, Texas 77555-129.

17.     The Texas Board of Criminal Justice (TBCJ) is an agency which supervises TDCJ and other components of the state correctional system. The TBCJ maintains its headquarters in Austin, Texas and is controlled by a board with nine members, including its current chair, Eric Nichols, who resides in Austin, Texas. TBCJ also operates the Texas Department of Criminal

Justice Office of the Inspector General (OIG) which is headquartered in Austin and conducts oversight of TDCJ at the direction of TBCJ. OIG is the custodian of most of the documentary evidence concerning Mr. Southards, Ms. Hagerty, and Mr. Skinner's deaths. TBCJ appointed Bryan Collier to his post as TDCJ's executive director and TBCJ supervised his conduct at all relevant times. TBCJ is a recipient of federal funds. TBCJ is sued for compensatory relief under federal law. TBCJ can be served through Bryan Collier, in his capacity as TDCJ's executive director, at 861-A IH-45 North, Huntsville, Texas 77320.

18.     Bryan Collier was at all relevant times the executive director of TDCJ. As such, Collier was the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and was responsible for their training, supervision, and conduct. Collier maintained an office in Austin. By law, he was responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Collier was acting under color of law, as the agent of TDCJ and TBCJ, and, as a matter of law, the official representative of TDCJ and TBCJ. He is sued in his personal, individual capacity for punitive and compensatory damages. Collier is a resident of Huntsville, Texas, in Walker County.  He can be served with process at 861-A IH-45 North Huntsville, TX 77320.

19.     Lannette Linthicum, M.D., was at all relevant times TDCJ's chief medical officer, and supervised and assisted in providing medical care to prisoners at all TDCJ facilities, including the facilities named herein. Linthicum was acting under color of law, as the agent of TDCJ, and, as a matter of law, the official representative of TDCJ. She is sued in her individual capacity for punitive and compensatory damages. Linthicum resides in Walker County. She can be served with process at 2 Financial Plaza, Huntsville, TX 77340.

20.     Michael Britt was the warden at the Estelle Unit when Mr. Southards died, and was acting under color of law, as the agent of TDCJ, and, as a matter of law, the official representative

of TDCJ. He is sued in his personal, individual capacity for punitive and compensatory damages. He can be served at 400 Darrington Road, Rosharon, TX 77583.

21.    Audrey England was the warden at the Lane Murray Unit when Ms. Hagerty died, and was acting under color of law, as the agent of TDCJ, and, as a matter of law, the official representative of TDCJ. She is sued in her personal, individual capacity for punitive and compensatory damages. She can be served at 742 FM 712, Marlin, Texas 76661.

22.    Donald Muniz was the warden at the Wainwright Unit when Mr. Skinner died, and was acting under color of law, as the agent of TDCJ, and, as a matter of law, the official representative of TDCJ. He is sued in his personal, individual capacity for punitive and compensatory damages. He can be served at 2665 Prison Rd. #1, Lovelady, Texas 75851.

23.    Daniel Dickerson was the Regional Director for TDCJ Region I supervising the Wainwright Unit and the Estelle Unit when Mr. Southards and Mr. Skinner died, and was acting under color of law, as the agent of TDCJ, and, as a matter of law, the official representative of TDCJ. He is sued in his personal, individual capacity for punitive and compensatory damages. He can be served at 861-A IH-45 North Huntsville, TX 77320.

24.    Jerry Sanchez was the Regional Director for TDCJ Region VI supervising the Lane Murray Unit when Ms. Hagerty died, and was acting under color of law, as the agent of TDCJ, and, as a matter of law, the official representative of TDCJ. He is sued in his personal, individual capacity for punitive and compensatory damages. He can be served at 400 Darrington Road, Rosharon, Texas 77583.

25.    Dr. Owen Murray was at all relevant times the chief physician executive for UTMB's correctional managed care program and oversaw the medical, mental health, and dental services provided to prisoners within more than 100 correctional facilities in Texas, predominately adult prisons of the Texas Department of Criminal Justice, including the Estelle, Lane Murray, and

Wainwright Units. Dr. Murray oversaw at all relevant times program development, quality assurance, outcomes management, the pharmaceutical formulary, disease management guidelines, offender correspondence, peer review, litigation coordination, financial management, business development, continuing medical education, and staff recruitment and development. Dr. Murray was acting under color of law and as the agent of UTMB at all relevant time. Dr. Murray maintained an office in Austin. He is sued in his personal, individual capacity for punitive and compensatory damages. He can be served with process at 301 University Blvd, Galveston, TX 77550.

26.    Officer Austine Aigbokhan was the correctional officer assigned to patrol Jon Southards' housing area, restrictive housing, as the A2 rover for the W.J. Estelle Unit on June 28, 2023 during the hours of 3:00 pm through approximately 10:40 pm. Officer Aigbokhan patrolled Mr. Southards' assigned housing area shortly before he was found unresponsive, but was relieved from patrolling that area by the time Mr. Southards was found unresponsive. At all relevant times, Officer Aigbokhan acted under color of law. Officer Aigbokhan is sued in his individual, personal capacity only. Officer Aigbokhan may be served at 264 FM 3478 Huntsville, TX 77320-3320 or wherever he may be found.

27.    Officer Mahogany Walker was a correctional officer assigned to patrol John Skinner's housing area during the shift when Officer Walker found Mr. Skinner unresponsive on July 30, 2023 at approximately 9:39 pm. At all relevant times, Officer Walker acted under color of law. Officer Walker is sued in his or her individual, personal capacity only. Officer Walker may be served at 2665 Jovian Motley Boulevard Lovelady, TX 75851 or wherever he or she may be found.

IV.    FACTS

A.    **Extreme Temperatures are Killing Texas Prisoners with Disabilities Like Jon Southards, Elizabeth Hagerty, and John Skinner.**

28.    According to the National Weather Service, "heat is the number one weather-related killer" in the United States, "resulting in hundreds of fatalities each year." On average, heat kills more people than floods, lightning, tornadoes, and hurricanes combined. Three of those victims, Jon Southards, Elizabeth Hagerty, and John Skinner, died inside TDCJ's brutally hot prisons in June and July of 2023.

29.    TDCJ's highest ranking and longest-serving leaders—including Bryan Collier and Lannette Linthicum, M.D.—as well as UTMB's Senior Vice President over Offender Health Services, Owen Murray, D.O., have long known and specifically knew long before June 2023 that most of the Estelle, Lane Murray, and Wainwright Unit's inmate living areas and the majority of TDCJ prisoner housing areas are not air-conditioned or climate controlled. As a predictable and known result, apparent indoor temperatures routinely exceed 100 degrees during the hot Texas summers in the Estelle, Lane Murray, and Wainwright Units and other TDCJ prisoner housing areas and did so in June and July 2023.

30.    In addition to being TDCJ's executive director, Bryan Collier is an agent for TBCJ, who appointed him to run TDCJ. TBCJ has the power to instruct Collier as well as to replace him.

31.    Collier's conduct relating to heat and as described throughout this complaint has been on behalf of TBCJ and has been approved, tacitly and often expressly, by TBCJ, despite TBCJ's knowledge of Collier's conduct and its consequences.

32.    Collier testified in 2019 that confining people "in temperatures of 95 degrees is a serious health risk." During the same hearing, Collier testified that some prisoners were particularly heat-sensitive and were at risk at temperatures at or exceeding 90 degrees. These

prisoners include those with disabilities that make them more sensitive to heat-related illness or injury, like Mr. Southards, Ms. Hagerty, and Mr. Skinner.

33.     Before 2023, TDCJ, UTMB, TBCJ, Collier, Linthicum, and Murray knew that Texas often experiences heat waves where temperatures can be even higher than normal for prolonged periods.

34.     The National Integrated Heat Health Information System (NIHHIS), a collaboration of several federal agencies including the National Oceanic and Atmospheric Administration, Centers for Disease Control and Prevention, Administration for Strategic Preparedness and Response, Federal Emergency Management Agency, Department of Health and Human Services, and the National Institutes of Health, identifies people with disabilities like Mr. Southards, Ms. Hagerty, and Mr. Skinner  as "most at risk" to heat.

35.     In fact, according to NIHHIS, heat waves triple the risk of death for people with pre-existing psychosocial disabilities—like Mr. Southards, Ms. Hagerty, and Mr. Skinner who were each diagnosed by UTMB with mental illnesses.

36.     In 2023, the ventilation system in Mr. Southards, Ms. Hagerty, and Mr. Skinner's living areas, like those servicing the housing areas where most TDCJ prisoners live, did not lower the indoor temperatures. Rather, the ventilation system just brought in "fresh" hot air from outside, while pumping out "stale" hot air from the inside, much the same way a vent system in a car does not provide any comfort and does not lower the temperature when it is run without the car's air conditioning. TDCJ, UTMB, and TBCJ, including but not limited to Collier, Linthicum, and Murray, have long understood that fans and the ventilation system did not decrease the temperatures indoors for these and most housing areas throughout TDCJ, so they are not adequate to mitigate the danger from indoor heat.

37.     In a March 26, 2025 order issued in Austin, Texas arising from a lawsuit against Collier, United States District Court Judge Robert Pitman evaluated the effectiveness of fans in TDCJ un-air-conditioned facilities to mitigate the danger from indoor heat, and concluded that fans are inadequate because they do not reduce the temperature, and also that fans can be counter-productive in extreme heat because they increase the heat stress on the body above certain heat levels.

38.     TDCJ prisoners generally have access to tap water and in summer months TDCJ is supposed to distribute ice water to prisoners. However, Judge Pitman concluded that access to cold water was not and is not properly administered by TDCJ and, regardless of administration, does not prevent the substantial risk of serious harm to TDCJ inmates from the heat in un-air-conditioned prisons.

39.     Defendants had long known and understood these facts concerning the deficiencies in fans and the provision of cold water found by Judge Pitman before Mr. Southards, Ms. Hagerty, and Mr. Skinner's deaths in 2023.

40.     Other than fans and water, TDCJ, TBCJ, Collier, and Linthicum claim they mitigate the risk from heat by conducting more frequent "wellness checks" to assess heat-sensitive prisoners' well-being during summer months. The list of heat-sensitive prisoners was compiled using medical work restrictions such as no work in temperature extremes or sunlight, which security officials could then print out and use to guide their checks on inmates in housing areas. These periodic wellness checks, if security officers actually conduct them, were and are a reasonable and necessary—although not sufficient to eliminate the substantial risk of serious harm—accommodation for people with disabilities who are more sensitive to heat. When conducted correctly, these more frequent, periodic checks make it more likely a security officer will notice symptoms of a heat-related illness and seek medical attention for the person with the

disability before it is too late to prevent death. Though TDCJ, TBCJ, Collier, Linthicum, Britt, Muniz, England, Dickerson, and Sanchez knew these wellness checks were important reasonable accommodations for persons with disabilities, they also knew their security staff were not actually implementing them. As a result, they each knew that prisoners with disabilities go hours in un-air-conditioned units in the summer months without security officers checking them for signs of heat-related illness. For over a decade, TDCJ, TBCJ, Collier, and Linthicum have had a written "wellness check" policy, yet throughout that period they, as well as all other Defendants, knew that policy was widely ignored and failed to take any steps to ensure security officers actually provided that accommodation to prisoners with disabilities.

41.    TDCJ, UTMB, TBCJ, Collier, Linthicum, Murray, Britt, Muniz, England, Dickerson, Sanchez, Aigbockhan, and Walker have long known that Texas summers have been hot, they are likely to continue to be hot, and heat waves are likely to continue, so that it is very hot in Texas prisons that don't have air conditioning.

42.    Collier himself testified in Austin, Texas that:

Q.    Can we agree that summers are hot in Texas?
A.    Yes, ma'am.

Q.    And that they've been hot for years?
A.    Yes, ma'am.

Q.    And they're likely to continue to be hot? Heat waves are likely to continue?
A.    I would agree.

Q.    And could we also agree that it's very hot in Texas prisons that don't have air conditioning?
A.    Yes.

…

Q.    Fair to say that there are over 90,000 cells without air conditioning throughout Texas?
A.    I'll agree.

43.     In the years before Mr. Southards, Ms. Hagerty, and Mr. Skinner's deaths, TDCJ installed motorized fans in the housing areas where those inmates would later be housed and die in the Estelle, Lane Murray, and Wainwright Units. Far from lowering the temperature in the housing areas, running the fans during the heat of the day as TDCJ routinely did and does actually increases the temperature inside and makes those housing areas hotter and more dangerous. TDCJ, UTMB, TBCJ, Collier, Linthicum, Murray, Britt, Muniz, England, Dickerson, and Sanchez knew this to be the case.

44.     TDCJ, UTMB, TBCJ, Collier, Linthicum, Murray, Britt, Muniz, England, Dickerson, and Sanchez knew years before Mr. Southards, Ms. Hagerty, and Mr. Skinner died that there is little difference between indoor and outdoor summer temperatures in TDCJ prisoner housing areas that lacked air-conditioning, and knew that for extensive periods of the summer months, particularly at night, the apparent temperatures were and are often hotter inside than outside—much the way a garage is often hotter and stuffier than the outside air in the summer.

45.     TDCJ, TBCJ, and UTMB's leadership, including Collier, Linthicum, and Murray, knew and discussed internally years before Mr. Southards, Ms. Hagerty, and Mr. Skinner died the fact that prolonged exposure to these elevated temperatures causes even a "healthy" seeming prisoner's body to shut down. TDCJ, TBCJ, UTMB, Collier, Linthicum, and Murray knew that as a prisoner's body loses the ability to cool itself, their body systems fail. If there is no immediate intervention, extreme temperatures will cause death.

46.     Judge Pitman also found in his March 26, 2025 order that Collier agreed that air conditioning TDCJ facilities is necessary as a matter of inmate health and safety. Defendants all knew that air conditioning was necessary for inmate health and safety long before 2023.

47.    In fact, TDCJ, UTMB, Collier, Linthicum, and Murray have incorporated a version of the following chart, adapted from a similar chart published by the National Oceanic and Atmospheric Administration, into TBCJ-approved agency policies since at least 2007.

**Table 1: Heat and Humidity Index**

**Actual Air Temperature (°F)**

| Relative Humidity (%) | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 126 | 130 | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

| Likelihood of heat disorders with prolonged exposure or strenuous activity | Heat Index | Risk Level |
|---|---|---|
| Yellow = Caution | 80 to 90°F | Possible fatigue with prolonged exposure |
| Gold = Extreme Caution | 91°F to 103°F | Heat-related illness possible with long exposure |
| Orange = Danger | 103°F to 115°F | Heat stroke possible and heat-related illness likely |
| Red = Extreme Danger | Greater than 115°F | High risk of heat stroke |

48.     The chart shows the heat index, or apparent temperature—the temperature plus the effect of humidity—which is a scientific measure of the temperature the body "feels." High humidity can dramatically increase the apparent temperature.

49.     The indoor apparent temperatures at the Estelle, Lane Murray, and Wainwright Units during the summer months routinely reached the gold "extreme caution" and orange "danger" zones in the years before Mr. Southards, Ms. Hagerty, and Mr. Skinner died as well as in 2023. Perennial highs during the summer months at the Estelle, Lane Murray, and Wainwright Units were and are still often in the red "extreme danger" zone. Defendants TDCJ, TBCJ, UTMB, Collier, Linthicum, Murray knew the weather at all three prisons, while Britt, Muniz, England, Dickerson, Sanchez, Aigbockhan, and Walker knew the weather at the prisons within their respective areas of responsibility.

50.     The NOAA chart incorporated by TDCJ, TBCJ, and UTMB is designed to predict the risk to people who *do not* suffer from medical conditions that increase their susceptibility to heat-related injuries. TDCJ, TBCJ, and UTMB, including Collier, Linthicum, and Murray, knew this limitation—that is, that this chart predicts the risk to "healthy" people, before even accounting for people, like Mr. Southards, Ms. Hagerty, and Mr. Skinner, who have an increased risk of heat-related illness or injury due to their disabilities.

51.     TDCJ, TBCJ, UTMB, Collier, Linthicum, Murray, Britt, Muniz, England, Dickerson, and Sanchez knew long before June 2023 that prolonged exposure to heat indexes of 88° Fahrenheit or more substantially increases the risk that prisoners with disabilities like Mr. Southards, Ms. Hagerty, and Mr. Skinner will experience serious harm, hospitalization, or death from exacerbation of their disabilities. These disability-related dangers include asthma attacks, kidney failure, heart attacks, aggravation of pre-existing conditions, and prolonged health effects that worsen medical outcomes.

52.     Prolonged exposure to heat is also harmful to mental health, causing higher rates of suicidality, agitation, impulsivity, cognitive decline, and sleep disorders.

53.     It was well known to TDCJ, UTMB, TBCJ, Collier, Linthicum, Murray, Britt, Muniz, England, Dickerson, and Sanchez long before 2023 that people with certain disabilities, like hypertension, obesity, diabetes, urinary disorders, and mental illness, or who take certain medications to treat disabilities—including but not limited to antipsychotics, anticholinergics, diuretics, carbamazepine, calcium channel blockers, and ACE inhibitors—are much more vulnerable to extreme temperatures. Their disabilities and, often, the medications needed to treat their disabilities prevent or severely inhibit their bodies from regulating their temperature, putting them at much greater risk of death.

54.     TDCJ and Collier have admitted that at least twenty-three men died in TDCJ prisons from heat-related causes between 1998 to 2012. Twenty of these men had disabilities that made them more vulnerable to heat-related illness, injury, or death or were prescribed medications for their disabilities that made them more vulnerable to heat-related illness, injury, or death.

55.     Specifically, during that period, the following TDCJ prisoners died from the heat inside TDCJ:

| Name | Age | Prison | Date of Death | Body Temp. | Facts |
|------|-----|--------|---------------|------------|-------|
| Archie White | 48 | Robertson | June 29, 1998 | 104.2 | Obese, hypertensive, schizophrenic; prescribed tricyclic antidepressants |
| Anselmo Lopez | 41 | Eastham | July 14, 1998 | Unk | Schizophrenic; prescribed psychotropic medications |
| James Moore | 47 | Unk | July 30, 1998 | 104.1 | Hypertensive, schizophrenic; prescribed psychotropic medications, beta-blockers and diuretics |
| Charles Finke, Jr. | 38 | Huntsville | Aug. 8, 1999 | 106 | Depression; prescribed anti-depressant, anticholinergic, antihistamine, and anti-psychotic medications |
| Gary Gemma | 35 | Coffield | Aug. 8, 1999 | Unk. | Schizophrenic; prescribed diphenhydramine, antipsychotics, anticholinergics |

| Name | Age | Prison | Date of Death | Body Temp. | Facts |
|------|-----|--------|---------------|------------|-------|
| Carl Green | 44 | Boyd | Aug. 19, 2000 | Unk. | Obesity; Cardiovascular disease |
| John Cardwell | 39 | Allred | Aug. 4, 2001 | 108.5 | Prescribed diuretics and psychotropics, spent 2 weeks in ICU, recently arrived |
| Darrell Wafer[1] | 40 | McConnell | May 19, 2003 | Unk. | Hypertension |
| Ricky Robertson | 37 | Darrington | July 16, 2004 | 108 | Bipolar with depression, prescribed antipsychotic, anticholinergic, and anti-depressant medications |
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk | Asthma, hypertension; prescribed antipsychotic, anti-depressant, anticholinergic medications |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | Prescribed antipsychotic and anti-depressant medicine, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | Hypertensive, coronary artery disease; prescribed anti-depressant and beta blocker medication, died after 5 days |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | Diabetic, hypertensive, obese; prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | Hypertensive, schizophrenic, prescribed psychotropics |
| Robert Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | Developmentally disabled, depression; prescribed antipsychotic and anti-depressant medication, found unresponsive 3:30 am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | Diabetic, hypertensive; prescribed betablocker, ACE inhibitor, anti-depressant, and carbamazepine; previously complained of heat-related illnesses, collapsed 8:00 am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | Developmentally disabled, schizophrenic; prescribed antipsychotic medicine and carbamazepine, found unresponsive at 3:00 am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | Obese, hypertensive; prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | Obese, hypertensive; prescribed diuretic, calcium channel blocker, ACE inhibitor; found at 3:30 am |

---

[1] Although his death is not directly related to housing conditions, Mr. Wafer was killed when TDCJ officers and UTMB staff decided to keep him in a hot shower for two hours, including for an hour after they saw he had passed out, reflecting their deliberate indifference to the danger posed by environmental heat.

| Name | Age | Prison | Date of Death | Body Temp. | Facts |
|------|-----|--------|---------------|------------|-------|
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | Depression, hypertension; prescribed diuretic, beta blocker, ACE inhibitor, died 3 days after arrival |
| Daniel Alvarado | 44 | Beto | Aug. 20, 2011 | 105.2 | HIV+, schizophrenic; prescribed psychotropics, found unresponsive at 9:20 am, incarcerated nine days |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | Prescribed antipsychotic and anti-depressant medication, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | Obese, hypertensive, diabetic, schizophrenic, with depression; prescribed antipsychotic, anti-depressant; died at transfer facility shortly after arrival, found after midnight |

56.     Many of these twenty-three men shared certain characteristics. Most took psychotropic drugs to treat some form of mental illness, suffered from diabetes, or took diuretics to treat hypertension. Many had first arrived in non-air-conditioned TDCJ facilities shortly before their deaths and were not acclimated to the heat. Most collapsed in the middle of the night (when it was hotter inside the housing units than outside), or were found dead early in the morning.

57.     Collier, Linthicum, Murray, TDCJ, UTMB, and TBCJ knew of the above details of each of those 23 deaths and recognized that they demonstrated the ongoing danger as well as the inadequacy of the agencies' mitigation measures, but consciously disregarded that risk.

58.     On February 3, 2017, the United States District Court for the Southern District of Texas, Judge Keith Ellison, denied TDCJ, UTMB, and several officials'—including Collier's predecessor's—motions for summary judgment against claims arising from Larry McCollum's death, including claims brought under the Rehabilitation Act. This order was received and read by Collier, Linthicum, Murray, and TBCJ long before 2023.

59.     TDCJ identified hundreds of prisoners who suffered non-fatal heat illnesses after 2011. Many if not most of these prisoners had disabilities that made them more sensitive to heat-

related illnesses, injuries, and death or were on medication for their disabilities that had the same effect.

60.    For years, internal discussions between and among TDCJ, TBCJ, and UTMB, including their leadership such as Collier, Linthicum, and Murray, repeatedly raised the heat deaths and widespread heat illnesses, as well as particular vulnerabilities of people with disabilities to both illness and death from the heat.

61.    For example, as early as a 2005 investigation into Ricky Robertson's death, Linthicum concluded in a memo that was received by Collier that air conditioning would be needed to protect inmates who took antipsychotic and other psychotropic medications from heat-related illness.

62.    Following a 2009 investigation into Dionicia Robles and James Shriver's death, Linthicum wrote directly to Collier's predecessor—in a memo that Collier received—discussing those heat-related deaths and the fact that both inmates took psychotropic medications, identifying them as heat related deaths.

63.    After the deaths in 2011, the Palestine Regional Medical Center sent a letter to TDCJ which was received by Collier and Linthicum raising the alarm about the number of hyperthermia patients they had received from TDCJ prisons. Collier and Linthicum's subordinates who received that letter were instructed to forward the letter up to through the leadership at TDCJ.

64.    Linthicum compiled a list of the 2011 heat-related deaths and sent it to TDCJ executives, so it was received by Collier, in 2012.

65.    Despite executives' awareness of numerous heat-related deaths and illnesses, it is likely that there were many more heat related injuries and deaths during this period as hyperthermia is known to be an underreported cause of death by medical examiners and pathologists. Further, TDCJ (with TBCJ's approval) and UTMB have actively undertaken measures that aggravate this

underreporting problem. As a result, TDCJ and UTMB stopped reporting heat-related deaths after 2012 and rarely collected information sufficient to confirm a diagnosis of heat-related death.

66.     In particular, in the years before 2023 as well as during 2023, TDCJ and UTMB failed to consistently take body temperatures for inmates found with symptoms consistent with heat-related and heat-aggravated illnesses—even though taking such temperatures is a critical part of *treating* illnesses that arise in hot conditions and well-known in the correctional industry to be an important part of death investigations.

67.     In the years before Mr. Southards, Ms. Hagerty, and Mr. Skinner's deaths, TDCJ and UTMB also slowed their processing of deceased inmates' remains, causing bodies to further decompose prior to autopsies, thus losing evidence of heat's contribution to deaths. Whereas most autopsies were performed within four days in 2012 and earlier, TDCJ and UTMB autopsies in 2022 and 2023 usually took five to twelve days.

68.     Even though the Texas legislature enacted specific reporting requirements for heat-related illnesses and death for 2020 onward, TDCJ (with TBCJ's approval) changed what it internally considered a "heat-related death" in response to this law to be limited to only those deaths where the reported cause of death is hyperthermia. UTMB generally conducts autopsies of TDCJ prisoners like Mr. Southards, Ms. Hagerty, and Mr. Skinner and requires a core body temperature taken at or around the time of death before it will conclude hyperthermia is a prisoner's cause of death.

69.     As a result of TDCJ's changes to its definition of "heat-related death" after the reporting law was implemented and TDCJ's and UTMB's failure to take or require core body temperatures of prisoners who died after experiencing symptoms consistent with a heat-related illness, TDCJ has not reported a single heat-related death since 2020 as hyperthermia has not been listed as the sole cause of death on any prisoner's final autopsy report. TDCJ, TBCJ, Collier, and

Linthicum did at least concede in a report to the legislature in Austin, Texas that three deaths in 2023 had elevated temperatures listed "as a possible contributing factor."

70. TDCJ, TBCJ, Collier, and Linthicum have also deliberately under-reported heat-related illnesses to the Texas legislature, including by not counting illnesses that UTMB itself reported as heat-related illnesses to TDCJ. Many of these prisoners who suffered heat-related illnesses were prisoners whose disabilities or medically-necessary treatment for disabilities made them more vulnerable to heat-related illnesses.

71. In his March 26, 2025 order issued in Austin, Texas, Judge Pitman found that TDCJ practices have likely led to heat-related deaths and injuries of TDCJ inmates being undercounted and underreported.

72. TDCJ, TBCJ, UTMB, Collier, Linthicum, and Murray were well aware of the underreporting identified by Judge Pitman, and that they themselves had caused it, well before Mr. Southards, Ms. Hagerty, and Mr. Skinner's deaths in 2023.

73. Other than the cover up, no meaningful changes were made to protect inmates from the heat until 2017 when a federal court ordered TDCJ to house a class of heat-sensitive prisoners living at the Wallace Pack Unit—located in Navasota, which has a similar climate to Huntsville and Gatesville—in housing with heat index below 88° F. TDCJ Executive Director and TBCJ agent Bryan Collier was a named defendant in that case and received the order.

74. In the Pack Unit litigation, Judge Ellison specifically found, in his July 19, 2017 order, that TDCJ prisoners at the Pack Unit who were prescribed certain classes of medications including antipsychotics, anticholinergic, and diuretic drugs, or who had a diagnosis of psychiatric conditions, obesity, diabetes, or hypertension—among other conditions—were "heat sensitive." Judge Ellison further found that TDCJ was deliberately indifferent to the substantial risk of harm to those heat sensitive inmates and, on August 8, 2017, ordered TDCJ to move all inmates fitting

that description into air conditioning. Judge Ellison's order was widely discussed throughout TDCJ and UTMB, and this part of the order was known to all Defendants. Had Mr. Southards, Ms. Hagerty, and Mr. Skinner been housed at the Pack Unit during that time, with the same diagnoses they each had and medications they were each taking at the time of their deaths, then each of them would have been required to be transferred by that order.

75.    Although during the Pack Unit litigation TDCJ implemented several new "heat mitigation" policies, these mitigation efforts did not prevent the risk of serious harm to prisoners from indoor heat and did not prevent or even meaningfully lessen the significant and increased risk of serious harm to prisoners whose disabilities or medically-necessary treatment for their disabilities made them more heat sensitive. These new policies most notably included alleged prisoner access to certain air-conditioned spaces, called "respite areas," on request; alleged prisoner access to cold showers on request; alleged increased access to ice water; additional water fountains; and additional commissary items. The latter three changes were summarily reversed after litigation ended. As to other changes that persisted on paper, TDCJ's staff in the years before Mr. Southards, Ms. Hagerty, and Mr. Skinner died routinely failed to provide these new so-called mitigation measures throughout the system. Part of the reason the Pack Unit order was issued at all was the failure of these measures to adequately protect against the heat and the agency's failure to implement them in the manner it claimed.

76.    TDCJ, TBCJ, UTMB, Collier, Linthicum, and Murray received Judge Ellison's 2017 order as well as thousands of grievances by 2023 evidencing that these so-called mitigation efforts were not being implemented on the ground, so they knew prisoners were routinely being denied these measures before Mr. Southards, Ms. Hagerty, and Mr. Skinner died, yet they did nothing to change these practices.

77.     But even when these more recently adopted mitigation efforts have been provided as intended, they have not prevented the significant risk of serious harm to inmates from indoor heat. TDCJ, TBCJ, UTMB, Collier, Linthicum, Murray, Britt, Muniz, England, Dickerson, and Sanchez knew well before 2023 that even perfect implementation of these heat mitigation efforts would not prevent the significant and increased risk of heat-related illness, injury, and death faced by disabled prisoners in TDCJ's un-air-conditioned housing areas.

78.     Judge Pitman, in his March 26, 2025 order, concluded that TDCJ's respite areas remained inadequate and ineffective at reducing the substantial risk of harm posed by extreme heat.

79.     Judge Pitman found that TDCJ inmates are not provided sufficient access to respite areas, and that Collier knew this, because insufficient staff are assigned to the task and insufficient space is provided to accommodate all of the inmates who would request and benefit from using respite areas. Even when inmates are granted respite, they are often limited to arbitrary time periods such as 15 minutes. Judge Pitman found that respite is particularly unlikely to be provided at night and inmates at higher levels of security have even more restricted access to respite.

80.     Judge Pitman further found that respite areas are not just poorly administered by TDCJ, but also that by design respite areas cannot prevent the substantial risk of harm from environmental heat because victims of heat illness often do not recognize that they need to cool off and because respite areas are designed to be temporary.

81.     Judge Pitman also found that the practice of providing cold showers did not guard against the health risks of environmental heat in TDCJ prisons.

82.     Judge Pitman found evidence that, similar to respite areas, TDCJ staff did not consistently provide these showers. Even when staff were willing to accommodate inmate requests, their permission often came with restrictions that undermined the purpose such as

forbidding cold showers at night. Further, most TDCJ prisons have limited shower facilities that made it impossible for all prisoners to use the cold shower even once a day.

83.     Judge Pitman also found that even frequent use of cold showers would not ameliorate the substantial risk of serious harm from extreme heat in TDCJ prisoner housing areas due to their temporary nature.

84.     Collier, Linthicum, Murray, TDCJ, TBCJ, UTMB, Britt, and Dickerson had long known the facts found by Judge Pitman concerning the ineffectiveness and inadequately implemented mitigation efforts of respite areas and cold showers long before Mr. Southards, Ms. Hagerty, and Mr. Skinner's deaths in 2023.

85.     As a consequence of the proceedings in Austin, TBCJ asked its auditor to investigate outside temperature logs kept by TDCJ facilities, although they did not specifically request an audit of the entire system—instead, they only narrowly asked about an outside temperature log that Judge Pitman identified during proceedings in Austin as likely falsified. Despite the narrow scope of this inquiry, TBCJ's auditor found that outside temperature logs were fabricated on at least three days at the single prison the investigation reviewed.

86.     TDCJ's outside temperature logs are supposed to be used by TDCJ to trigger mitigation measures for inmates working outdoors and for inmates housed without air conditioning when the heat exceeds certain benchmarks. The notable breakpoints in TDCJ policy are heat indices of 80, 90, 98, and 108, where work is slightly slowed with 5-minute breaks every hour at low end of the spectrum, while work in the heat is "restricted" at the high end.

87.     Judge Pitman found that TDCJ routinely undercuts its administration of heat mitigation measures by falsifying temperature records at prisons without air conditioning, reflecting that its staff disregard the actual heat levels.

88.     Epidemiological studies show that the protective effects of each of TDCJ's newer mitigation efforts is limited and does not prevent the substantial risk of serious harm from prolonged exposure to heat. Accordingly, TDCJ prisoners have continued to die and suffer heat illnesses when they are not housed in air conditioning. Prisoners with disabilities that make them more heat sensitive or with disabilities whose necessary treatment and medications make them more heat-sensitive have disproportionately suffered and died in un-air-conditioned housing. TDCJ, TBCJ, UTMB, Collier, Linthicum, and Murray were aware of these studies and their findings before 2023, but decided to continue to make no improvements to protect inmates.

89.     In his March 26, 2025 order, Judge Pitman found that Collier and TDCJ received two studies in 2022 which together concluded that TDCJ's so-called heat mitigation measures were not effective and that inmates were dying from the heat inside their housing areas. Nonetheless, Judge Pitman found that Collier and TDCJ failed to take any actions or make any policy changes in response to the epidemiological evidence, nor did they ever ask anyone with epidemiological expertise to evaluate the studies.

90.     Judge Pitman further found that Collier admitted he knew that dozens of TDCJ inmates had died or fallen ill because of extreme heat with the so-called heat mitigation measures in place.

91.     At the prison-specific level, the Estelle, Lane Murray, and Wainwright Unit's security functions are managed by the senior wardens of each facility, each of who, is the highest-ranking security official assigned to work on site at that particular prison on a day-to-day basis.

92.     At all relevant times, the Estelle Unit senior warden was Michael Britt, employed by TDCJ.

93.     At all relevant times, the Lane Murray Unit senior warden was Audrey England, employed by TDCJ.

94.    At all relevant times, the Wainwright Unit senior warden was Donald Muniz, employed by TDCJ.

95.    In June and July 2023, Britt, England, and Muniz had authority to move prisoners within their respective prisons, including to move prisoners into the air-conditioned housing areas of the prison complex. Each senior warden was responsible for the safety of inmates and the conditions inside their respective prisons, including all of the heat mitigation efforts.

96.    Britt, England, and Muniz also had the authority to direct their employees to provide reasonable accommodations to prisoners with disabilities, including the authority to direct their employees to conduct periodic wellness checks of prisoners with disabilities, to move a disabled prisoner into air-conditioned housing, and to provide other access to cooling as a reasonable and necessary accommodation.

97.    England's immediate supervisor in June 2023 was the Regional Director for TDCJ Region VI, Jerry Sanchez.

98.    Britt and Muniz were supervised in June and July 2023 by the Regional Director for TDCJ Region I, Daniel Dickerson.

99.    As the regional directors, Sanchez and Dickerson had authority to approve of the wardens' decisions and to override or change policy decisions affecting the prisons within their respective regions. Both men routinely visited the relevant prisons in their respective regions in person. Sanchez and Dickerson were responsible for ensuring the safety of inmates and conditions at the prisons within their respective regions, as well as for ensuring prisoners with disabilities received reasonable and necessary accommodations.

100.    Despite knowing they were routinely not even meeting the goals of TDCJ's nominal mitigation efforts at Estelle, Lane Murray, and Wainwright, TBCJ, TDCJ, Collier,

England, Muniz, Britt, Dickerson, and Sanchez did nothing to improve the mitigation measures at Estelle, Lane Murray, and Wainwright.

101.    For example, on information and belief, in the years before Mr. Southards, Ms. Hagerty, and Mr. Skinner died and in June and July 2023, officers at the Estelle, Lane Murray, and Wainwright Units often failed to conduct "wellness" checks, security often failed to report problems with ice water delivery, security often failed to report problems with other sources of access to inmate water such as plumbing problems, security often refused to take inmates to respite areas, and security often refused to take inmates to cool showers.

102.    TBCJ, TDCJ, Collier, England, Britt, Muniz, Dickerson, and Sanchez routinely received reports of these deficiencies at the Estelle, Lane Murray, and Wainwright Units, while Collier, Dickerson, and Sanchez also received similar reports from other prisons under their supervision.

103.    In 2018, TDCJ settled the Pack Unit lawsuit by agreeing to house all then-current Pack Unit class members in air conditioning and install permanent air conditioning at that prison.

104.    That same year, the Texas House of Representatives Committee on Corrections, which convenes in Austin, informed TDCJ, TBCJ, and UTMB that TDCJ's non-air-conditioning "mitigation" efforts were not enough to protect inmates for the heat.

105.    At the same time as the Pack Unit settlement in 2018, TDCJ and UTMB settled a number of wrongful death cases relating to the heat deaths from 2011 and 2012.

106.    Part of the 2018 Pack Unit settlement—which Collier, Linthicum, and Murray were aware of and approved—included a list of disabilities, medical conditions, and medications associated with a higher risk of heat-related illness:

a. Inmates who are 65 or older.
b. Inmates diagnosed with Coronary Artery Disease.
c. Inmates diagnosed with Congestive Heart Failure.
d. Inmates diagnosed with Cardiovascular Disease.

27

    e.   Inmates diagnosed with Cystic Fibrosis.

    f.   Inmates diagnosed with a Sweat Gland disorder.

    g.   Inmates diagnosed with Sjogren's syndrome.

    h.   Inmates diagnosed with Asthma, other than mild asthma requiring no more than albuterol.

    i.   Inmates diagnosed with Chronic Obstructive Pulmonary Disease (COPD), other than mild COPD requiring no more than albuterol.

    j.   Cirrhotic inmates who are also receiving a diuretic, or daily laxatives, or the nonabsorbable antibiotics Rifamixin or Neomycin.

    k.   Inmates diagnosed with Obesity.

    l.   Inmates with BMI above 30.

    m.   Inmates receiving Antipsychotic drugs.

    n.   Inmates receiving Lithium.

    o.   Inmates receiving Tricyclic antidepressants.

    p.   Inmates receiving diuretics.

    q.   Inmates with diabetes if accompanied by target organ damage that increases the risk from heat.

    r.   Inmates receiving bupropion.

    s.   Inmates chronically receiving high-activity anticholinergic medications.

    t.   Inmates receiving beta blockers.

    u.   Inmates with uncontrolled hypertension accompanied by target organ damage that increases the risk from heat.

    v.   Inmates diagnosed with active psychiatric conditions, other than those induced by drugs.

    w.   Inmates with developmental disabilities.

    x.   Inmates receiving the anti-convulsant drugs carbamazepine (Tegretol), topiramate (Topamax), and zonisamide.

107.    Notably, Mr. Southards' diagnoses of psychosis as well as his prescriptions for haloperidol (an antipsychotic), oxybutynin (an anticholinergic), and diphenhydramine (an anticholinergic and antihistamine) at the time of his death meant that he separately satisfied at least three of these categories, yet he was not housed in an air-conditioned cell when he died.

108.    Likewise, Ms. Hagerty would have satisfied at least three of these categories due to her diagnoses of mood disorder, diabetes, cardiovascular disease, asthma, and obesity as well as her prescriptions for carbamazepine and citalopram (an anti-depressant) at the time of her death, yet she was also not housed in an air-conditioned cell when she died.

109.    Further, Mr. Skinner's diagnoses of post-traumatic stress disorder, with psychosis, and hypertension as well as his prescriptions for ziprasidone (an antipsychotic), oxybutynin, and

diphenhydramine at the time of his death meant that he separately satisfied at least three of these categories, yet he was not housed in an air-conditioned cell when he died.

110.    TDCJ and UTMB knew of each inmate's diagnoses and medications.

111.    In the years after the Pack Unit settlement, TDCJ (with TBCJ's knowledge and assent), UTMB, Collier, Linthicum, and Murray created a computer algorithm that assigned prisoners "heat scores," which they publicly claimed would identify the prisoners most at-risk of heat-related illness and injury to prioritize these prisoners for placement in air conditioning. This public claim was false.

112.    TDCJ, UTMB, Collier, Linthicum, and Murray, along with UTMB's Dr. Jane Leonardson who helped create the algorithm, deliberately limited the algorithm so that it would identify only a relatively small number of prisoners as being at a heightened risk of heat-related illness and injury, instead of actually creating a tool to estimate the relative risk of heat illness across the prisoner population.

113.    When the "heat score" algorithm was first developed in 2018, TDCJ had approximately 33,000 air-conditioned beds—capacity to house inmates—across the prison system.

114.    Nonetheless, TDCJ and UTMB, with the knowing approval of TBCJ, Collier, Linthicum, and Murray, and with the help of Dr. Leonardson, ensured that TDCJ's heat score algorithm would not identify more than 12,000 prisoners as at-risk of heat-related illness and injury.

115.    In March 2025, Judge Pitman found what TDCJ, UTMB, TBCJ, Collier, Linthicum, Murry, and Leonardson already knew: that TDCJ's heat score system was arbitrary, inadequate, and ineffective.

116.    Though TDCJ claimed in 2023 that it had increased the number of air-conditioned beds to 42,500, or approximately 9,500 more available beds than it had in 2018, TDCJ and UTMB

made only minimal changes to the heat score algorithm as the number of air-conditioned beds increased, meaning that in 2023, it still identified only around 12,000 prisoners for priority placement into air-conditioning.

117.    UTMB and Murray had the ability between 2018 and 2023 to recommend and decide jointly with TDCJ on further changes to actually approach some semblance of comparing the relative risk of TDCJ prisoners to heat-related illness or injury, yet did not recommend or attempt to implement widespread changes to the "heat sensitivity score" algorithm that UTMB and Murray knew would be necessary to even attempt to align the algorithm's results with its alleged purpose and well-accepted medical science.

118.    Thus, even as TDCJ added additional capacity to house thousands more inmates in air-conditioned beds, TBCJ, TDCJ, UTMB, Collier, Linthicum, and Murray kept the same constrained "heat score" system so that the new capacity for cooled housing areas would not be allocated based on any semblance of medical need.

119.    TDCJ, TBCJ, UTMB, Collier, Linthicum, Murray, and Leonardson not only knew that the "heat score" algorithm was inherently under-inclusive, but also they knew before Mr. Skinner, Ms. Hagerty, and Mr. Southards died that the algorithm was wildly arbitrary such that the 12,000 prisoners with non-zero heat scores were not necessarily the ones most at risk of heat-related illness or injury. Moreover, they further knew that many air-conditioned beds were vacant or occupied by inmates who did not have a medical need as high as inmates housed in the heat such as Mr. Skinner, Ms. Hagerty, and Mr. Southards.

120.    The "heat score" algorithm relies upon ICD codes in prisoners' electronic medical records to calculate the "heat score." ICD codes are alphanumeric sequences in the International Classification of Diseases, a system for medical classification maintained by the World Health Organization. In the American health care system, ICD codes are used to guide insurance coverage,

supervise hospital care, report causes of death to the CDC, and coordinate across different health care systems. As none of these purposes is relevant to day-to-day care for TDCJ prisoners at the unit level, UTMB providers who worked from TDCJ prison infirmaries frequently did not carefully or thoroughly select ICD codes for their diagnoses, including in 2023 and the preceding years.

121.    In addition, UTMB did not inform its treating medical providers which ICD codes were associated with the heat score algorithm, preventing treating medical providers who believed their prisoner patient needed to be housed in air-conditioning from ensuring they correctly documented that prisoner's necessary ICD codes for this opaque purpose.

122.    This "heat score" algorithm allowed the agencies to misleadingly tell the public that every prisoner with a heat score was housed in air-conditioning, rather than confronting the reality that many prisoners known to be sensitive to the heat due to disabilities and medical conditions beyond their control and/or the medications necessary to treat those disabilities and conditions would not be housed in air-conditioning, like Mr. Southards, Ms. Hagerty, and Mr. Skinner.

123.    Though TDCJ, TBCJ, UTMB, Collier, Murray, and Linthicum knew, even before the Pack Unit Settlement, that prisoners with mental illness, hypertension, asthma, and obesity as well as those taking antipsychotic medications, anticholinergic medications, and certain medications for hypertension were among those at significantly elevated risk of heat-related illness and injury, they did not ensure that prisoners who met these criteria were assigned heat scores. Accordingly, when each of them died, TDCJ and UTMB had assigned Mr. Southards, Ms. Hagerty, and Mr. Skinner a heat score of zero.

124.    After Mr. Southards, Ms. Hagerty, and Mr. Skinner died, Dr. Leonardson testified in Austin, Texas that the TDCJ and UTMB policy on heat stress implemented in 2018 and reviewed before Mr. Southards, Ms. Hagerty, and Mr. Skinner's death in 2023 was "a lot more

inclusive than" the "heat score" algorithm and identifies more disabilities, medical conditions, and medications that create a heightened risk of heat-related illness or injury.

125.    In fact, under this policy, UTMB medical treatment providers were able to order reasonable accommodations for prisoners like Mr. Southards, Ms. Hagerty, and Mr. Skinner to reduce their exposure to heat while *working*. TDCJ and TBCJ had long alleged that they piggy-backed on these heat-related work restrictions as a proxy for inmates who needed "wellness checks," yet they deliberately did not use that heat restriction list for their new scoring system.

126.    Accordingly, UTMB medical treatment providers ordered work restrictions that Mr. Southards, Ms. Hagerty, and Mr. Skinner not work in direct sunlight, in temperature extremes, or in humidity extremes to reasonably accommodate each person's mental illness and prescriptions necessary to treat each person's medical conditions. Thus, Mr. Southards, Ms. Hagerty, and Mr. Skinner's respective UTMB medical providers ordered an additional reasonable accommodation that they not work in temperature extremes because of their medical conditions.

127.    In 2023, TDCJ, TBCJ, UTMB, Collier, Linthicum, and Murray prevented medical treatment providers from ordering that prisoners like Mr. Southards, Ms. Hagerty, and Mr. Skinner be *housed* in air-conditioned housing, even if doing so was a reasonable and necessary accommodation for their disabilities that made them more heat-sensitive or whose medically necessary treatment for their disabilities made them more heat-sensitive.

128.    Between 2018 and 2023, the vast majority of prisoners with disabilities, conditions, and medications making them vulnerable to the heat—even according to TDCJ and UTMB's own policies—including Mr. Southards, Ms. Hagerty, and Mr. Skinner, had a "heat score" of zero. This is true even though the 2018 settlement alone would have classified Mr. Southards, Ms. Hagerty, and Mr. Skinner and many other prisoners who received a zero "heat score" across TDCJ as heat-sensitive prisoners.

129.    Dr. Leonardson also testified in Austin that anticholinergics are "very drying medications and decrease your ability to sweat and cool yourself." Despite this, UTMB and TDCJ did not include anti-cholinergic prescriptions in the heat score algorithm, and the fact that Mr. Skinner, Mr. Southards, and Ms. Hagerty were prescribed anticholinergic medications did not increase their heat score.

130.    TDCJ, through Bryan Collier, misleadingly represented to the Texas House Appropriations Committee that the heat score is a "system where our medical providers have a scoring system based on … several factors: it can include age, weight, body mass, but it can also include any medications—lots of other factors that can make you heat sensitive" during a hearing in Austin, Texas on July 12, 2022.

131.    Collier did not tell the Texas Legislature that TDCJ had dictated the parameters of the scoring system, rather than allowing medical providers to assign a score or develop a scoring system based on medical need.

132.    Collier did not tell the Texas Legislature that TDCJ and UTMB had devised the heat score system to avoid giving a non-zero score to too many prisoners.

133.    Collier did not tell the Texas Legislature that every single one of the factors he listed in his testimony would still yield a heat score of zero in the absence of other co-occurring factors.

134.    Collier also publicly misrepresented the heat score policy on June 14, 2024, claiming that it was "determined by the agency's medical partners" even though he knew that he and TDCJ had simply dictated the parameters of the heat score to UTMB, who had obliged by using the parameters TDCJ requested.

135.    In 2022, TDCJ—including Bryan Collier and Lannette Linthicum—and UTMB—including Owen Murray—received an epidemiological study of the association between extreme

heat and mortality among inmates housed in Texas prisons with and without air conditioning. That study showed that the lack of air conditioning substantially increased the risk of death from extreme heat by approximately 0.7% for every degree the heat index exceeds 85º F. Thus, for the perennial extreme index of 105º F, for example, inmates had a 15% increased risk of death. For reference, a heat index of 105º F equates to an air temperature of just over 92º F at 60% humidity, which is a common humidity level in Gatesville, Texas during the summer where the Lane Murray Unit is located.

136. Based on the study which TDCJ, UTMB, Collier, Linthicum, and Murray received in 2022, an average of fourteen TDCJ inmates died from extreme heat every year between 2001 and 2019 due to their housing in non-air-conditioned prisons.

137. Also in 2022, TDCJ—including Bryan Collier and Lannette Linthicum—and UTMB—including Owen Murray—received another study that concluded that prisoners fall extremely ill or die from the heat inside non-air-conditioned prison housing areas. The study also found that TDCJ failed to consistently implement its "mitigation" measures including ice, cold showers, wellness checks, and respite areas.

138. The study also included survey results from Texas prisoners. 60% of respondents reported wellness checks were not being conducted by TDCJ staff. 11% of respondents reported no ice water was distributed to them by TDCJ staff.

139. Consistent with the survey result concerning wellness checks, in 2024, a mother called the prison where her son had been housed, asked for a wellness check, and was assured that her son was fine—though he had died in the sweltering heat of his un-air-conditioned cell two days earlier.

140. The study also highlighted survey results from disabled prisoners who reported even less access to TDCJ's so-called mitigation efforts than non-disabled prisoners including

prisoners who reported they were unable to stand or sit on the floor and so were denied access to the short-term air-conditioned "respite" areas as no chairs were allowed in the respite areas.

141.    In the years before Mr. Southards, Ms. Hagerty, and Mr. Skinner died and in June and July 2023, TDCJ's so-called heat mitigation efforts were so ineffective that inmates routinely spread toilet water across the floor of their living areas and laid in the filthy water to try and cool off.

142.    The practice of flooding or wetting the floors was widespread and known across the agencies to all Defendants, including on some occasions when TDCJ disciplined prisoners for using this method to try to cool off.

143.    In fact, Collier testified in Austin, Texas that he was aware of inmates' practice of wetting the floor to try to cool off.

144.    TDCJ's mitigation efforts were so ineffective in the years preceding 2023 and during 2023 that prisoners often engaged in self-harm in an effort to be transferred to inpatient psychiatric care—and thus air-conditioning. This practice, too, was widely known to all Defendants.

145.    In 2023, TDCJ inmates filed 5,202 Step One grievances related to the heat and 609 Step Two grievances.

146.    In ongoing litigation in Austin in 2024, TDCJ and Collier conceded that heat contributed to the death of 32-year-old John Castillo in his non-air-conditioned cell in the Hughes Unit on August 6, 2023. Mr. Castillo was found unresponsive and covered in sweat and vomit at 10:42 pm, his core body temperature was 107.5º F, and the cell was 94.4º F—hotter than the ambient temperature of 91º F outside. He had epilepsy, depression, and a urinary condition or disability and was taking oxybutynin (an anticholinergic), phenytoin (an anti-epileptic), and sertraline (an SSRI).

147.    Despite these disabilities, medical conditions, and medically necessary medications, each of which increased his risk of heat-related illness or injury, Mr. Castillo was not housed in air-conditioned housing, as TDCJ and UTMB had assigned him a "heat score" of zero.

148.    Though Mr. Castillo's cell had a fan in it when he died and he was noted to have gone to the water cooler 23 times in the 24 hours before his death, neither the fan nor the water prevented his death.

149.    Judge Pitman found credible evidence that Mr. Castillo would not have died if he had been in an air-conditioned cell.

150.    In ongoing litigation in Austin in 2024, TDCJ and Collier also conceded that heat contributed to the death of 50-year-old Patrick Womack in his non-air-conditioned cell in the Coffield Unit on August 21, 2023. Mr. Womack was found unresponsive around 1:44 pm with a core body temperature of 106.9º F in a cell with an indoor temperature of approximately 96.6º F. It had been hours since a security officer had conducted a wellness check or otherwise confirmed he was responsive. The delay was so extreme that he had started to develop rigor mortis when he was found.

151.    Mr. Womack had depression, psychosis, and a urinary condition or disability and was taking benztropine (an anticholinergic), haloperidol (an antipsychotic), sertraline (an SSRI), and terazosin (an anticholinergic).

152.    Mr. Womack's UTMB medical treatment providers had issued orders several years before his death that he not work in direct sunlight, temperature extremes, or humidity extremes to accommodate his psychiatric disability. Earlier that month he had been discharged from Skyview, one of TDCJ's air-conditioned psychiatric units.

153.    Despite his disabilities, medical conditions, and medically necessary medications, each of which increased his risk of heat-related illness or injury, Mr. Womack was not housed in air-conditioned housing as TDCJ and UTMB had assigned him a "heat score" of zero.

154.    The night before his death, TDCJ staff refused Mr. Womack's request to access a cold shower. Though bottles of water were present in his cell, they did not prevent his death.

155.    Judge Pitman found credible evidence that Mr. Womack would not have died if he had been housed in an air-conditioned cell.

156.    Another prisoner who died from the heat in TDCJ was 42-year-old Armando Gonzales, who also lived in the Hughes Unit. Ms. Gonzales was a transgender female who died on August 23, 2023 after she was found unresponsive, seizing, and covered in vomit on August 21, 2023 at about 10:00 pm. Her cell at the time she was found was between 97–100º F, and her core temperature was 109.4º F. Ms. Gonzales had Hepatic fibrosis, bipolar disorder, cirrhosis, and a history of substance abuse. She was taking several medications including aripiprazole (an antipsychotic), citalopram (an SSRI), spironolactone, and bupropion.

157.    Despite these disabilities, medical conditions, and medically necessary medications, each of which increased her risk of heat-related illness or injury, Ms. Gonzales was not housed in air-conditioned housing as TDCJ and UTMB had assigned her a "heat score" of zero.

158.    When she died, Ms. Gonzales's cell contained a fan and eleven bottles of water, none of which prevented her death.

159.    Judge Pitman found credible evidence that Ms. Gonzales would not have died if she had been housed in an air-conditioned cell.

160.    A year earlier, Corey Smith died from the heat in the TDCJ Hughes Unit on July 28, 2022. Ms. Smith was a transgender female who was found at 2:00 am with a core body

temperature of 107.6º F. She had a history of high cholesterol, asthma, and substance abuse; she was taking Benadryl (diphenhydramine, an anticholinergic and antihistamine) and spironolactone.

161.    Despite these disabilities, medical conditions, and medically necessary medications, each of which increased her risk of heat-related illness or injury, Ms. Smith was not housed in air-conditioned housing as TDCJ and UTMB had assigned her a "heat score" of zero.

162.    UTMB, TDCJ, TBCJ, Collier, Linthicum, Murray, Britt, England, Muniz, Dickerson, and Sanchez know and knew before 2023 that extreme heat above 90 degrees indoors is harmful medically and potentially lethal to prisoners suffering from disabilities that make them more heat sensitive or who take certain medications to treat these disabilities, including carbamazepine and anti-depressants. UTMB, TDCJ, TBCJ, Collier, Linthicum, Murray, Britt, England, Muniz, Dickerson, and Sanchez know and knew before 2023 that prisoners with these medical problems, including Mr. Southards, Ms. Hagerty, and Mr. Skinner, would be endangered when placed into brutally hot environments, like TDCJ's un-air-conditioned prisoner housing areas, yet continued a regime where prisoners with those medical conditions would be housed in dangerous extreme heat.

163.    Indeed, the fact that prisoners with mental illness and on medications used to treat mental illnesses like antipsychotics, SSRIs, SNRIs, and anticholinergics are at an increased risk of heat-related illness or injury was so well known to TDCJ and TBCJ in 1988 when they built Skyview, one of TDCJ's acute psychiatric treatment units, that it was built with air-conditioning. TDCJ likewise fully air-conditions its other acute psychiatric treatment units including the Scott Unit (formerly Jester IV) and the mental health units located within the Montford Unit. Yet the vast majority of TDCJ prisoners with mental illnesses or prescribed medications for mental illness that make them more heat-sensitive, like Mr. Southards, Ms. Hagerty, and Mr. Skinner, are not

housed on these units and are not required to be housed in air conditioning by TDCJ or UTMB policy.

164.    UTMB, TDCJ, TBCJ, Collier, Linthicum, Murray, Britt, England, Muniz, Dickerson, and Sanchez knew that these prisoners who were at heightened risk for heat-related illness or injury as a result of their disabilities or medications to treat their disabilities, like Mr. Southards, Ms. Hagerty, and Mr. Skinner, needed reasonable and necessary accommodations, namely, air-conditioned housing to mitigate the increased risk posed to these prisoners by their disabilities.

165.    UTMB, TDCJ, TBCJ, Collier, Linthicum, Murray, Britt, England, Muniz, Dickerson, and Sanchez knew before 2023 that denying prisoners with disabilities that made them more heat-sensitive reasonable accommodations like air-conditioned housing and frequent wellness checks caused those prisoners to suffer more pain and punishment than non-disabled prisoners.

166.    UTMB, TDCJ, TBCJ, Collier, Linthicum, Murray, Britt, England, Muniz, Dickerson, and Sanchez knew before 2023 that the "heat score" policy, which excluded prisoners such as Mr. Southards, Ms. Hagerty, and Mr. Skinner—and Ms. Gonzales, Mr. Womack, Mr. Castillo, and Ms. Smith—was inadequate to identify prisoners whose disabilities, medical conditions, and medications heightened their risk of heat-related illness. Indeed, it would have also excluded many prior decedents such as Kenneth James, Kelly Marcus, Larry McCollum, Michael Martone, and Douglas Hudson.

167.    UTMB, TDCJ, TBCJ, Collier, Linthicum, and Murray were fully capable before 2023 of creating an accurate, more inclusive heat score system that correctly identified more prisoners who were at higher risk of death and serious illness from the heat as a result of their

disabilities and medications to treat their disabilities, such as Mr. Southards, Ms. Hagerty, and Mr. Skinner, but chose not to.

168.    UTMB, TDCJ, TBCJ, Collier, Linthicum, and Murray were also fully capable before 2023 of implementing a medical restriction policy that permitted medical treatment providers to assess individual prisoners for heat sensitivity and order them placed in air-conditioned housing as a reasonable accommodation for their disabilities. UTMB, TDCJ, and TBCJ, including Collier, Linthicum, and Murray, not only chose not to do so but chose to implement a policy that affirmatively prevented medical treatment providers from providing these reasonable and necessary accommodations to prisoners with disabilities, like Mr. Southards, Ms. Hagerty, and Mr. Skinner.

169.    UTMB, operating under a policy developed by and maintained together with the agreement of TDCJ, TBCJ, UTMB, Collier, Linthicum, and Murray before 2023, makes medical housing recommendations to TDCJ for some prisoners with disabilities. For instance, a prisoner using a wheelchair could have a housing restriction recommended by a UTMB doctor that they not be assigned to a top bunk. But UTMB and TDCJ policies, approved by TBCJ, Collier, Linthicum, and Murray, intentionally do not contemplate special housing for prisoners with heat-sensitive disabilities. Rather, they intentionally deny medical providers the option of requiring this reasonable accommodation to prisoners with heat-sensitive disabilities.

170.    Similarly, UTMB, TDCJ, TBCJ, Collier, Linthicum, and Murray have formulated and maintained work policies designed to minimize possible heat exhaustion and heat stroke among inmates performing forced labor. UTMB treatment providers can order—and did order in the cases of Mr. Southards, Mr. Womack, Ms. Gonzales, Mr. Skinner, and, on information and belief, Ms. Hagerty—that prisoners not work in direct sunlight, temperature extremes, or humidity

extremes as reasonable accommodations for their disabilities and medications that made them more heat-sensitive.

171.    In contrast to the work policies and the housing polices for non-heat-related medical restrictions, prison physicians in 2023 were able to move a person to air conditioning only if the inmate needed to be hospitalized, whereas the vast majority of air-conditioned beds were assigned based on the discretion of TDCJ security officials or the intentionally underinclusive and inaccurate heat score algorithm. This is still the case.

172.    UTMB, TDCJ, TBCJ, Collier, Linthicum, and Murray on numerous occasions before 2023 contemplated but rejected adding the option for treating physicians to recommend their patients be housed in air conditioning.

173.    As a direct and proximate result of TDCJ, TBCJ, UTMB, Collier, Linthicum, and Murray's policy decisions, although Mr. Southards, Ms. Hagerty, and Mr. Skinner's treating medical providers knew that each was susceptible to the heat, they could only provide them "no temperature extremes," "no humidity extremes," and "no direct sunlight" *work assignment* restrictions to reasonably accommodate their disabilities. They were prohibited by the agencies' policies from ordering or even recommending that each prisoner be provided a reasonable accommodation of not being housed in temperature extremes, like the un-air-conditioned cells in the Estelle, Lane Murray, and Wainwright Units in which each of them died.

174.    TDCJ and UTMB staff were widely aware that the "heat score" system was deliberately underinclusive. Obviously UTMB staff knew the scoring system was incomplete because they could see their patients whose disabilities made them obviously vulnerable to the heat were not being accommodated and were being housed in un-air-conditioned cells. While TDCJ staff outside of health services do not typically see inmates' exact medical diagnoses, TDCJ security supervisors who are responsible for inmate housing assignments including Muniz,

England, Britt, Dickerson, and Sanchez in June and July 2023 could see that inmates such as Mr. Southards, Ms. Hagerty, and Mr. Skinner were routinely excluded from the heat score list even though they received heat-related reasonable accommodations for their work assignments and were on the heat restriction list that was nominally supposed to be used for wellness checks.

175.    Notably, TDCJ, with Collier's authorization, has detailed policies that require TDCJ to house pigs in safer and more humane temperatures than prisoners. More specifically, TDCJ policy requires the pigs live in a "comfortable environment with ventilation. Animals shall never be handled or housed in a manner that does not provide these essentials." Misters cool the pigs when the temperature goes above 74 degrees to keep the pigs "comfortable." And TDCJ policy requires temperatures be kept no higher than 85 degrees to ensure "pig comfort." TDCJ policies even establish an "upper critical limit" for pigs at 95 degrees because temperatures above 95, according to TDCJ policies, negatively affect pigs "health," and "some form of cooling" is required above this "critical limit."

176.    Tellingly, TDCJ has no similar policy to protect humans in its custody, not even those whose disabilities make them more heat-sensitive.

177.    TDCJ, TBCJ, and UTMB policies specifically acknowledge certain medical conditions like cardiovascular disease, asthma, and psychiatric conditions negatively affect heat tolerance, as do psychotropic medications and anticholinergic medications, to name a few.

178.    Though many TDCJ prisoners are young and healthy enough to likely survive in the inhumane conditions inherent in un-air-conditioned cells (though they still likely experience suffering while doing so), Defendants know that prisoners with these identified medical conditions and other disabilities that affect their heat tolerance are at heightened risk of death from heat.

179.    In fact, before 2023, TDCJ also advised its employees, including but not limited to Aigbokhan and Walker, that an increased risk of heat stroke occurs when people "are in poor

physical condition" or "use certain medications," including diuretics and psychotropics.

180.    TDCJ, TBCJ, UTMB, Collier, Linthicum, Murray, Britt, Muniz, England, Sanchez, and Dickerson know and knew before 2023 that prisoners in TDCJ custody are afflicted with disabilities that make them more heat-sensitive, suffer more in TDCJ's prisons than non-disabled prisoners because of their disabilities in the extreme temperatures every summer, and are at increased risk of heat-related injury.

181.    In contrast to TDCJ facilities, Texas county jails are required by law to keep indoor temperatures between 65 and 85 degrees. *See* 37 TEX. ADMIN. CODE §§ 259.160, 260.154, 261.255. TDCJ has no such protections for its prisoners, though TBCJ has the authority to promulgate similar rules for TDCJ.

182.    Collier testified in Austin, Texas that it is feasible to install additional air conditioning in TDCJ facilities and that doing so would significantly reduce prisoner illness and injury.

183.    Indeed, in 2021, TDCJ rapidly installed air conditioning in a few of its prisons over the course of a matter of months—but not to protect TDCJ's most heat-sensitive prisoners. Instead, that air conditioning was used for pretrial detainees who were ordered by the governor to be transferred into TDCJ custody because they were allegedly undocumented immigrants. Because they were pretrial detainees, TDCJ was required to bring the prison units housing these detainees within compliance of the Texas jail regulations requiring temperatures be kept between 65 and 85 degrees.

184.    Judge Pitman found that air conditioning is the only effective protective measure from extreme heat inside of TDCJ prisons—and the least restrictive means to address the substantial risk of serious harm it poses to TDCJ inmates.

B. **Heat caused Jon Southards' death on June 28, 2023.**

185.  Mr. Southards was assigned to live in the Estelle Unit beginning on June 21, 2023.

186.  Beginning in May, and reaching a fever pitch in the weeks before Mr. Southards was transferred to Estelle, the United States National Weather Service (NWS) and countless news sources repeatedly warned of an impending and then ongoing, record-breaking heat wave affecting most of Texas—including Huntsville where the Estelle Unit was located—that summer.

187.  The predicted heat wave arrived at Estelle several days before Mr. Southards.

188.  The Electric Reliability Council of Texas (ERCOT) issued an official warning about the heat on June 13, 2023.

189.  NWS issued a series of formal heat-related warnings for the Huntsville, Texas area beginning on June 14, 2023 which remained in place continuously through the day of Mr. Southards' death and beyond.

190.  Despite UTMB, TDCJ, and TBCJ, including Collier, Linthicum, Murray, Britt, and Dickerson, learning of the upcoming and then ongoing heat wave before Mr. Southards even arrived at Estelle, TDCJ and UTMB did nothing different in light of this information.

191.  Lower-level officers, including Officer Aigbokhan, were also aware of the heat wave because they were living through it. Officers responsible for providing mitigation measures including respite, cold showers, and ice water, such as Officer Aigbokhan, knew that Mr. Southards was particularly vulnerable during this heat wave because during shift turnout every day they received the wellness check list and the heat restriction list which included Mr. Southards' name as an inmate particularly vulnerable to the ongoing heat wave.

192.    Despite this, throughout the week before he died on June 28, 2023, TDCJ security staff, including Officer Aigbokhan, denied Mr. Southards access to the Estelle Unit's air-

conditioned areas—notwithstanding TDCJ's alleged "respite" program—and cool showers which would have, at least temporarily, provided him a brief reprieve from the brutal heat in his cell.

193.    Instead, Mr. Southards' only ways to try to feel cooler were to soak his sheet in toilet water and lay on it and to drink water.

194.    Every day that he was housed at Estelle, Mr. Southards was hot, felt unsafe, and was actually unsafe due to the extreme heat.

195.    Mr. Southards believed that many of the other inmates housed with him were frequently collapsing from the heat and not being treated.

196.    During his week at Estelle, Mr. Southards requested cool water verbally as well as in writing, but was frequently denied it by TDCJ officers including Officer Aigbokhan.

197.    On the day of Mr. Southards' death, though TDCJ security officers, including Officer Aigbokhan, were required to conduct periodic wellness checks and observe all prisoners every thirty minutes, they did not do so. Instead, they came by only a few times and, on information and belief, falsified their rounds documentation to indicate they came by every thirty minutes. As Mr. Southards was locked inside his single-cell cell for the entire day, these few security officer rounds were Mr. Southards' only opportunities to request or receive fresh water.

198.    When Mr. Southards ran out of water between security rounds, he was forced to choose between drinking nothing, drinking hot water from his sink, or drinking cooler water from his toilet. In an attempt to obtain a reprieve from the heat, Mr. Southards drank water from his toilet.

199.    Around 1:20 p.m. on June 28, 2023, the date of his death, a UTMB LPC conducted a mental health assessment on Mr. Southards who reported no plan for suicide or self-injury and that Mr. Southards was hopeful about the future.

200.    Later that same afternoon, Mr. Southards talked to his mother and made plans to call her the following day.

201.    On the afternoon Mr. Southards died, he begged Officer Aigbokhan for water as he passed by Mr. Southards' cell.

202.    On June 28, 2023, a TDCJ officer, believed to be Officer Aigbokhan, taunted Mr. Southards by placing cold water on the ground outside his cell door so that he could see it, but not reach it.

203.    TDCJ staff including Officer Aigbokhan knew that Mr. Southards was on the heat restriction list and thus particularly susceptible to injury from the heat, so they knew that denying him cold water put him in danger due to his disabilities, but intentionally withheld cold water from him nonetheless.

204.    When Officer Aigbokhan finally gave him water, Mr. Southards asked about a shower, which prompted Officer Aigbokhan to laugh and walk away.

205.    On information and belief, Officer Aigbokhan measured the ambient heat index inside Mr. Southards cellblock as over 120° F.

206.    The high temperature outdoors in Huntsville that day was 97º F, with a maximum outdoor heat index of 108.5º F.

207.    Officer Aigbokhan last checked on Mr. Southards sometime between 8 and 9 p.m. Officer Aigbokhan failed to check on Mr. Southards for over an hour and forty minutes after that, despite still being responsible for checking the area and performing wellness checks on Mr. Southards. The next round was not conducted until around 11 p.m., twenty minutes after a new officer assumed Officer Aigbokhan's duties, at which time that new officer found Mr. Southards unresponsive.

208.    Though Mr. Southards was covered in a heat rash, housed in an un-air-conditioned cell, sweating profusely, felt hot to the touch, and appeared to be suffering from a heat-related illness or injury, UTMB medical staff did not take Mr. Southards' temperature, consistent with TDCJ and UTMB policies and practices to intentionally sabotage treatment in order to cover up the occurrence of heat-related illness.

209.    Mr. Southards was declared dead on June 28, 2023 at 11:58 p.m. He was only 36 years-old.

210.    Throughout the day and during his death, Mr. Southards experienced excruciating conscious pain and suffering from the heat which ultimately kill him.

211.    When TDCJ finally measured the ambient temperature in his cell at 3 a.m. on June 29, 2023, the indoor heat index was still 96.2° F—hotter than outdoors, which was "only" 90.8º F by that hour.

212.    Though UTMB determined Mr. Southards' death an accident, wrongly attributing his death to a non-lethal dose of his prescribed diphenhydramine, TDCJ's OIG inexplicably documented Mr. Southards died by suicide. On information and belief, TDCJ changed Mr. Southards' death from an accidental death to death by suicide to hide or minimize the fact that heat caused Mr. Southard's death.

213.    Two doctors—one emergency room physician well-versed in treating heat stroke and one medical examiner who worked in hot climates—reviewed Mr. Southards' death and concluded that Mr. Southards died from the heat in his cell on June 28, 2023. Both concluded that Mr. Southards would not have died if he had been housed in an air-conditioned cell.

214.    Based on his clinical history, toxicology, and evidence from his autopsy, Mr. Southards' death was caused by the high indoor temperatures in his housing area at the Estelle Unit.

215.    Judge Pitman found credible evidence that Mr. Southards would not have died if he had been housed in an air-conditioned cell.

**C. Heat caused Elizabeth Hagerty's death on June 30, 2023.**

216.  Despite her medical susceptibility to the heat, Ms. Hagerty was assigned to live in a non-air-conditioned cell at the Lane Murray Unit from at least June 19, 2023 until her death on June 30, 2023.

217.  In May, the same predicted heat wave was expected to strike Gatesville.

218.  The predicted heat wave arrived at Lane Murray on June 14, 2023.

219.  NWS issued formal heat warnings for the Gatesville, Texas area one after another from June 14, 2023 through the date of Ms. Hagerty's death on June 30, 2023.

220.  Despite UTMB, TDCJ, and TBCJ, including Collier, Linthicum, Murray, England, and Sanchez, learning of the upcoming and then ongoing heat wave for weeks before Ms. Hagerty's death, TDCJ and UTMB did nothing different in light of this information.

221.    On information and belief, TDCJ staff knew that Ms. Hagerty was on the heat restriction list and thus particularly susceptible to injury from the heat.

222.    On June 23, 2023, Ms. Hagerty complained of a heat rash and was seen by UTMB medical staff, but other than work restrictions keeping her indoors and out of the boiler room, they were not empowered to keep Ms. Hagerty out of the heat inside the facility. Ms. Hagerty remained assigned to work in the un-air-conditioned prison kitchen.

223.  The high temperature outdoors in Gatesville during the day on June 29, 2023 was 100º F, with a maximum outdoor heat index of over 101.7º F.

224.    Shortly after midnight on June 30, 2023, Ms. Hagerty was found unresponsive in her un-air-conditioned cell.

225.    The temperature inside of Ms. Hagerty's cell was 95.7º F, even though the outdoor temperature had cooled to 82º F.

226.    Ms. Hagerty was declared dead on July 30, 2023 at 12:48 a.m. She was only 37 years-old, with an expected release date of August 2, 2023 and due to complete her sentence on January 4, 2025.

227.    Throughout the day and during her death, Ms. Hagerty experienced excruciating conscious pain and suffering from the heat which ultimately kill her.

228.    In ongoing litigation in 2024, TDCJ conceded that the heat contributed to Ms. Hagerty's death.

229.    Based on her clinical history, toxicology, and evidence from her autopsy, Ms. Hagerty's death was caused by the high indoor temperatures in her housing area at the Lane Murray Unit.

230.    Judge Pitman found credible evidence that Ms. Hagerty would not have died if she had been housed in an air-conditioned cell.

231.    Ms. Hagerty was expected to be released from confinement on August 2, 2023—just over a month after her avoidable death.

D.  **Heat caused John Skinner's death on July 30, 2023.**

232.  Mr. Skinner again requested that UTMB house him in air conditioning due to concern for his health and safety in light of his heat-related work restrictions on May 22, 2023.

233.  On May 25, 2023, Mr. Skinner's medical provider told him they did not have the authority to oversee or otherwise affect his housing in air-conditioned cells, and that he would need to follow up with security, which he did.

234.  Nonetheless, Mr. Skinner was assigned to live in a non-air-conditioned cell at the Wainwright Unit beginning on June 12, 2023.

235.   As discussed above, the predicted 2023 heat wave arrived at Wainwright just a couple days after Mr. Skinner.

236.   During the 48 days Mr. Skinner lived at Wainwright, NWS issued twelve formal heat-related warnings for the Huntsville, Texas area—covering 30 of the 48 days he was living there, including the day he died, July 30, 2023.

237.   Despite UTMB, TDCJ, and TBCJ, including Collier, Linthicum, Murray, Muniz, and Dickerson, learning of the upcoming and then ongoing heat wave during Mr. Skinner's time at Wainwright, TDCJ and UTMB did nothing different in light of this information.

238.   Lower-level officers, including Officer Walker, were also aware of the heat wave because they were living through it. Officers responsible for providing mitigation measures including respite, old showers, and ice water, such as Officer Walker, knew that Mr. Skinner was particularly vulnerable during this heat wave because during shift turnout every day they received the wellness check list and the heat restriction list which included Mr. Skinner's name as an inmate particularly vulnerable to the ongoing heat wave.

239.   Despite this, TDCJ security staff including Officer Walker denied Mr. Skinner access to the Wainwright Unit's air-conditioned areas—notwithstanding TDCJ's alleged "respite" program—and cool showers which would have, at least temporarily, provided him a brief reprieve from the brutal heat in his cell.

240.   On the day of Mr. Skinner's death, though TDCJ security officers including Officer Walker were nominally required by policy to conduct periodic wellness checks and observe all prisoners every thirty minutes and pay particular attention to Mr. Skinner due to his presence on the heat restriction list, they did not do so.

241.   Officer Walker was the officer with responsibility for patrolling Mr. Skinner's housing area in the evening on July 30, 2023

242.    TDCJ security staff, including Officer Walker, further refused Mr. Skinner's repeated requests for water on the day of his death.

243.    TDCJ staff, including Officer Walker, knew that Mr. Skinner was on the heat restriction list and thus particularly susceptible to injury from the heat.

244.  The high temperature outdoors in Huntsville that day was 105º F, with a maximum outdoor heat index of over 107.6º F.

245.    At 7:56 pm, Mr. Skinner rolled from his bed onto his knees, in agony, then collapsed to the ground from the heat.

246.    The heat index outside was 100.7º F at the time Mr. Skinner collapsed.

247.    It was likely hotter inside Mr. Skinner's cell.

248.    Officer Walker did not conduct wellness checks every thirty minutes or even patrol the housing area where Mr. Skinner had collapsed for hours. Officer Walker had not done a patrol since 7:00 pm.

249.    Because wellness checks and even basic security rounds were not being properly conducted, no TDCJ staff noticed Mr. Skinner had collapsed until Officer Walker finally returned and saw Mr. Skinner had collapsed at 9:39 pm, causing a delay in the arrival of off-site EMS. By the time EMS finally took over care at 10:25 pm, it was too late.

250.    Mr. Skinner was declared dead on July 30, 2023 at 10:30 p.m. He was only 45 years-old.

251.    Throughout the day and during his death, Mr. Skinner experienced excruciating conscious pain and suffering from the heat which ultimately kill him.

252.    Based on his clinical history, toxicology, and evidence from his autopsy, Mr. Skinner's death was caused by the high indoor temperatures in his housing area at the Wainwright Unit.

### E. Jon Southards was a qualified person with disabilities who suffered more pain and punishment than non-disabled prisoners.

*1. Depression*

253.    Mr. Southards' depression was a chronic mental illness. Mr. Southards, like most people with depression, experienced irregular sleep patterns, loss of appetite, fatigue, feelings of worthlessness, irritability, persistent headaches, thoughts of suicide, and problems concentrating. Mr. Southards' depression was a physiological condition affecting his major bodily systems, including his brain.

254.    Mr. Southards' depression impaired his ability to self-regulate his temperature and take care of himself, such as by diminishing his awareness of thirst and his ability to seek out water to quench it.

255.    Mr. Southards' depression substantially limited his ability to think, concentrate, and sleep, and limited the operation of his brain.

256.    In addition, to treat his depression, UTMB prescribed Mr. Southards duloxetine. Duloxetine is a selective serotonin and norepinephrine reuptake inhibitor (SNRI) medication which is known to impair the ability to thermoregulate. SNRIs can and do dehydrate prisoners receiving them more quickly than prisoners who do not take them. Thus, this medicine that Mr. Southards needed to accommodate his depression also increased his risk of serious harm and death from the heat.

257.    In addition to duloxetine, Mr. Southards was prescribed carbamazepine as a mood stabilizer due to his depression and other psychiatric ailments. Carbamazepine is known to reduce a person's ability to tolerate heat and impair a person's ability to thermoregulate. A person taking carbamazepine is more likely to suffer dizziness, weakness, and syncope when exposed to environmental heat. Thus, this medicine that Mr. Southards needed to accommodate his depression and other psychiatric ailments also increased his risk of serious harm and death from the heat.

258.    To reasonably accommodate his depression and related increased heat-sensitivity, in July 2019, his UTMB treating providers ordered work restrictions for Mr. Southards, preventing TDCJ from assigning him work assignments in direct sunlight, temperature extremes, and humidity extremes. TDCJ and UTMB policy, approved and enacted by TBCJ, Collier, Linthicum, and Murray, as discussed above, prevented his treating providers from ordering that he be housed in air-conditioning, though this was a reasonable, necessary, and obvious accommodation for his depression.

259.    TDCJ, TBCJ, and UTMB including their agents Collier, Linthicum, and Murray, knew before Mr. Southards died that at least ten other prisoners with depression or prescribed antidepressant medication had died as a result of indoor heat inside TDCJ. At least four others, not including Mr. Southards, died during the summer of 2023.

260.    TDCJ, TBCJ, and UTMB including their agents Collier, Linthicum, and Murray, knew before Mr. Southards died that at least two other prisoners had died from environmental heat while prescribed carbamazepine, and that carbamazepine was listed in the subclass for the Pack Unit litigation settlement due to the risk posed by housing prisoners taking that medication in the heat.

261.    Thus, TDCJ, TBCJ, and UTMB including their agents Collier, Linthicum, and Murray, knew that intentionally placing Mr. Southards in hot living conditions exposed him to a substantial risk of serious harm due to his disability of depression.

262.    On top of suffering an increased risk of overt heat-related illness and death, the heat aggravated his depression so that Mr. Southards experienced more misery, fatigue, and apathy than an average person without his disability when exposed to the same conditions.

263.    In fact, on June 5, 2023, his UTMB treating provider ordered him placed on the waitlist for the Skyview Unit for increased suicidality. Between June 13–16, 2023, Mr. Southards

received inpatient psychiatric care at the air-conditioned Skyview Unit.

264.    TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, were well aware of heat's role in aggravating mental illnesses such as depression.

*2. Psychosis*

265.    Mr. Southards' psychosis, which was diagnosed as a schizoaffective disorder, was a chronic mental illness that caused him to experience recurring impaired judgment, hallucinations, and delusions. Mr. Southards' perception of reality was recurrently impaired by his psychosis.

266.    Mr. Southards' psychosis was a physiological condition affecting his major bodily systems, including his brain. It also impaired his ability to thermoregulate by undermining his self-awareness and decision-making, such as by making him less aware of his thirst and the option to drink water to quench his thirst.

267.    Mr. Southards' psychosis substantially limited his ability to think, concentrate, and sleep, and limited the operation of his brain.

268.    Mr. Southards was prescribed haloperidol for his psychosis.

269.    TDCJ, TBCJ, and UTMB policy, which Collier, Linthicum, and Murray were aware of and approved before 2023, recognizes that antipsychotics, including haloperidol, are associated with heat stress and "inmates on antipsychotic drugs should not be allowed to work or recreate in environments where the apparent air temperature is 95º F or higher." This is because antipsychotics like haloperidol interfere with the brain's function in thermoregulation, reducing autonomic responses to heat such as increased blood flow to the skin and sweating that normally help a person's body cool itself. Haloperidol was necessary to accommodate Mr. Southards' psychosis, but it impaired his body's ability to regulate his internal temperatures.

270.    UTMB also prescribed Mr. Southards diphenhydramine in part due to the side effects of haloperidol (as well as other disabilities).

271.    TDCJ, TBCJ, and UTMB policy, which Collier, Linthicum, and Murray were aware of and approved before 2023, recognizes patients taking antihistamines and anticholinergics, including specifically the diphenhydramine that Mr. Southards was prescribed, as "associated with heat stress." Diphenhydramine was necessary to accommodate Mr. Southards' disabilities, but it impaired his body's ability to regulate his internal temperature in extreme heat by reducing his ability to sweat.

272.    To reasonably accommodate his psychosis and related increased heat-sensitivity, in July 2019, his UTMB treating providers ordered work restrictions for Mr. Southards, preventing TDCJ from assigning him work assignments in direct sunlight, temperature extremes, and humidity extremes. They were prevented from ordering that he be housed in air-conditioning, though this was a reasonable, necessary, and obvious accommodation for his chronic psychiatric disability.

273.    TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that at least sixteen prisoners had died before 2023 from the heat with diagnoses consistent with psychosis (like schizophrenia or schizoaffective disorder) or while prescribed similar psychotropic medications.

274.    TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that high heat conditions, like those found in TDCJ's un-air-conditioned cells, exacerbated symptoms of psychosis and led to increased symptoms of paranoia, hallucinations, and agitation which in turn further impaired prisoners suffering from psychosis like Mr. Southards from recognizing impending signs of heat-related illness and the need to drink water.

275.    Thus, TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that intentionally placing Mr. Southards in hot living conditions exposed him to a

substantial risk of serious harm due to his disability of psychosis and his prescribed haloperidol and diphenhydramine compared to average prisoners without those disabilities.

276.    On top of suffering an increased risk of overt heat-related illness and death, the heat aggravated his psychosis so that Mr. Southards experienced more delusions and distorted judgment than an average person without his disability when exposed to the same conditions.

277.    TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, were well aware of heat's role in aggravating psychosis.

*3. Asthma*

278.    Mr. Southards' asthma was a chronic physical illness that caused his airways to become inflamed, narrow, swell, and produce extra mucus, which in turn impaired his ability to breathe.

279.    Mr. Southards' asthma was exacerbated by prolonged exposure to heat.

280.    Mr. Southards had been prescribed an antihistamine, diphenhydramine, in part due to his asthma (and later his psychosis, discussed above, and possibly other disabilities).

281.    To reasonably accommodate his asthma and related increased heat-sensitivity, in July 2021, his UTMB treating providers ordered an additional work restriction for Mr. Southards, preventing TDCJ from assigning him work assignments in temperature extremes because of his asthma. UTMB and TDCJ policy, as discussed above, prevented his treating medical providers from ordering that he be housed in air-conditioning, though this was a reasonable, necessary, and obvious accommodation for his asthma.

282.    As discussed above, TDCJ, TBCJ, and UTMB policy, which Collier, Linthicum, and Murray were aware of and approved before 2023, recognizes patients taking antihistamines and anticholinergics, including specifically the diphenhydramine that Mr. Southards was prescribed, as "associated with heat stress." Diphenhydramine was necessary to accommodate Mr.

Southards' disabilities, but it impaired his body's ability to regulate his internal temperature in extreme heat by reducing his ability to sweat.

283.    TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that at least three other TDCJ inmates with asthma died from the heat inside TDCJ before 2023. These included Micah Burrell on August 1, 2004, Curtis Garland on June 23, 2014, and Quintero Jones on July 31, 2015. Two more prisoners with asthma died in 2023, not including Mr. Southards.

284.    Thus, TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that intentionally placing Mr. Southards in hot living conditions exposed him to a substantial risk of serious harm due to his disability of asthma.

285.    On top of suffering an increased risk of overt heat-related illness and death, the heat aggravated his asthma so that Mr. Southards experienced more difficulty breathing than an average person without his disability when exposed to the same conditions, which in turn caused him more pain, fatigue, and distress than non-disabled prisoners.

286.    TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, were well aware of heat's role in aggravating respiratory illnesses and asthma.

287.    Indeed, before 2023, Linthicum at least once personally demanded that her office air conditioner be fixed due to her own asthma.

*4.  Urinary disorder*

288.    Mr. Southards also suffered from a urinary disorder that limited his voluntary control of his bladder. This disability impaired the normal functioning of his genitourinary system.

289.    TDCJ and UTMB were aware of this disability as UTMB diagnosed Mr. Southards with it and prescribed oxybutynin.

290.    In the absence of oxybutynin, Mr. Southards' urinary disorder impaired his ability to control his urinary system compared to a non-disabled person, impairing his ability to care for himself.

291.    TDCJ, TBCJ, and UTMB policy, which Collier, Linthicum, and Murray were aware of and approved before 2023, recognizes that oxybutynin is a known anticholinergic medication which is associated with heat stress.

292.    Anticholinergics like oxybutynin also have specific warnings from the manufacturer to avoid excessive heat and dehydration printed on the medication information sheets, and both TDCJ and UTMB were aware of this warning.

293.    Anticholinergics like oxybutynin increase a patient's susceptibility to the heat by reducing their ability to sweat.

294.    Accordingly, although Mr. Southards needed oxybutynin due to his urinary disability, taking the medicine significantly increased his susceptibility to heat-related illness, as the oxybutynin impaired Mr. Southards' thermoregulation and ability to sweat compared to a non-disabled person.

295.    Thus, TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that intentionally placing Mr. Southards in hot living conditions exposed him to a substantial risk of serious harm due to his urinary disability because he needed his prescribed oxybutynin to accommodate that disability.

296.    TDCJ, TBCJ, and UTMB also knew that intentionally placing Southards in hot living conditions with an impaired ability to sweat, caused in part by his medically-necessary oxybutynin, would cause him to suffer more pain than non-disabled prisoners.

**F. Elizabeth Hagerty was a qualified person with disabilities who suffered more pain and punishment than non-disabled prisoners.**

*1. Mood disorder*

297.    Ms. Hagerty suffered from mood disorder, a chronic mental illness.

298.    Ms. Hagerty, like most people with mood disorder, experienced persistent fatigue, irregular appetite, irritability, persistent headaches, emotional lability, difficulty sleeping, and problems concentrating due to her mood disorder. Ms. Hagerty's mood disorder was a physiological condition affecting her major bodily systems, including her brain.

299.    Ms. Hagerty's mood disorder impaired her ability to self-regulate her temperature and take care of herself, such as by diminishing her awareness of thirst and her ability to seek out water to quench it.

300.    Ms. Hagerty's mood disorder substantially limited her ability to think, concentrate, and sleep, and limited the operation of her brain.

301.    In addition, to treat her mood disorder, UTMB prescribed Ms. Hagerty citalopram to treat her mood disorder. Citalopram is a selective serotonin reuptake inhibitor (SSRI). SSRIs can and do dehydrate prisoners receiving them more quickly than prisoners who do not take them. Thus, this medicine that Ms. Hagerty needed to accommodate her mood disorder also increased her risk of serious harm and death from the heat.

302.    In addition to citalopram, Ms. Hagerty was prescribed carbamazepine as a mood stabilizer due to her mood disorder. Carbamazepine is known to reduce a person's ability to tolerate heat and impair a person's ability to thermoregulate and to have anti-cholinergic effects. A person taking carbamazepine is more likely to suffer dizziness, weakness, and syncope when exposed to environmental heat. Thus, this medicine that Ms. Hagerty needed to accommodate her mood disorder also increased her risk of serious harm and death from the heat.

303.    To reasonably accommodate her mood disorder and related increased heat-

sensitivity, on information and belief, her UTMB treating providers ordered work restrictions for Ms. Hagerty, preventing TDCJ from assigning her work assignments in direct sunlight, temperature extremes, and humidity extremes. As discussed above, UTMB and TDCJ policy, which TBCJ, Collier, Linthicum, and Murray were aware of and approved before 2023, prevented Ms. Hagerty's medical providers from ordering that she be housed in air-conditioning, though this was a reasonable, necessary, and obvious accommodation for her mood disorder.

304.    TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew before Ms. Hagerty died that at least ten other prisoners prescribed antidepressant medication had died as a result of indoor heat inside TDCJ. At least four others, not including Ms. Hagerty, died during the summer of 2023.

305.    TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew before Ms. Hagerty died that at least two other prisoners had died from environmental heat while prescribed carbamazepine, and that carbamazepine was listed in the subclass for the Pack Unit litigation settlement due to the risk posed by housing prisoners taking that medication in the heat.

306.    Thus, TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that intentionally placing Ms. Hagerty in hot living conditions exposed her to a substantial risk of serious harm due to her disability of mood disorder.

307.    On top of suffering an increased risk of overt heat-related illness and death, the heat aggravated her mood disorder so that Ms. Hagerty experienced more misery, fatigue, and apathy than an average person without her disability when exposed to the same conditions.

308.    TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, were well aware of heat's role in aggravating mental illnesses such as Ms. Hagerty's mood disorder.

*2. Obesity*

309.    Ms. Hagerty was also overweight and clinically obese. She had previously been morbidly obese with a BMI over 40, but had been reducing her weight for several years when she died. At the time of her death, she was five feet tall and weighed over 185 pounds, so she had a BMI of 36.4.

310.    Due to Ms. Hagerty's obesity, she suffered difficulty walking, standing, performing manual tasks, lifting, breathing, and bending. Ms. Hagerty was substantially impaired in the performance of those major life activities compared to an average person due to her obesity.

311.    TDCJ and UTMB were aware of this disability as UTMB diagnosed Ms. Hagerty with obesity. Further, TDCJ and UTMB both knew Ms. Hagerty's height and weight.

312.    The Pack Unit transfer order specifically identified obese inmates as those more sensitive to the heat.

313.    TDCJ's settlement in the Pack Unit lawsuit specifically anticipated that obesity made prisoners more susceptible to injury in the hot conditions of TDCJ's non-air-conditioned prisons.

314.    TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that six inmates who died from the heat between 1998 and 2012 suffered from obesity, including three of those whose families settled wrongful death lawsuits with TDCJ and UTMB— Mr. McCollum, Mr. Martone, and Mr. Hinojosa.

315.    Thus, TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that intentionally placing Ms. Hagerty in hot living conditions exposed her to a substantial risk of serious harm due to her obesity.

316.    TDCJ, TBCJ, and UTMB also knew that intentionally placing Ms. Hagerty in hot living conditions would cause her to suffer more pain and be more likely to die from the heat than non-disabled prisoners.

*3. Diabetes*

317.    Ms. Hagerty also suffered from type 2 diabetes, which is a disease of the pancreas where not enough insulin is secreted. Insulin regulates the liver and other body systems' use of glucose. The result is that people with type 2 diabetes like Ms. Hagerty have abnormally high blood sugar in the absence of medical intervention. High blood sugar, in turn, damages a wide range of bodily systems and functions over time.

318.    As a consequence of Ms. Hagerty's diabetes, she had significant damage to her cardiovascular system. Ms. Hagerty's diabetes caused fatigue and impaired her ability to fight infections, sensations in her extremities, appetite, and urinary continence.

319.    Ms. Hagerty's diabetes thus substantially limited her ability to climb, walk, stand, cool, sweat, and breathe.

320.    Ms. Hagerty's diabetes impaired her major bodily systems, including her digestive and cardiovascular systems.

321.    Ms. Hagerty's diabetes also impaired her ability to self-regulate her temperature and endure extreme temperatures. One mechanism of enduring high temperatures is the body's natural vasodilation of blood vessels near the skin to promote cooling via sweating. Ms. Hagerty's diabetes impaired her blood vessels' lability and thus their ability to vasodilate. Ms. Hagerty's diabetes also damaged the nerves near the surface of her skin, causing them to respond more slowly or not at all to the heat and thus failing to trigger the vasodilation and sweat responses necessary for thermoregulation. These effects of Ms. Hagerty's diabetes caused her to have an impaired ability to cool her body and also posed more strain on her body when it attempted to endure high

temperatures, as other organ systems such as her heart and lungs had to work harder to attempt to accomplish necessary thermoregulation.

322.    TDCJ and UTMB were both aware of Ms. Hagerty's diabetes.

323.    TDCJ, TBCJ, and UTMB policy, which Collier, Linthicum, and Murray were aware of and approved before 2023, recognizes that diabetes is associated with heat stress.

324.    The Pack Unit transfer order specifically identified diabetic inmates as those more sensitive to the heat.

325.    TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that three inmates who died from the heat during 2011 and 2012 suffered from diabetes, all of whose families settled wrongful death lawsuits with TDCJ and UTMB—Mr. McCollum, Mr. Togonidze and Mr. Hinojosa.

326.    Thus, TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that intentionally placing Ms. Hagerty in hot living conditions exposed her to a substantial risk of serious harm due to her diabetes.

327.    TDCJ, TBCJ, and UTMB also knew that intentionally placing Ms. Hagerty in hot living conditions would cause her to suffer more pain and be more likely to die from the heat than non-disabled prisoners.

*4.  Hyperlipidemia*

328.    Ms. Hagerty also suffered from hyperlipidemia, a cardiovascular disease characterized by high blood cholesterol. Hyperlipidemia substantially impaired Ms. Hagerty's cardiovascular system, a major bodily system, compared to an average person and increased her risk of cardiovascular injuries such as heart attacks.

329.    TDCJ and UTMB were aware of this disability as UTMB diagnosed Ms. Hagerty with hyperlipidemia.

330.    Like most cardiovascular disease, hyperlipidemia reduced Ms. Hagerty's heat tolerance. The increased cholesterol in Ms. Hagerty's blood interfered with vasodilation, causing thermoregulation to place a greater strain on her cardiovascular system compared to an average person.

331.    In addition, when exposed to the heat, Ms. Hagerty was at increased risk of stroke compared to an average person due to her hyperlipidemia.

332.    TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that at least thirteen prisoners had died before 2023 from the indoor heat with diagnoses or prescriptions consistent with cardiovascular disease like Ms. Hagerty's hyperlipidemia.

333.    TDCJ, TBCJ, and UTMB knew that high heat conditions, like those found in TDCJ's un-air-conditioned cells, exacerbated the risk of heart attacks from hyperlipidemia.

334.    Thus, TDCJ and UTMB, including their agents Collier, Linthicum, and Murray, knew that intentionally placing Ms. Hagerty in hot living conditions exposed her to a substantial risk of serious harm from heat-related illness due to her disability of hyperlipidemia.

335.    On top of suffering an increased risk of overt heat-related illness and death, the heat aggravated her hyperlipidemia so that Ms. Hagerty experienced more risk of death from stroke than an average person without her disability when exposed to the same conditions.

336.    TDCJ, TBCJ, and UTMB also knew that intentionally placing Ms. Hagerty in hot living conditions with an impaired ability to vasodilate, caused in part by hyperlipidemia, would cause her to suffer more pain and risk of death than non-disabled prisoners.

*5. Asthma*

337.    Ms. Hagerty's asthma was a chronic physical illness that caused her airways to become inflamed, narrow, swell, and produce extra mucus, which in turn impaired her ability to breathe.

338.    Ms. Hagerty's asthma was exacerbated by prolonged exposure to heat.

339.    TDCJ and UTMB were aware of this disability as UTMB diagnosed Ms. Hagerty with asthma.

340.    As discussed above, TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, know that at least three other TDCJ inmates with asthma died from the heat inside TDCJ before 2023. These included Micah Burrell on August 1, 2004, Curtis Garland on June 23, 2014, and Quintero Jones on July 31, 2015. Two more prisoners with asthma died in 2023, not including Ms. Hagerty.

341.    As discussed above, TDCJ and UTMB, including their agents Collier, Linthicum, and Murray, were well aware of heat's role in aggravating respiratory illnesses and asthma.

342.    As discussed above, before 2023, Linthicum at least once personally demanded that her office air conditioner be fixed due to her own asthma.

343.    Thus, TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that intentionally placing Ms. Hagerty in hot living conditions exposed her to a substantial risk of serious harm due to her disability of asthma.

344.    On top of suffering an increased risk of overt heat-related illness and death, the heat was aggravated her asthma so that Ms. Hagerty experienced more difficulty breathing than an average person without her disability when exposed to the same conditions, which in turn caused her more pain, fatigue, and distress than non-disabled prisoners.

### G.  John Skinner was a qualified person with disabilities who suffered more pain and punishment than non-disabled prisoners.

*1.  Post-traumatic stress disorder*

345.    Mr. Skinner suffered from post-traumatic stress disorder (PTSD), a chronic mental illness.

346.    Mr. Skinner, like most people with PTSD, experienced persistent rumination,

intrusive thoughts, emotional lability, anxiety, difficulty sleeping, and problems concentrating due to his PTSD. Mr. Skinner's PTSD was a physiological condition affecting his major bodily systems, including his brain.

347.    Mr. Skinner's PTSD impaired his ability to self-regulate his temperature and take care of himself, such as by diminishing his awareness of thirst and his ability to seek out water to quench it.

348.    Mr. Skinner's PTSD substantially limited his ability to think, concentrate, and sleep, and limited the operation of his brain.

349.    In addition, to treat his PTSD, doctors had previously prescribed Mr. Skinner first- and second-generation antipsychotic medications. As a result of long-term use of those medications, Mr. Skinner suffered permanent, recurrent tremors. These tremors were a physiological condition which affected his major bodily symptoms, including his arms and legs. These tremors substantially limited Mr. Skinner's ability to control his arms and legs, to sit still, and to sleep.

350.    In the months leading up to his death, UTMB prescribed Mr. Skinner ziprasidone to treat his PTSD. Ziprasidone is an antipsychotic medication which is known to impair the ability to thermoregulate.

351.    TDCJ, TBCJ, and UTMB policy, which Collier, Murray, and Linthicum were aware of and approved before 2023, recognizes that antipsychotics, including ziprasidone, are associated with heat stress and "inmates on antipsychotic drugs should not be allowed to work or recreate in environments where the apparent air temperature is 95º F or higher." This is because antipsychotics like ziprasidone interfere with the brain's function in thermoregulation, reducing autonomic responses to heat such as increased blood flow to the skin and sweating that normally help a person cool itself. Ziprasidone was necessary to accommodate Mr. Skinner's PTSD, but it

impaired his body's ability to regulate his internal temperatures.

352.     UTMB also prescribed Mr. Skinner diphenhydramine in part due to the side effects of ziprasidone (as well as other disabilities).

353.     TDCJ, TBCJ, and UTMB policy, which Collier, Murray, and Linthicum were aware of and approved before 2023, recognizes patients taking antihistamines and anticholinergics, including specifically the diphenhydramine that Mr. Skinner was prescribed, as "associated with heat stress." Diphenhydramine was necessary to accommodate Mr. Skinner's disabilities, but it impaired his body's ability to regulate his internal temperature in extreme heat by reducing his ability to sweat.

354.     To reasonably accommodate his PTSD and related increased heat-sensitivity, dating back to 2015, his UTMB treating providers ordered work restrictions for Mr. Skinner, preventing TDCJ from assigning him work assignments in direct sunlight, temperature extremes, and humidity extremes. Mr. Skinner's treating providers were prevented from ordering that he be housed in air-conditioning, though this was a reasonable, necessary, and obvious accommodation for his chronic psychiatric disability.

355.     As discussed above, Mr. Skinner specifically requested that he be housed in air-conditioning, but his request was denied because his UTMB providers told him they did not have authority to assign him to a cool bed.

356.     TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that at least sixteen prisoners had died before 2023 from the heat with diagnoses consistent with psychosis-related ailments, like PTSD, or while prescribed similar psychotropic medications.

357.     TDCJ, TBCJ, and UTMB knew that high heat conditions, like those found in TDCJ's un-air-conditioned cells, exacerbated symptoms of PTSD and led to increased symptoms of persistent rumination, intrusive thoughts, emotional lability, anxiety, difficulty sleeping, and

problems concentrating which in turn further impaired prisoners suffering from PTSD from recognizing impending signs of heat-related illness and the need to drink water.

358.    Thus, TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that intentionally placing Mr. Skinner in hot living conditions exposed him to a substantial risk of serious harm due to his disability of PTSD and his prescribed ziprasidone and diphenhydramine compared to an average person without his disability when exposed to the same conditions.

359.    On top of suffering an increased risk of overt heat-related illness and death, the heat aggravated his PTSD so that Mr. Skinner experienced more flashbacks, rumination, anxiety, difficulty sleeping, and distorted judgment than an average person without his disability when exposed to the same conditions.

360.    TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, were well aware of heat's role in aggravating PTSD.

*2. Urinary disorder*

361.    Mr. Skinner also suffered from a urinary disorder that limited his voluntary control of his bladder. This disability impaired the normal functioning of his genitourinary system.

362.    TDCJ and UTMB were aware of this disability as UTMB diagnosed Mr. Skinner with it and prescribed oxybutynin.

363.    In the absence of oxybutynin, Mr. Skinner's urinary disorder impaired his ability to control his urinary system compared to a non-disabled person, impairing his ability to care for himself.

364.    TDCJ, TBCJ, and UTMB policy, which Collier, Murray, and Linthicum were aware of and approved before 2023, recognizes that oxybutynin is a known anticholinergic medication which is associated with heat stress.

365.    Anticholinergics like oxybutynin also have specific warnings from the manufacturer to avoid excessive heat and dehydration printed on the medication information sheets, and both TDCJ, TBCJ, and UTMB were each aware of this warning.

366.    Anticholinergics like oxybutynin increase a patient's susceptibility to the heat by reducing their ability to sweat.

367.    Accordingly, although Mr. Skinner needed oxybutynin due to his urinary disability, taking the medicine significantly increased his susceptibility to heat-related illness, as the oxybutynin impaired Mr. Skinner's thermoregulation and ability to sweat compared to a non-disabled person.

368.    Thus, TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that intentionally placing Mr. Skinner in hot living conditions exposed him to a substantial risk of serious harm due to his urinary disability because he needed his prescribed oxybutynin to accommodate that disability.

369.    TDCJ, TBCJ, and UTMB also knew that intentionally placing Mr. Skinner in hot living conditions with an impaired ability to sweat, caused in part by his medically-necessary oxybutynin, would cause him to suffer more pain and be more likely to die from the heat than non-disabled prisoners.

*3. Hypertension*

370.    Mr. Skinner also suffered from hypertension, which is a disease of the cardiovascular system where blood pressure has asserted high pressure on artery walls, damaging them over time.

371.    Mr. Skinner's hypertension impaired his breathing, caused fatigue, and caused anxiety, substantially limiting his ability to climb, walk, stand, cool, sweat, and breathe.

372.    Mr. Skinner's hypertension impaired his major bodily systems, including his

respiratory and cardiovascular systems.

373.    Mr. Skinner's hypertension also impaired his ability to self-regulate his temperature and endure extreme temperatures. As discussed above, one mechanism of enduring high temperatures is the body's natural vasodilation of blood vessels near the skin to promote cooling via sweating. Mr. Skinner's hypertension impaired his blood vessels' lability and thus their ability to vasodilate, causing him to have an impaired ability to cool his body and posing more strain on his body when it attempted to endure high temperatures.

374.    TDCJ and UTMB were both aware of Mr. Skinner's hypertension.

375.    As discussed above, TDCJ, TBCJ, and UTMB policy, which Collier, Murray, and Linthicum were aware of and approved before 2023, recognizes that cardiovascular disease, including hypertension, is associated with heat stress.

376.    To treat his hypertension, Mr. Skinner was prescribed amlodipine and lisinopril by UTMB.

377.    Amlodipine and lisinopril are both known to increase the risk of heat-related illness and to impair thermoregulation.

378.    Amlodipine is specifically mentioned in TDCJ, TBCJ, and UTMB policy, which Collier, Murray, and Linthicum were aware of and approved before 2023, as a drug associated with heat stress. A calcium channel blocker, amlodipine interfered with Mr. Skinner's thermoregulation by lowering his blood pressure and unbalancing his electrolytes, making it easier for him to become dehydrated. In addition, because low blood pressure increases the risk of feinting and falling during a heat-related illness, Mr. Skinner's ability to take care of himself during a heat-related illness was impaired by his amlodipine.

379.    Lisinopril is an Angiotensin Converting Enzyme (ACE) Inhibitor. Lisinopril interfered with Mr. Skinner's thermoregulation by decreasing his blood pressure and reducing his

natural sense of thirst. In addition, like amlodipine, lisinopril's resulting decrease in blood pressure impaired Mr. Skinner's ability to take care of himself during a heat-related illness due to the enhanced risk of feinting and falling.

380.    Amlodipine and lisinopril were necessary to accommodate Mr. Skinner's hypertension, but they both impaired his body's ability to regulate his internal temperatures.

381.    As discussed above, Mr. Skinner was designated not to work in the heat, and specifically requested that he be housed in air-conditioning, but his request was denied because his UTMB providers told him they did not have authority to assign him to a cool bed.

382.    TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that at least thirteen prisoners had died before 2023 from the indoor heat with diagnoses consistent with cardiovascular disease, like hypertension, or while prescribed similar anti-hypertensive medications.

383.    TDCJ, TBCJ, and UTMB knew that high heat conditions, like those found in TDCJ's un-air-conditioned cells, exacerbated symptoms of hypertension and led to increased symptoms of fatigue, anxiety, and difficulty breathing.

384.    Thus, TDCJ, TBCJ, and UTMB, including their agents Collier, Linthicum, and Murray, knew that intentionally placing Mr. Skinner in hot living conditions exposed him to a substantial risk of serious harm due to his disability of hypertension and his prescribed amlodipine and lisinopril.

385.    On top of suffering an increased risk of overt heat-related illness and death, the heat aggravated his hypertension so that Mr. Skinner experienced more fatigue, anxiety, and difficulty breathing than an average person without his disability when exposed to the same conditions.

71

386.    TDCJ, TBCJ, and UTMB also knew that intentionally placing Mr. Skinner in hot living conditions with an impaired ability to vasodilate, caused in part by hypertension, and his low blood pressure, caused in part by his medically-necessary amlodipine and lisinopril, would cause him to suffer more pain than non-disabled prisoners.

387.    TDCJ, TBCJ, and UTMB discriminated against Mr. Southards, Ms. Hagerty, and Mr. Skinner by denying them reasonable accommodations necessary to allow them access to TDCJ and UTMB's programs and services, including safe housing inside TDCJ prisons, compared to non-disabled prisoners.

## V.    CAUSES OF ACTION

### A.    42 U.S.C. § 1983: Eighth and Fourteenth Amendment – Unconstitutional Conditions of Confinement as to System-Wide Extreme Indoor Heat (against Defendants Collier, Linthicum, and Murray)

388.    Plaintiffs incorporate the previous paragraphs as if alleged herein, and further plead:

389.    Mr. Southards, Ms. Hagerty, and Mr. Skinner each had a clearly established Eighth Amendment right to be housed in conditions of confinement that were not dangerous and did not pose a substantial risk of serious harm to their health.

390.    Rather than housing Mr. Southards, Ms. Hagerty, and Mr. Skinner in safe conditions of confinement, Defendants Collier, Linthicum, and Murray chose to enact a system-wide policy which would subject Mr. Southards, Ms. Hagerty, and Mr. Skinner and inmates like them to extreme heat inside their housing areas with full knowledge of the dangerousness of those conditions. Defendants Collier, Linthicum, and Murray acted with deliberate indifference to Mr. Southards, Ms. Hagerty, and Mr. Skinner's serious health and safety needs, in violation of their rights under the Eighth and Fourteenth Amendments to the United States Constitution by causing them to be housed in extreme heat.

391.    Further, Collier, Linthicum, and Murray implemented the practices and policies that they each knew would result in assigning inmates who are medically vulnerable to the heat into housing areas where they would routinely be exposed to dangerous heat.

392.    Collier, Linthicum, and Murray's actions included intentionally devising a "heat score" system that they knew before 2023 imposed an artificial cap to avoid identifying too many prisoners as heat sensitive and failed to prioritize even the intentionally limited available air-conditioned housing areas for those at the greatest risk of harm from the heat. Collier, Linthicum, and Murray used that policy while deliberately forbidding medical providers from restricting or recommending the assignment of inmates to air-conditioned housing areas despite their expertise and ability to make an individualized assessment to ensure each inmate was housed safely in light of their medical conditions.

393.    Collier, Linthicum, and Murray knew before 2023 that these decisions would result in obvious problems, including by creating an imminent and substantial risk of serious harm, injury, and death to inmates such as Mr. Southards, Ms. Hagerty, and Mr. Skinner who had medical conditions that made them more vulnerable to the indoor heat. Collier, Linthicum, and Murray knew before 2023 and admitted that similarly situated inmates had died as a direct and proximate result of the same conditions in the past. Collier, Linthicum, and Murray knew before 2023 that many more deaths and injuries had resulted from the indoor heat than they had admitted to, as they had been specifically informed by statistical and epidemiological analysis and they had personally engaged in a plan to cover up evidence of heat injuries and deaths. Despite knowing of the obvious and recurring risk that the conditions posed, Collier, Linthicum, and Murray promulgated policies that exacerbated the problem and did nothing to correct the dangerous conditions of confinement for TDCJ inmates including Mr. Southards, Ms. Hagerty, and Mr. Skinner.

394.    Collier, Linthicum, and Murray knew that the dangerous conditions of confinement lacked any legitimate penological purpose.

395.    Collier, Linthicum, and Murray actually drew the inference that their policy decisions would injure and kill inmates, particularly inmates like Mr. Southards, Ms. Hagerty, and Mr. Skinner who were at greater risk due to their medical conditions.

396.    As a direct and proximate result of Collier, Linthicum, and Murray's policy decisions, Mr. Southards, Ms. Hagerty, and Mr. Skinner died from extreme heat inside their housing areas.

397.    Accordingly, Collier, Linthicum, and Murray are liable to the Plaintiffs under 42 U.S.C. § 1983.

**B.    42 U.S.C. § 1983: Eighth and Fourteenth Amendment – Unconstitutional Conditions of Confinement as to Unit-Specific Extreme Indoor Heat and the Lack of Heat Mitigation Efforts (against Defendants Collier, Linthicum, Britt, England, Muniz, Dickerson, and Sanchez)**

398.    Plaintiffs incorporate the previous paragraphs as if alleged herein, and further plead:

399.    Mr. Southards, Ms. Hagerty, and Mr. Skinner had a clearly established Eighth Amendment right to be housed in conditions of confinement that were not dangerous and did not pose a substantial risk of serious harm to their health.

400.    Collier, Linthicum, Britt, England, Muniz, Dickerson, and Sanchez knew and were well aware before 2023 that inmates at substantial risk of serious harm from living in extreme heat, including Mr. Southards, Ms. Hagerty, and Mr. Skinner, were nonetheless excluded by TDCJ policy from being housed in air conditioning and that their medical providers were intentionally prohibited from recommending that they be housed in air conditioning.

74

401.    Despite this knowledge, Collier, Linthicum, Britt, England, Muniz, Dickerson, and Sanchez deliberately implemented and effectuated a practice of not using available resources at the unit level to mitigate the substantial risk of serious harm to inmates known to be particularly vulnerable to the heat including Mr. Southards, Ms. Hagerty, and Mr. Skinner. Despite the known risk, Collier, Linthicum, Britt, England, Muniz, Dickerson, and Sanchez oversaw a widespread practice and condition whereby inmates were not moved into air conditioning even if they were placed on the medical heat restriction list, such inmates were not routinely checked for signs of heat illness, such inmates were routinely denied cold or any drinking water, such inmates were routinely denied cold showers, and such inmates were not offered or permitted even temporary access to cool areas.

402.    Collier and Linthicum knew this was so widespread as to be an unconstitutional condition of confinement or in the alternative official policy because it was widely reported to them from across the TDCJ system through grievances, reports of heat illness, reports of heat-related deaths, court orders, court settlements, news articles, and scientific studies.

403.    Britt, England, Muniz, Dickerson, and Sanchez likewise knew this was so widespread as to be an unconstitutional condition of confinement or in the alternative official policy as to their respective areas of supervision because it was widely reported to them from their respective areas of supervision through grievances, reports of heat illness, reports of heat-related deaths, news articles, and scientific studies. In addition, Britt, England, Muniz, Dickerson, and Sanchez personally observed these practices as they physically walked the prison or prisons under their supervision and the practices were sufficiently pervasive that they would have seen them occurring long before 2023.

404.    As discussed above, Collier, Linthicum, Britt, England, Muniz, Dickerson, and Sanchez were also aware of these dangerous practices because they were highlighted in a preliminary injunction order by Judge Keith Ellison which was infamous within the agency.

405.    Collier, Linthicum, Britt, England, Muniz, Dickerson, and Sanchez drew the inference that these lacking mitigation efforts and the lack of unit-level re-assignment to air conditioning posed an obvious and recurring risk of harm to inmates—particularly inmates like Mr. Southards, Ms. Hagerty, and Mr. Skinner who were on the heat restriction list and had known illnesses and medications making them more susceptible to the heat—because the wellness check, drinking water, cool-down shower, and respite area written policies nominally required those accommodations, while those measures as well as the reassignment to air conditioning were obviously necessary protective measures in light of the ongoing reports of illnesses and deaths from heat as well as the reports of upcoming heat waves.

406.    Despite this, Collier, Linthicum, Britt, England, Muniz, Dickerson, and Sanchez disregarded the substantial risk of serious harm to inmates like Mr. Southards, Ms. Hagerty, and Mr. Skinner by failing to rectify these conditions or even to follow TDCJ's written policies. Thus, Collier, Linthicum, Britt, England, Muniz, Dickerson, and Sanchez were each deliberately indifferent to the safety of inmates in their care. Collier and Linthicum were deliberately indifferent as to Mr. Southards, Ms. Hagerty, and Mr. Skinner. Dickerson was indifferent as to Mr. Southards and Mr. Skinner. Britt was deliberately indifferent as to Mr. Southards. England and Sanchez were deliberately indifferent as to Ms. Hagerty. And Muniz was deliberately indifferent as to Mr. Skinner.

407.    Collier, Linthicum, Britt, England, Muniz, Dickerson, and Sanchez lacked any legitimate penological purpose for imposing these dangerous conditions of confinement on Mr. Southards, Ms. Hagerty, and Mr. Skinner.

408.    As a direct and proximate result of Collier, Linthicum, Britt, England, Muniz, Dickerson, and Sanchez's deliberate indifference, Mr. Southards, Ms. Hagerty, and Mr. Skinner died from extreme heat and the lack of mitigation efforts inside their housing areas.

409.    Accordingly, Collier and Linthicum are liable to all Plaintiffs; Britt is liable to Tona Southards-Naranjo; England and Sanchez are liable to Ms. Hagerty's survivors; Muniz is liable to Mr. Skinner's survivors; and Dickerson is liable to both Tona Southards and Mr. Skinner's survivors under 42 U.S.C. § 1983.

### C.    42 U.S.C. § 1983: Eighth and Fourteenth Amendment – Failure to Protect and Denial of Medical Attention (Tona Southards-Naranjo against Defendant Officer Aigbokhan and Mr. Skinner's Survivors against Defendant Officer Walker)

410.    Plaintiffs incorporate the previous paragraphs as if alleged herein, and further plead:

411.    Mr. Southards and Mr. Skinner had clearly established rights to not have their serious medical needs treated with deliberate indifference. Mr. Southards and Mr. Skinner further had a clearly established right to mitigation of the dangers of environmental extreme heat during their incarceration.

412.    Rather than providing the 30-minute wellness checks, access to cold drinking water, access to cold showers, or access to air-conditioned spaces which Officer Aigbokhan knew Mr. Southards needed and which Officer Walker knew Mr. Skinner needed, as each Defendant had been specifically trained that these mitigation efforts were required for inmate safety and Officer Aigbokhan knew that Mr. Southards was on the heat restriction list while Officer Walker knew that Mr. Skinner was on the heat restriction list, each Defendant withheld all of these protections.

413.    Officer Aigbokhan was the officer responsible for Mr. Southards' safety for several hours before Mr. Southards was found unresponsive, yet during this time Officer Aigbokhan specifically withheld water from Mr. Southards despite his requests, refused to allow him access

to air conditioning even though Officer Aigbokhan was permitted to and required by written policy to bring Mr. Southards to a respite area on request, and intentionally failed to check on Mr. Southards every 30 minutes despite written policy requiring this. Failing to check on Mr. Southards every thirty minutes also denied Mr. Southards timely access to medical care which he needed to prevent serious harm from the heat.

414.    Officer Aigbokhan therefore disregarded the known risk of serious harm to Mr. Southards despite specific knowledge that Officer Aigbokhan's actions and inactions would exacerbate and fail to protect Mr. Southards from that risk.

415.    Officer Walker was the officer responsible for Mr. Skinner's safety for the hours before he died, yet during this time Officer Walker specifically withheld water from Mr. Skinner despite his requests, refused to allow him access to air conditioning even though Officer Walker was permitted to and required by written policy to bring Mr. Skinner to a respite area on request, and intentionally failed to check on Mr. Skinner every 30 minutes despite written policy requiring this. Failing to check on Mr. Skinner every thirty minutes also denied Mr. Skinner timely access to medical care which he needed to prevent serious harm from the heat.

416.    Officer Walker therefore disregarded the known risk of serious harm to Mr. Skinner despite specific knowledge that Officer Walker's actions and inactions would exacerbate and fail to protect Mr. Skinner from that risk.

417.    Defendants Officer Aigbokhan and Officer Walker drew the inference that their disregard for Mr. Southards and Mr. Skinner respectively created a substantial risk of serious harm, including death, to each inmate. Thus, Officer Aigbokhan was deliberately indifferent to Mr. Southards' safety and serious medical needs while Officer Walker was deliberately to Mr. Skinner's safety and serious medical needs.

418.    As a direct and proximate consequence of Officer Aigbokhan's deliberate indifference, Mr. Southards suffered and died.

419.    As a direct and proximate consequence of Officer Walker's deliberate indifference, Mr. Skinner suffered and died.

420.    Thus, Defendant Officer Aigbokhan is liable to Tona Southards under 42 U.S.C. § 1983.

421.    Likewise, Defendant Officer Walker is liable to Mr. Skinner's survivors under 42 U.S.C. § 1983.

### D.    Americans with Disabilities Act and Rehabilitation Act
### (against University of Texas Medical Branch, Texas Department of Criminal Justice, and Texas Board of Criminal Justice)

422.    UTMB, TDCJ, and TBCJ have been and are recipients of federal funds, and thus are covered by the mandate of the Rehabilitation Act.

423.    The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to ensure persons with disabilities have equal access to the services, programs, and benefits of the recipient as non-disabled persons.

424.    Likewise, Title II of the Americans with Disabilities Act (as amended in 2008) also applies to the University of Texas Medical Branch, Texas Department of Criminal Justice, and Texas Board of Criminal Justice, and also requires each entity to make reasonable modifications of the prison system to accommodate people with disabilities. 42 U.S.C. § 12131 et seq.

425.    The Estelle, Lane Murray, and Wainwright Units and other TDCJ prisons are facilities and their operations, including their provision of medical care by UTMB, comprise programs and services for Americans with Disabilities Act and Rehabilitation Act purposes. Jon Southards, Elizabeth Hagerty, and John Skinner were otherwise qualified to participate in the

programs and services at their respective units of assignment provided by TDCJ, TBCJ, and UTMB.

426.    For purposes of the Americans with Disabilities Act and Rehabilitation Act, Mr. Southards was a qualified individual with physiological and mental impairments, including depression, asthma, and psychosis, that substantially limited several of his major life activities.

427.    Defendants UTMB, TDCJ, and TBCJ knew that Mr. Southards suffered from depression, asthma, and psychosis, and was prescribed medications to treat these disabilities including duloxetine, diphenhydramine, and haloperidol, which impaired his major life activities.

428.    Ms. Hagerty was a qualified individual with physiological and mental impairments, including mood disorder, obesity, diabetes, hyperlipidemia, and asthma, that substantially limited several of her major life activities.

429.    Defendants UTMB, TDCJ, and TBCJ knew Ms. Hagerty suffered from mood disorder, obesity, diabetes, hyperlipidemia, and asthma, and was prescribed medications to treat these disabilities including citalopram and carbamazepine, which impaired her major life activities.

430.    Mr. Skinner was a qualified individual with physiological and mental impairments that substantially limited several of his major life activities including PTSD, urinary incontinence, and hypertension.

431.    Defendants UTMB, TDCJ, and TBCJ knew Mr. Skinner suffered from PTSD, urinary incontinence, and hypertension, and was prescribed medications to treat these disabilities including ziprasidone, diphenhydramine, oxybutynin, amlodipine, and lisinopril which impaired his major life activities.

432.    Defendants UTMB, TDCJ, and TBCJ knew Mr. Southards, Ms. Hagerty, and Mr. Skinner were at a substantially increased risk of heat-related illness or injury as a result of these disabilities and their medically-necessary treatments. They knew that air-conditioned housing was

a reasonable accommodation for these disabilities that was necessary in order to ensure Mr. Southards, Ms. Hagerty, and Mr. Skinner received the same access to TDCJ's services and programs as non-disabled prisoners.

433.    Despite their knowledge, TDCJ, TBCJ, and UTMB's employees intentionally discriminated against Mr. Southards, Ms. Hagerty, and Mr. Skinner by failing and refusing to provide them with the reasonable accommodation necessary to protect them from the extreme temperatures that untimely ended their lives, namely, air-conditioning.

434.    As alleged above, UTMB, TDCJ, and TBCJ, including but not limited to Collier, Linthicum, Murray, Muniz, England, Britt, Dickerson, and Sanchez, deliberately failed to and refused to reasonably accommodate Mr. Southards, Ms. Hagerty, and Mr. Skinner while in custody in violation of the Americans with Disabilities Act and Rehabilitation Act as follows:

    a.  Refused to house Mr. Southards, Ms. Hagerty, and Mr. Skinner in air-conditioned housing despite knowing it was necessary to accommodate their disabilities;

    b.  Deliberately refused to give treating medical providers the power to assign disabled inmates, including Mr. Southards, Ms. Hagerty, and Mr. Skinner, to air-conditioned housing despite knowing it was necessary to accommodate their disabilities;

    c.  Refused to recommend that Mr. Southards, Ms. Hagerty, and Mr. Skinner be housed in air-conditioning, despite knowing it was necessary to accommodate their disabilities;

    d.  Knowingly implemented a "heat score" algorithm that was intentionally underinclusive and deceptive, resulting in Mr. Southards, Ms. Hagerty, and Mr. Skinner being denied air-conditioned housing, despite air-conditioned housing being necessary to accommodate their disabilities in periods of extreme heat;

    e.  On information and belief, forbade medical providers from routinely collecting internal temperatures during medical emergencies, thereby denying medical care to prisoners who suffered heat-related illnesses that required an internal temperature to diagnose and treat, disproportionately causing prisoners with disabilities like Mr. Southards, Ms. Hagerty, and Mr. Skinner to suffer more pain, punishment, and risk of death than non-disabled prisoners in an intentional effort to deceive and cover up heat-related illness;

f. Refused to periodically check on Mr. Southards, Ms. Hagerty, and Mr. Skinner's well-being despite housing them in hot conditions and knowing doing so was a reasonable accommodation for their disabilities;

g. Refused to give Mr. Southards, Ms. Hagerty, and Mr. Skinner access to cool water despite housing them in hot conditions, causing them to suffer more pain, punishment, and risk of death than non-disabled prisoners, though doing so was a reasonable accommodation for their disabilities;

h. Refused to give Mr. Southards, Ms. Hagerty, and Mr. Skinner access to regular cool showers despite housing them in hot conditions, causing them to suffer more pain, punishment, and risk of death than non-disabled prisoners;

i. Refused to give Mr. Southards, Ms. Hagerty, and Mr. Skinner access to air conditioning relief or respite areas despite housing them in hot conditions, causing them to suffer more pain, punishment, and risk of death than non-disabled prisoners; and

j. Intentionally housed Mr. Southards, Ms. Hagerty, and Mr. Skinner in hot, un-air-conditioned conditions despite their disabilities, causing them to suffer more pain, punishment, and risk of death than non-disabled prisoners.

These refusals and failures to accommodate Mr. Southards, Ms. Hagerty, and Mr. Skinner's known disabilities caused each of their deaths.

435. As shown above, UTMB, TDCJ, and TBCJ failed and refused to reasonably modify their policies or provide reasonable accommodations necessary for Mr. Southards, Ms. Hagerty, and Mr. Skinner to have equal access to their facilities, services, and programs compared to non-disabled prisoners. These intentional failures and refusals proximately and directly caused each of their deaths.

436. Mr. Southards, Ms. Hagerty, and Mr. Skinner died as a direct and sole result of UTMB, TDCJ, and TBCJ's intentional discrimination.

## VI.    DAMAGES

### 1. Jon Southards' family

437.    Tona Southards-Naranjo is entitled to compensatory damages against TDCJ, TBCJ, and UTMB in the maximum amounts allowed by the Americans with Disabilities Act and the Rehabilitation Act.

438.    Tona Southards-Naranjo is further entitled to compensatory damages and punitive damages against Collier, Linthicum, Murray, Britt, Dickerson, and Officer Aigbokhan under 42 U.S.C. § 1983.

439.    As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to, and the wrongful death of Jon Southards, Plaintiff asserts claims under 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act and the wrongful death and survivorship statutes as specifically pled herein.

440.    More particularly, Plaintiff Tona Southards-Naranjo, as heir at law to the Estate of Jon Southards, asserts a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;
- past mental anguish;
- past and future lost wages;
- funeral and/or burial expenses; and
- attorneys' fees and costs pursuant to 42 U.S.C. § 1988, the Americans with Disabilities Act, the Rehabilitation Act, or as allowed by law.

441.    Plaintiff Tona Southards-Naranjo, in her individual capacity asserting wrongful death claims on her own behalf and on behalf of all wrongful death beneficiaries, has incurred damages including, but not limited to, the following:

- past and future mental anguish;

- past and future loss of companionship, society, services, and affection of Jon Southards; and,
- attorneys' fees and costs pursuant to 42 U.S.C. § 1988, the Americans with Disabilities Act, and the Rehabilitation Act, or as allowed by law.

*2. Elizabeth Hagerty's family*

442.    Elizabeth Salazar is entitled to compensatory damages against TDCJ, TBCJ, and UTMB in the maximum amounts allowed by the Americans with Disabilities Act and the Rehabilitation Act.

443.    Elizabeth Salazar is further entitled to compensatory damages and punitive damages against Collier, Linthicum, Murray, England, and Sanchez under 42 U.S.C. § 1983.

444.    As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused, solely caused, and/or were the moving force of the injuries and damages to, and the wrongful death of Elizabeth Hagerty, Plaintiff Elizabeth Salazar asserts claims under 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act and the wrongful death and survivorship statutes as specifically pled herein.

445.    More particularly, Plaintiff Elizabeth Salazar, as heir at law to the Estate of Elizabeth Hagerty, asserts a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;
- past mental anguish;
- past and future lost wages;
- funeral and/or burial expenses; and
- attorneys' fees and costs pursuant to 42 U.S.C. § 1988, the Americans with Disabilities Act, the Rehabilitation Act, or as allowed by law.

446.    Plaintiff Salazar, in her individual capacity asserting wrongful death claims, on her own behalf, as well as on behalf of all wrongful death beneficiaries, has incurred damages including, but not limited to, the following:

- past and future mental anguish;

- past and future loss of companionship, society, services, and affection of Elizabeth Hagerty; and,
- attorneys' fees and costs pursuant to 42 U.S.C. § 1988, the Americans with Disabilities Act, the Rehabilitation Act, or as allowed by law.

*3. John Skinner's family*

447. Clara Virginia Skinner and Shelby Skinner are entitled to compensatory damages against TDCJ, TBCJ, and UTMB in the maximum amounts allowed by the Americans with Disabilities Act and the Rehabilitation Act.

448. Clara Virginia Skinner and Shelby Skinner are further entitled to compensatory damages and punitive damages against Collier, Linthicum, Murray, Muniz, Dickerson, and Officer Walker under 42 U.S.C. § 1983.

449. As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused, solely caused, and/or were the moving force of the injuries and damages to, and the wrongful death of John Skinner, Plaintiffs assert claims under 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act and the wrongful death and survivorship statutes as specifically pled herein.

450. More particularly, Plaintiff Shelby Skinner, as heir at law to the Estate of John Skinner, asserts a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;
- past mental anguish;
- past and future lost wages;
- funeral and/or burial expenses; and
- attorneys' fees and costs pursuant to 42 U.S.C. § 1988, the Americans with Disabilities Act, the Rehabilitation Act, or as allowed by law.

451. Plaintiffs Clara Skinner and Shelby Skinner, in their individual capacities asserting wrongful death claims, each on their own behalf, as well as on behalf of all wrongful death beneficiaries, have incurred damages including, but not limited to, the following:

- past and future mental anguish;
- past and future loss of companionship, society, services, and affection of John Skinner; and,
- attorneys' fees and costs pursuant to 42 U.S.C. § 1988, the Americans with Disabilities Act, the Rehabilitation Act, or as allowed by law.

## VII.    ATTORNEYS' FEES AND COSTS

452.    Plaintiffs request attorneys' fees, costs, and expenses, including expert expenses, against TDCJ, TBCJ, and UTMB for their respective Americans with Disabilities Act and Rehabilitation Act claims, pursuant to 42 U.S.C. §12205 and 29 U.S.C. § 794a.

453.    Plaintiffs further request attorneys' fees, costs, and expenses, including expert expenses, against Defendants Collier, Linthicum, Murray, Britt, England, Muniz, Dickerson, Sanchez, Officer Aigbokhan, and Officer Walker for their respective 42 U.S.C. § 1983 claims, pursuant to 42 U.S.C. § 1988.

## VIII.    JURY DEMAND

454.    Plaintiffs request this case be tried by jury.

## IX.    PRAYER FOR RELIEF

THEREFORE, Plaintiffs pray that the Defendants be cited to appear and answer herein and that upon final hearing they have judgment against Defendants for

A.  Compensatory damages, against all Defendants, jointly and severally;

B.  Exemplary damages against Defendants Collier, Linthicum, Murray, Britt, England, Muniz, Dickerson, Sanchez, Officer Aigbokhan, and Officer Walker;

C.  Find and declare that Plaintiffs are the prevailing parties in this case;

D.  Attorneys' fees, including reasonable and necessary expenses (including expert fees);

E.  Costs of court;

F.  Pre-judgement and post-judgment interest in the highest rate allowable under the law; and

G.  All other relief, legal and equitable, to which Plaintiffs are justly entitled.

Dated: June 26, 2025.

Respectfully submitted,

**EDWARDS LAW**
603 W 17th St.
Austin, Texas 78701
Tel.  512-623-7727
Fax.  512-623-7729

By____/s/ Jeff Edwards_____
    JEFF EDWARDS
    State Bar No. 24014406
    jeff@edwards-law.com
    MIKE SINGLEY
    State Bar No. 00794642
    mike@edwards-law.com
    DAVID JAMES
    State Bar No. 24092572
    david@edwards-law.com
    LISA SNEAD
    State Bar No. 240622.04
    lisa@edwards-law.com
    PAUL SAMUEL
    State Bar No. 24124463
    paul@edwards-law.com

**ATTORNEYS FOR ALL PLAINTIFFS**

**WEBB, CASON & MANNING**
710 Mesquite St.
Corpus Christi, Texas 78401
(361) 887-1031

    Matthew Manning
    State Bar No. 24075847
    Matt@wcctxlaw.com
    Parker Webb
    State Bar No. 24085648
    Parker@wcctxlaw.com

**ATTORNEYS FOR PLAINTIFF SALAZAR
ONLY**