UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TONA SOUTHARDS-NARANJO, individually and as representative of the Estate of Jon Southards; | § § § § | |
| ELIZABETH BANDA SALAZAR, individually and as representative of the Estate of Elizabeth Hagerty; | § § § § § | |
| CLARA VIRGINIA SKINNER, SHELBY SKINNER, JAXON RAY, and CADEN CROOKS, individually and as representatives of the Estate of John Skinner; | § § § § § | CIVIL ACTION NO. 1:25-cv-990-RP |
| LAURA PEREZ, individually and as personal representative of the Estate of John Manuel Castillo, Jr.; | § § § § § § | |
| *Plaintiffs*, v. | § § § § | |
| TEXAS DEPARTMENT OF CRIMINAL JUSTICE, UNIVERSITY OF TEXAS MEDICAL BRANCH, TEXAS BOARD OF CRIMINAL JUSTICE, BRYAN COLLIER, LANETTE LINTHICUM, MICHAEL BRITT, AUDREY ENGLAND, DONALD MUNIZ, DANIEL DICKERSON, JERRY SANCHEZ, OWEN MURRAY, AUSTINE AIGBOKHAN, MAHAGHONY WALKER, and GENE MILLER, | § § § § § § § § § § § § § | JURY DEMANDED |
| *Defendants.* | § § | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION FOR PROTECTIVE ORDER**

The Court should deny Defendants' motion for protective order. Doc. 44.

I.    SUMMARY OF THE ARGUMENT

Defendants' motion for protective order should be denied for three reasons.

First, Defendants' request for across-the-board limits on all discovery to only four prisons from 2021 to 2023 is untethered from the facts alleged in this case—which include facts learned since the appeals in *Webb* and *Hinojosa*—indeed, the subsequent development of the *Webb* case in particular delved into Defendant TDCJ, UTMB, and Linthicum's conduct dating back to 1998. TBCJ, TDCJ, UTMB, Collier, Linthicum, and Murray each learned about deaths and injuries from indoor heat decades earlier, not just two years earlier, and from other prisons, not just these four. Thus, that history and scope is tailored to the qualified immunity defenses of the policymaker defendants (as well as the ADA and Rehab Act claims against the agencies).

Second, the Rule 26 factors weigh against Defendants' proposed bright line limits on discovery. Defendants assert undue burden, but they declined to negotiate on any specific request. Plaintiffs remain willing to confer on any of the specific requests they propounded, and indeed suggested several broad categorical limits and revisions in conference before responses were even due, but could not and cannot agree to Defendants' proposed limits on all discovery.

Third, in the alternative, if the Court limits discovery based on qualified immunity, then it should establish a second discovery period as to the agency Defendants who do not enjoy qualified immunity so that broader discovery can begin after qualified immunity has been fully briefed.

Accordingly, the Court should deny Defendants' motion.

## II.   FACTUAL BACKGROUND

This § 1983 case arises from the deaths of four inmates due to extreme heat inside their Texas state prison cells in four different prisons in 2023. Doc. 28. The inmates' survivors are the Plaintiffs. Doc. 28. Defendants are three agencies, Texas Department of Criminal Justice (TDCJ); Texas Board of Criminal Justice (TBCJ), and University of Texas Medical Branch (UTMB); three state-level policymakers for TDCJ and its healthcare: TDCJ's then-executive director Bryan

Collier; TDCJ's director of health services, Lannette Linthicum; and UTMB's director of correctional managed healthcare, Owen Murray; and various lower-level TDCJ officials who were involved in the day-to-day operation of the four prisons when Plaintiffs' decedents died.

Twenty five years before the four deaths giving rise to this lawsuit, on June 29, 1998, TDCJ officers were transporting Archie White in an un-air-conditioned prison vehicle when he suffered a heat stroke on the way to the Robertson Unit in Abilene; he died the next day.[1] Two weeks later, Anselmo Lopez died in his un-air-conditioned cell at the Eastham Unit, now called the Wainwright Unit, in Lovelady, Texas.[2] Six days after that, James Moore died from hyperthermia inside the Byrd Unit in Huntsville.[3] In the midst of these deaths, then-TBCJ chair Allan Polunsky wrote to TDCJ's executive director, and copied Linthicum, asserting that "we need to make addressing this heat situation the agency's highest priority."[4]

Last year, this Court found that, after considering the ensuing twenty-five year period from 1998 through 2023, Defendant Collier likely acted with deliberate indifference when he and his

---

[1] Doc. 28, p. 18, ¶ 59; Ex. 1, TDCJ's Second Supp. Resp. to Webb's Interrogatories, p. 2; Ex. 65, Robertson Unit Directory, *available at* https://www.tdcj.texas.gov/unit_directory/rb.html. Plaintiffs request that the Court take judicial notice of government websites, particularly Defendants' own websites when offered against them by Plaintiffs, as in this exhibit and other applicable exhibits through this response. *See* FED. R. EVID. 801(d)(2), 803(8), 902(5); *Boudreaux v. Louisiana State Bar Ass'n,* 86 F.4th 620, 635 (5th Cir. 2023) (may take judicial notice of opposing party's website); *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 491 n.12 (5th Cir. 2013) (same); *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (government agency's website); *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005) (same); *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (same).
[2] Doc. 28, p. 18, ¶ 59; Ex. 1, TDCJ's Second Supp. Resp. to Webb's Interrogatories, p. 2; Ex. 67, Wainwright Unit Directory, *available at* https://www.tdcj.texas.gov/unit_directory/ea.html; Ex. 66, *TDCJ to Rename Three Prison Units*, TDCJ Connections Newsletter, *available at* https://www.tdcj.texas.gov/connections/-articles/2021/20210600_renaming_units.html.
[3] Doc. 28, p. 18, ¶ 59; Ex. 1, TDCJ's Second Supp. Resp. to Webb's Interrogatories, p. 2; Ex. 63, Byrd Unit Directory, *available at* https://www.tdcj.texas.gov/unit_directory/du.html.
[4] Ex. 10, Memo from A. Polunsky to W. Scott (July 24, 1998).

co-defendants nonetheless chose not to prioritize protecting TDCJ inmates from the heat.[5] As of August 2017, only about 32,000 inmates out of more than 145,000 were housed in air conditioning.[6] As a result, TDCJ admits at least twenty-three people died from indoor heat during the period 1998 to 2012 at thirteen different prisons across the state—all different facilities than where Plaintiffs' decedents were housed, but all assigned to non-air-conditioned housing just like the victims in this case.[7] In 2016, Collier admitted twenty of these were heat-related deaths.[8]

The agency and policymaker Defendants knew about the details of those twenty-three heat deaths, including because TDCJ itself identified them in a court-ordered interrogatory response in *Webb v. Livingston*, 4:14-cv-3302 (S.D. Tex.) in 2016—directly contrary to Defendants' suggestion that the case remained limited to only the Hodge Unit where Robert Webb died.[9] The same court-ordered interrogatory response lists hundreds of heat-related injuries to inmates and TDCJ officers around the state between 2002 through 2016.[10]

Murray, who was involved in quality control at UTMB starting in 1995, routinely received autopsy reports that revealed heat as the cause throughout his tenure.[11] Linthicum similarly discussed heat related deaths repeatedly with the executive director,[12] and personally prepared a

---

[5] Ex. 5, *Tiede v. Collier*, No. 1:23-cv-1004, Doc. 202 (Mar. 26, 2025), pp. 18, 84.

[6] *See* Ex. 16, TDCJ Survey of Air-Conditioned Housing, p. 3; Ex. 17, TDCJ Fiscal Year 2017 Statistical Report, p. 1, *available at* https://www.tdcj.texas.gov/documents/Statistical_Report_FY2017.pdf; *see also* Ex. 15, Email to Collier re Units with Air Conditioning (June 2013).

[7] Doc. 28, pp. 18–20, ¶¶ 58–59; Ex. 1, TDCJ's Second Supp. Resp. to Webb's Interrogatories, pp. 2–9.

[8] Ex. 33, Excerpts from Brad Livingston's Answer in *Cole v. Livingston*, 4:14-cv-1698, Doc. 432, (S.D. Tex.), pp. 36–38; *see* Ex. 34, Motion to Substitute Brad Livingston with Bryan Collier in *Cole v. Livingston*, 4:14-cv-1698, Doc. 547 (S.D. Tex. Sep. 9, 2016).

[9] Doc. 28, p. 20, ¶ 61; Ex. 1, TDCJ's Second Supp. Resp. to Webb's Interrogatories, pp. 2–9.

[10] Doc. 28, p. 21, ¶ 63; Ex. 1, TDCJ's Second Supp. Resp. to Webb's Interrogatories, pp. 2–265.

[11] Ex. 2, Murray Deposition, 78:3–5 (he "would have had discussions" about all hyperthermia deaths during his tenure); *see also* Ex. 3, Livingston Deposition, 56:17–22.

[12] *See, e.g.*, Ex. 3, Livingston Deposition, 13:13–18, 14:16–24.

May 3, 2005 memorandum about Ricky Robertson's death from extreme heat in his housing area at the Darrington Unit in Brazoria County, copying Defendant Murray.[13] Linthicum spelled out the particularly high risk posed to inmates taking psychotropic medications and wrote "Short of building new facilities with tempered air or air conditioning; I do not know what else can be done" for the then-17,000 inmates taking such medicines across the system.[14] Linthicum wrote another memorandum about James Shriver and Dionicio Robles' 2007 deaths from extreme heat, emphasizing that both took psychotropic and anticholinergic medications "which are known to cause temperature deregulation permitting hyperthermia."[15]

In 2017, a federal court denied TDCJ, UTMB, and Brad Livingston (Collier's predecessor and former immediate supervisor)[16] sovereign and qualified immunity at the summary judgment stage for the 2011 heat death of Larry McCollum.[17] Mr. McCollum died at the Hutchins Unit near Dallas.[18] Despite this, the summary judgment order emphasized the 2007 deaths of Robles and Shriver at the Byrd Unit which is located in Huntsville[19] as evidence of Livingston's subjective deliberate indifference, as well as five more deaths at yet other prisons between 1999 and 2010.[20]

---

[13] Ex. 11, Memorandum from Linthicum re: Ricky Robertson, p. 2.

[14] Ex. 11, Memorandum from Linthicum re: Ricky Robertson, p. 2.

[15] Ex. 12, Email from Linthicum re: Heat Related Deaths, pp. 1, 3.

[16] Ex. 4, *Cole v. Collier*, Hearing Testimony Sep. 10, 2019 (Collier), 12:4–10 (explaining Collier was deputy executive director for nine years before becoming executive director in 2016); *see* Ex. 34, Motion to Substitute Brad Livingston with Bryan Collier in *Cole v. Livingston*, 4:14-cv-1698, Doc. 547 (S.D. Tex. Sep. 9, 2016).

[17] Doc. 28, p. 20, ¶ 62; Ex. 47, Order Denying Summary Judgment in *McCollum v. Livingston*, 4:14-cv-3253, Doc. 342 (S.D. Tex. Feb. 3, 2017), p. 83.

[18] Doc. 28, pp. 19–20, ¶ 62; Ex. 64, Hutchins Unit Directory, *available at* https://www.tdcj.texas.gov/unit_directory/hj.html (located in Dallas); Ex. 1, TDCJ's Second Supp. Resp. to Webb's Interrogatories, p. 6.

[19] Ex. 1, TDCJ's Second Supp. Resp. to Webb's Interrogatories, p. 5; Ex. 63, Byrd Unit Directory, *available at* https://www.tdcj.texas.gov/unit_directory/du.html.

[20] Ex. 47, Order Denying Summary Judgment in *McCollum v. Livingston*, 4:14-cv-3253, Doc. 342 (S.D. Tex. Feb. 3, 2017), p. 2, n.2 & p. 23.

Also in 2017, Defendant Collier was ordered to house the population of yet another Texas prison, the Wallace Pack Unit, in air conditioning.[21] That order relied on the foregoing history of heat-related death and illness across the system, even though no deaths at the Pack Unit had ever been identified as heat-related, to conclude that Collier "know[s] that a risk of serious harm exists as a result of the extreme temperatures at the Pack Unit."[22]

In 2018, Collier settled the Pack Unit lawsuit, agreeing to permanently house the Pack Unit inmate population in air conditioning.[23] Also in 2018, TDCJ, UTMB, Linthicum, Murray, and other officials agreed to settle a suite of heat-related cases, including *McCollum*, which in total concerned eight heat-related deaths and one heat-stroke injury—of those, Linthicum, Murray, or both were party to six settlements.[24] The next year, TDCJ, UTMB, Linthicum, and Murray settled another lawsuit alleging a heat-related inmate death on July 31, 2015 at the McConnell Unit in Beeville Texas.[25]

After the settlements, and ostensibly inspired by a list of illnesses and medications that

---

[21] Doc. 28, p. 24, ¶ 78; Ex. 35, Preliminary Injunction Order, *Cole v. Collier*, No. 4:14-cv-1698, Doc. 737 (S.D. Tex. July 19, 2017), pp. 98–99.

[22] Ex. 35, Preliminary Injunction Order, *Cole v. Collier*, No. 4:14-cv-1698, Doc. 737 (S.D. Tex. July 19, 2017), pp. 3, 43–44, 86.

[23] Doc. 28, p. 30, ¶ 108; Ex. 37, Order approving settlement, *Cole v. Collier*, No. 4:14-cv-1698, Doc. 1188 (S.D. Tex. June 8, 2018), p. 5.

[24] Doc. 28, p. 30, ¶ 110; Ex. 48, Stipulation of Dismissal in *McCollum*; Ex. 53, Second Amended Complaint in *Webb v. Livingston* (Murray); Ex. 55, Order of Dismissal in *Webb*; Ex. 49, First Amended Complaint in *Togonidze v. Livingston* (Murray); Ex. 50, Order of Dismissal in *Togonidze*; Ex. 40, Amended Complaint in *Hinojosa v. Livingston* (Murray and Linthicum); Ex. 41, Stipulation of Dismissal in *Hinojosa*; Ex. 31, Amended Complaint in *Caddell v. Livingston* (Linthicum); Ex. 32, Order of Dismissal in *Caddell*; Ex. 44, Second Amended Complaint in *Martone v. Livingston* (Murray and Linthicum); Ex. 45, Stipulation of Dismissal in *Martone*; Ex. 29, Third Amended Complaint in *Adams v. Livingston* (concerning three deaths, Linthicum and Murray); Ex. 30, Order of Dismissal in *Adams*.

[25] Ex. 42, Second Amended Complaint in *Jones v. TDCJ*; Ex. 43, Order approving settlement in *Jones*. The *Jones* complaint also alleged two other inmates died from the heat on August 1, 2004 and June 23, 2014. Ex. 42, pp. 7–8 (Micah Burrell and Curtis Garland).

increase the risk from heat contained in the Pack Unit settlement agreement, TDCJ and UTMB—at Collier's direction—devised a "heat sensitivity score" algorithm, which Collier publicly claimed prioritized inmates with certain medical conditions or taking certain medications for assignment to air-conditioned housing.[26]

However, Defendants knew—in fact, Judge Pitman specifically found that Collier knew[27]—that this heat score system was arbitrary, inadequate, and ineffective at capturing all inmates with heightened risk from the heat, and that treating physicians had no power to require that any of their inmate patients be assigned air-conditioned housing if the inmate did not receive an automated heat score.[28] TDCJ and UTMB's official heat stress policy recognizes all prisoners, disabled or not, are at risk of heat-related injury, using a graded warning system which warns that when the heat index exceeds 90°F "Heat-related illness [is] possible;" at above 103°F, "Heatstroke [is] possible and heat-related illness likely;" and when above 115°F, "High risk of heat stroke."[29] Collier himself testified in 2019 that housing people in temperatures of 95 degrees poses a serious health risk.[30]

---

[26] Doc. 28, pp. 30–32, ¶¶ 111, 117–120; Ex. 7, *Tiede v. Collier* Hearing Transcript Aug. 1, 2024 (Leonardson), 82:16–22, 91:17–25; Ex. 8, *Tiede v. Collier* Hearing Transcript Aug. 2, 2024 (Collier), 162:9–24.

[27] Ex. 5, *Tiede v. Collier*, No. 1:23-cv-1004, Doc. 202 (Mar. 26, 2025), pp. 44–46, 81–82.

[28] Doc. 28, pp. 30–36, ¶¶ 121–134; Ex. 7, *Tiede v. Collier* Hearing Transcript Excerpt (Aug. 1, 2024), 130:17–131:1, 132:3–132:13, 134:12–14; Ex. 19, TDCJ Health Services Liaison Facility Types List, p. 2 ("HSL cannot request reassignment of an offender to an air-conditioned or climate-controlled facility.").

[29] Doc. 28, p. 16, ¶ 51; *see* Ex. 22, Correctional Managed Health Care Committee (CMHCC) Policy 27.02, *Heat Stress* (May 28, 2019), p. 6. Exhibit 22 is the version of the policy in effect during the four deaths at issue in this lawsuit; a similar policy remains in effect today. *See* https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhc_policy_manual/D-27.02.pdf. CMHCC is composed of representatives of TDCJ and UTMB, as well as appointees of the Governor and TDCJ's other contract medical provider, Texas Tech University Health Sciences Center. TEX. GOV'T CODE § 501.133.

[30] Doc. 28, p. 10, ¶ 36; Ex. 4, *Cole v. Collier*, Hearing Testimony Sep. 10, 2019 (Collier), 49:16–25.

On top of that baseline risk to everyone, the agencies' policy specifies medications and ailments that place people at heightened risk from heat which are "a lot more inclusive than" the heat score algorithm.[31] Indeed, the heat score algorithm did not even capture all inmates enumerated in the risk factors of the *Cole v. Collier* settlement that supposedly inspired it.[32] Of particular note, anticholinergic medications are listed under the policy and the settlement, but the heat score algorithm in 2023 only assigned a point to an inmate's score for those medications if the inmate was also over 65 years old—otherwise, those heat-sensitive medicines were ignored by the algorithm.[33] Medications being anticholinergic means they are "very drying medications and decrease your ability to sweat and cool yourself."[34] This is the same pharmacological effect and increased risk from heat that Linthicum had personally highlighted in her memos over a decade earlier.[35] As a result, even though Mr. Skinner, Mr. Southards, Mr. Castillo, and Ms. Hagerty were all prescribed anticholinergic medications, none received a heat score and therefore were kept in un-air-conditioned housing.[36]

---

[31] Doc. 28, p. 35, ¶ 130; Ex. 7, *Tiede v. Collier* Hearing Transcript Excerpt (Aug. 1, 2024), 126:18–127:9; Ex. 23, CMHCC Policy 27.02 Attachment A; Ex. 24, CMHCC Policy 27.02 Attachment B.

[32] *Compare* Ex. 36, *Cole* Settlement, pp. 7–8 *with* Ex. 18, Heat Score Form (rec'd 2023).

[33] *Compare* Ex. 36, *Cole* Settlement, p. 8 *and* Ex. 24, CMHCC D-27.2 Attachment A *with* Ex. 25, Heat Score Form (2023).

[34] Doc. 28, p. 35, ¶ 135; Ex. 7, *Tiede v. Collier* Hearing Transcript Excerpt (Aug. 1, 2024), 106:20–107:9.

[35] Ex. 12, Email from Linthicum re: Heat Related Deaths, pp. 1, 3; Ex. 11, Memorandum from Linthicum re: Ricky Robertson, p. 2.

[36] Doc. 28, p. 35, ¶ 135; Ex. 28, Southards Urgent Care Record, p. 1 (diphenhydramine and oxybutynin); Ex. 27, Skinner Death Summary, p. 1 (diphenhydramine and oxybutynin); Ex. 26, Hagerty Urgent Care Record (carbamazepine); Ex. 25, Castillo Urgent Care Record (oxybutynin) Oxybutynin and diphenhydramine are specifically enumerated as associated with heat stress in TDCJ and UTMB's policy. Ex. 23, CMHCC D-27.2 Attachment A. Carbamazepine is widely recognized as an anticholinergic medication, but it is also an antipsychotic medication—where the policy says "all" antipsychotic medications are associated with heat stress. *See, e.g.*, Ex. 58, Khalili et al., *Carbamazepine Toxicity* (Nat'l Lib. Med. (July 24, 2023), *available at* https://www.ncbi.nlm.nih.gov/books/NBK507852/?report=printable; Ex. 57, Leucht et al., *Carbamazepine for schizophrenia*, Cochrane Database of Systematic Reviews 2014, Issue 5. Art.

Defendants also knew that TDCJ's officially confirmed heat deaths and injuries were only the tip of the iceberg, as UTMB autopsy reports dating back to 2011 and decades of scientific literature demonstrate that most deaths caused by heat arise from aggravating an underlying illness and leave no specific evidence.[37] In 2022, Collier (and likely the other policymakers) received a peer-reviewed epidemiological study demonstrating that an average of fourteen excess deaths per year occurred among inmates housed in largely un-air-conditioned TDCJ prisons between 2001 and 2019 due to extreme heat events, compared to no detectable increase at TDCJ prisons where most housing areas had air conditioning.[38] Collier did nothing to investigate the study; his designee would later testify that the science was "nothing more than writing on a piece of paper."[39]

On March 26, 2025, this Court made findings about multiple heat-related deaths in 2023, including specifically that TDCJ's so-called "mitigation" practices were inadequate and

---

No.: CD001258, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC7032545/pdf/CD001258.pdf.

[37] *See, e.g.*, Ex. 14, Autopsy of Kenneth James, p. 12 ("many heat-related illnesses and deaths are unrecognized as such"); Ex. 15, Autopsy of Kelly Marcus, p. 12 (same); Ex. 56, Bruce Wenger, "Human Adaptation to Hot Environments," MEDICAL ASPECTS OF HARSH ENVIRONMENTS VOLUME 2, Borden Institute (Medical Department of the Army 2002), p. 52 ("heat illness is probably underreported"); Ex. 61, Lisa Leon and Abderrezak Bouchama, *Heatstroke*, 5 Comprehensive Physiology 611, 634 (April 2015); Ex. 59, Fowler et al., *Heat-Related Deaths After an Extreme Heat Event—Four States, 2012, and United States, 1999-2009*, 62 MMWR 433, 436 (CDC June 7, 2013) (noting that including only deaths with heat listed as a cause might underestimate the impact of a heat wave on mortality); Ex. 62, Luber et al., *Heat-Related Deaths—United States, 1999-2003*, 55 MMWR 796, 797 (CDC July 28, 2006) ("the number of heat-related deaths is underestimated"); Ex. 60, Greenberg et al., *The Epidemiology of Heat-Related Deaths, Texas—1950, 1970-79, and 1980*, 73 Am. J. of Pub. Health 803, 805 (July 1983); Ex. 52, Expert Report of Dr. S. Vassallo, M.D., p. 12, ¶ 53 ("[m]any more people die each year from heat-related exacerbations of underlying medical vulnerabilities than from heatstroke."); Ex. 53, Expert Report of Dr. M. McGeehin, Ph.D., p. 16, ¶¶ 45–47.

[38] Doc. 28, p. 37, ¶ 142; Ex. 20, Skarha et al., *Provision of Air Conditioning and Heat-Related Mortality in Texas Prisons* (Nov. 2, 2022); Ex. 6, *Tiede v. Collier* Hearing Tr. July 30, 2024, 160:7–15; Ex. 21, Email to Collier (Nov. 9, 2022).

[39] Ex. 5, *Tiede v. Collier*, No. 1:23-cv-1004, Doc. 202 (W.D. Tex. Mar. 26, 2025), p. 43.

ineffective;[40] that many of TDCJ's documented temperature readings were inaccurate and fabricated;[41] that Collier and TDCJ had received scientific studies in 2022 alerting them to the danger from extreme heat despite its "mitigation" practices;[42] that the heat score system was arbitrary, inadequate, and ineffective;[43] and that indoor heat caused the deaths of three of Plaintiffs' decedents—Elizabeth Hagerty, John Castillo, and Jon Southards—as well as two other inmates in 2023, and that these inmates would not have died had they been housed in air-conditioning.[44] Doc. 28, pp. 25–27, 32, 40, 52, 55, 62, ¶¶ 82–87, 89–91, 93, 121, 157, 161, 221, 243, 293. Collier testified before this Court that it would be feasible to install additional air conditioning in TDCJ facilities.[45]

Accordingly, this Court found it substantially likely that Collier was deliberately indifferent to the substantial risk of serious harm to inmates across the state posed by the indoor heat—the same indoor heat that killed Plaintiffs' decedents.[46] Critically, this Court specifically considered the forgoing history in that determination—going back to 1998, not just 2021.[47]

## III.    PROCEDURAL HISTORY

Plaintiffs filed a detailed complaint which included 81 pages of relevant facts, including virtually all of the above discussion which is based on evidence derived from previous litigation involving TDCJ, UTMB, Collier, Linthicum, and Murray. Doc. 28, pp. 10–91. Despite superior access to that evidence, Defendants declined to admit virtually all of those facts. *See* Doc. 31.

---

[40] Ex. 5, *Tiede v. Collier*, No. 1:23-cv-1004, Doc. 202 (W.D. Tex. Mar. 26, 2025), pp. 46–52.
[41] Ex. 5, *Tiede v. Collier*, No. 1:23-cv-1004, Doc. 202 (W.D. Tex. Mar. 26, 2025), pp. 53–56.
[42] Ex. 5, *Tiede v. Collier*, No. 1:23-cv-1004, Doc. 202 (W.D. Tex. Mar. 26, 2025), p. 42.
[43] Ex. 5, *Tiede v. Collier*, No. 1:23-cv-1004, Doc. 202 (W.D. Tex. Mar. 26, 2025), p. 44.
[44] Ex. 5, *Tiede v. Collier*, No. 1:23-cv-1004, Doc. 202 (W.D. Tex. Mar. 26, 2025), pp. 21–31.
[45] Ex. 8, *Tiede v. Collier* Hearing Transcript. Aug. 2, 2024 (Collier), 258:13–16, 263:7–11.
[46] Ex. 5, *Tiede v. Collier*, No. 1:23-cv-1004, Doc. 202 (W.D. Tex. Mar. 26, 2025), pp. 75–83.
[47] Ex. 5, *Tiede v. Collier*, No. 1:23-cv-1004, Doc. 202 (W.D. Tex. Mar. 26, 2025), pp. 18, 77.

Plaintiffs sent written discovery to the fourteen Defendants on February 28, 2026. As Defendants appeared to intend to dispute the decades of their history with this issue, even those issues settled in previous lawsuits and Court orders, Plaintiffs did include requests as to most elements of that history for the agencies and policymaker defendants. On that same day, Plaintiffs produced over 40,000 pages of relevant documents, including most exhibits to this motion other than the government websites and court filings.

Plaintiffs agreed to extend Defendants' time to respond and, when Defendants sought to confer on this motion, offered to limit large swaths of requests. Defendants have responded with objections, but have not further conferred with Plaintiffs on any specific requests.

Defendants seek to stop discovery into practically all of the facts discussed above and in Plaintiffs' complaint in their motion for protective order, instead seeking to limit discovery to only four prisons and the time period 2021 to 2023. Doc. 44; Doc. 44-67.

## IV.   LEGAL STANDARD

Rule 26 allows parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." FED. R. CIV. P. 26(b)(1). Parties resisting discovery must make specific objections supported by evidence. *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990).

In civil cases, "there is a strong presumption in favor of discovery, and it is the party who moves for a stay that bears the burden of overcoming this presumption." *Ramirez v. Escajeda*, No. EP-17-CV-00193-DCG, 2019 WL 5258040, at *1 (W.D. Tex. June 17, 2019) (quoting *Alcala v. Texas Webb Cty.*, 625 F. Supp. 2d 391, 397-98 (S.D. Tex. 2009)). While qualified immunity can sometimes justify limits on discovery, "qualified immunity does not shield government officials from all discovery but only from discovery which is either avoidable or overly broad." *Bohlman*

11

*v. Comal Cnty., Tex.*, No. SA-05-CA-693WWJ, 2006 WL 8432994, at *1–2 (W.D. Tex. May 2, 2006).

## V.   ARGUMENT

The Court should deny the motion for protective order for three reasons.

### A.   Defendants' deliberate indifference before 2021 and concerning other prisons is critically relevant.

The Court should decline Defendants' invitation to narrow this case to four specific prisons and a two-and-a-half year time period for three reasons.

First, prior incidents are relevant to show the Defendants—particularly the policy-level Defendants—were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists." *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998). Defendants are correct that defendants' deliberate indifference can be proven by demonstrating the risk was obvious—*see, e.g.*, *Silva v. Donley Cnty. Texas*, 32 F.3d 566, 1994 WL 442404, *5–6 (5th Cir. 1994); *Harris v. Hegmann*, 198 F.3d 153, 155 (5th Cir. 1999); *Brown v. Bryan Cnty., OK*, 219 F.3d 450, 459 (5th Cir. 2000)—or arose from a pervasive condition of confinement—*see, e.g.*, *Montano v. Orange Cnty., Tex.*, 842 F.3d 865, 874 (5th Cir. 2016); *Shepherd v. Dallas County*, 591 F.3d 445, 453 (5th Cir. 2009); *Helling v. McKinney*, 509 U.S. 25, 36 (1993). But Defendants are incorrect that a prior pattern is irrelevant; to the contrary, supervisors are also deliberately indifferent if a prior pattern put those officials on notice that their conduct was dangerous or otherwise risked constitutional violations. (The existence of this pattern, the importance of prison policies in causing that pattern, and the context for Defendants' post-incident statements such as

12

during the *Tiede* litigation can also be demonstrated by subsequent violations.[48]) Since Defendants have not conceded their deliberate indifference (or indeed any of the pattern facts), they cannot complain that Plaintiffs are attempting to prove the existence of a decades-long pattern known to Defendants. *Contra* Doc. 44, p. 6.

In this vein, documents "regarding known prior incidents of similar misconduct by other [officers] … [are] highly relevant." *Roque v. City of Austin*, No. 1-17-CV-00932-LY, 2018 WL 5848988, at *5 (W.D. Tex. Nov. 7, 2018).[49] The Fifth Circuit has often required detailed evidence of an extensive chain of similar incidents to prove a pattern for *Monell* liability, which is similar to supervisory liability, under § 1983. *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 851 (5th Cir. 2009); *Cano v. Bexar Cnty., Tex.,* 280 Fed.Appx. 404, 406 (5th Cir. 2008); *Bennett v. City of Slidell,* 728 F.2d 728, 768, n.3 (5th Cir. 1984). This is because "[a] pattern could evidence not only the existence of a policy but also official deliberate indifference." *Piotrowski v. City of Houston*, 237 F.3d 567, 582 (5th Cir. 2001). In other correctional cases, the Fifth Circuit has considered the existence of a pattern to show *Monell* <u>and</u> supervisory liability. *See Parker v. LeBlanc*, 73 F.4th 400, 405 (5th Cir. 2023) (report showing prior similar violations showed unconstitutional practice sufficient to deny qualified immunity to policymaker personally); *Sanchez v. Young Cnty., Texas*, 956 F.3d 785, 793 (5th Cir. 2020) (reversing grant of summary judgment on *Monell* theory where jail failed to correct deficiencies or discipline misconduct, and multiple officials testified to similar

---

[48] *See* Ex. 46, *McCollum v. Livingston*, 3:12-cv-2037, Doc. 69 (N.D. Tex. July 24, 2023), p. 4 (compelling documents about heat-related deaths after McCollum's, because "data from multiple TDCJ facilities could be relevant to the question of whether an institution-wide trend or pattern existed").

[49] *See also Estevis v. City of Laredo, et al*., No. 5:22-CV-22, 2023 WL 9319061, at *3 (S.D. Tex. Mar. 31, 2023); *Maurer v. St. Tammany Par. Sch. Bd*., CV 19-13479, 2020 WL 12801030, at *3 (E.D. La. June 26, 2020); *Adams v. City of New Orleans,* 2017 WL 713853, at *2 (E.D. La. Feb. 23, 2017); *Mayfield v. Brewer*, 2:13-CV-73-KS-MTP, 2014 WL 11515052, at *2 (S.D. Miss. Jan. 10, 2014); *Chauvin v. Lee*, No. CIV.A. 99-2200, 2000 WL 567006, at *3 (E.D. La. May 8, 2000).

policy); *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 395 (5th Cir. 2000) (denying qualified immunity because allegations that satisfied *Monell* also stated an individual claim against the supervising policymaker, including one prior similar incident); *see also Colle v. Brazos County*, 981 F.2d 237, 244 (5th Cir. 1993) (denying qualified immunity for sheriff based on *Monell* allegations). Defendants' proposed *a priori* rejection of prior incidents is therefore plainly wrong.

Second, contrary to Defendants' argument, the scope of prior heat litigation favors Plaintiffs' discovery here. The Fifth Circuit in *Webb* and *Hinojosa* affirmed permitting discovery where those defendants appealed and argued the discovery was too broad—there was no cross appeal arguing that the permitted discovery was too narrow, so the Fifth Circuit did not say those exact parameters were the maximum discovery permitted in those heat-death cases, much less in future cases; it simply dismissed the appeals. *See Webb v. Livingston*, 618 Fed. Appx. 201, 211 (5th Cir. 2015); *Hinojosa v. Livingston*, 807 F.3d 657, 675 (5th Cir. 2015). Indeed, the *Hinojosa* court even suggested broader discovery might be merited: "while Defendants' knowledge of heat-related policies and procedures in place at the Garza West Unit and similar transfer facilities is more probative than their knowledge of policies and practices at other TDCJ facilities, we cannot say that discovery as to the latter is unnecessary." *Hinojosa*, 807 F.3d at 674. And the Fifth Circuit's analysis proved prescient: On remand in *Webb*, the scope of discovery widened significantly; as discussed above, TDCJ was compelled to produce documents and information on heat deaths and illnesses going back seventeen years to 1998.[50] In a related case, *McCollum v. Livingston*, the Southern District of Texas specifically cited seven deaths from 1999 to 2010, at totally different prisons than McCollum's 2011 death, when it denied those defendants qualified

---

[50] Ex. 1, TDCJ's Second Supp. Resp. to Webb's Interrogatories, p. 1 (noting that TDCJ supplemented its responses "[p]ursuant to… the orders of the Court").

immunity at summary judgment.[51] That evidence arose in part from the *Webb* order, but also an earlier order compelling production regarding thirteen deaths in the Northern District of Texas.[52]

Finally, Plaintiffs do not just allege, but have specific evidence that these same individuals have known about and chosen not to solve the ongoing substantial risk of harm from heat throughout the state for decades, so that long history is directly relevant to deliberate indifference and thus qualified immunity. The head of TBCJ told Linthicum that addressing the danger from heat needed to become the agency's highest priority in 1998,[53] amidst multiple confirmed heat deaths across the state that year. Linthicum herself told Murray they had no way to better prevent heat deaths other than building more air-conditioned facilities in 2005, again while contemplating a death the year before.[54] Agency leadership continued to have these discussions as more and more inmates died, culminating in litigation against TDCJ, UTMB, Linthicum, and Murray. Collier was likely part of those conversations dating back to 2007 when he became deputy executive director,[55] but in any event Collier certainly knew about the risk and its history from his experience leading TDCJ to settle the lawsuits arising from eight heat-related deaths, a heat stroke, and a class action to air condition an entire prison in 2018.[56] And Collier personally acknowledged the existence of the risk in contempt proceedings in 2019.[57] Yet, Defendants seek to foreclose discovery into *all* of

---

[51] Ex. 47, Order Denying Summary Judgment in *McCollum v. Livingston*, 4:14-cv-3253, Doc. 342 (S.D. Tex. Feb. 3, 2017), p. 2, n.2, 23; *see supra* p. 5, nn.16–20.

[52] *See* Ex. 46, *McCollum v. Livingston*, 3:12-cv-2037, Doc. 69 (N.D. Tex. July 24, 2023), p. 4; Ex. 1, TDCJ's Second Supp. Resp. to Webb's Interrogatories, pp. 2–9.

[53] Ex. 10, Memo from A. Polunsky to W. Scott (July 24, 1998).

[54] Ex. 11, Memorandum from Linthicum re: Ricky Robertson, p. 2.

[55] Ex. 4, *Cole v. Collier*, Hearing Testimony Sep. 10, 2019 (Collier), 12:4–10 (explaining Collier was deputy executive director for nine years before becoming executive director in 2016); *see* Ex. 34, Motion to Substitute Brad Livingston with Bryan Collier in *Cole v. Livingston*, 4:14-cv-1698, Doc. 547 (S.D. Tex. Sep. 9, 2016).

[56] *See supra* p. 6, nn.23–25.

[57] Ex. 4, *Cole v. Collier*, Hearing Testimony Sep. 10, 2019 (Collier), 49:16–25.

those demonstrably relevant facts.

The Court should reject Defendants' effort to hide from the evidence against them via a discovery order.

**B.  Rule 26 weighs against Defendants' proposed limits.**

Defendants' effort to limit the scope and time of all discovery based on the burden of certain requests is a gross over-reaction to their objections.

Discovery is permitted for any relevant, nonprivileged matter, so long as it is proportional considering six factors: (1) the importance of the issues at stake; (2) the amount in controversy; (3) the parties' relative access to information; (4) the parties' resources; (5) the importance of the discovery; and (6) the burden or expense of the proposed discovery. FED. R. CIV. P. 26.

All six proportionality factors disfavor Defendants' proposed limits on discovery.

*1.  Defendants seek to prohibit important discovery.*

Turning to the fifth factor first, Defendants' proposed limits would stymy necessary and important discovery for three reasons.

First, as discussed above, Defendants TBCJ, UTMB, Collier, Linthicum, and Murray all learned about the risk to TDCJ inmates long before 2021, so the proposed time limit is divorced from the allegations as well as the evidence in this case. *See supra* pp. 12–16. Defendants' knowledge from 1998 to 2020 did not evaporate at the stroke of midnight on January 1, 2021— they all still knew from their years of experience that heat would cause and did cause deaths and injury. Moreover, the fact that Defendants knew for decades and did not take reasonable steps to solve the problem during all that time is critically relevant, as the Court in *McCollum* specifically

16

found when it also considered deaths more than two years before Mr. McCollum's death.[58] Thus, unsurprisingly, district courts generally compel records regarding other inmate deaths that may have involved similar constitutional violations beyond just a prior two-year period.[59] (That said, Plaintiffs had already limited most of their requests to narrower periods—only confirmed heat death, official policy, and facility construction requests target information going back to 1998.[60])

Second, limiting this case to the specific un-air-conditioned prisons where these four inmates died is not appropriate where TBCJ, TDCJ, UTMB, Linthicum, Collier, and Murray all oversaw multiple other prisons with the same dangerous conditions and knew other inmates were dying and being injured by those conditions. Again, that very logic was used to deny qualified immunity for analogous policy decisions in *McCollum* outside the Hutchins Unit where Mr. McCollum died.[61]

Finally, the delay inherent in executives' knowledge and their available interventions also makes a two-year time period extremely unfair to Plaintiffs. Historically, the agency takes some

---

[58] Ex. 47, Order Denying Summary Judgment in *McCollum v. Livingston*, 4:14-cv-3253, Doc. 342 (S.D. Tex. Feb. 3, 2017), p. 2, n.2 & p. 23; *see supra* p. 5, nn.16–20.

[59] *See, e.g.*, Ex. 54, *Webb v. Livingston*, No. 6:13-cv-00711, Doc. 110 (E.D. Tex. April 22, 2014), pp. 3, 5 (compelling production of UTMB peer review records for prior TDCJ heat deaths going back to 1998); Ex. 46, *McCollum v. Livingston*, No. 3:12-cv-02037, Doc. 69 (N.D. Tex. July 24, 2013) (compelling production of TDCJ EAC records for *subsequent* TDCJ heat deaths); *Belcher v. Lopinto*, No. CV 18-7368, 2019 WL 5860744, at *4 (E.D. La. Nov. 8, 2019) (compelling ten years of jail death records where defendant had objected and tried to limit scope to three years); Ex. 70, *Martinez v. Southwestern Correctional, LLC*, No. 6:17-cv-00009, Doc. 85 (W.D. Tex. July 22, 2019) (compelling production of private prison operator's records concerning five years of prior deaths); *see also supra* p. 12, n.49 and accompanying text (non-correctional pattern evidence compelled).

[60] *See, e.g.*, Doc. 44-1, pp. 22–23 (request 241 for Estelle policies going back to 1998, but requests 242, 247–249, 255, 256 about other aspects of unit operations limited to 2013); *id.* at 27 (requests 298–310 seeking documents for named inmates going back to 1998, but requests about unspecified inmates with measured hyperthermia limited to 2013).

[61] Ex. 47, Order Denying Summary Judgment in *McCollum v. Livingston*, 4:14-cv-3253, Doc. 342 (S.D. Tex. Feb. 3, 2017), p. 2, n.2, 23; *see supra* p. 5, nn.16–20.

17

amount of time to investigate deaths and injuries before its leaders learn they may be heat-related. In the case of Shriver and Robles, for example, Linthicum's memo was not written until two years after they died.[62] The agency was disputing whether nearly a dozen deaths were caused by heat for five years or more before conceding they were caused by heat during litigation.[63] Thus, heat-related deaths from 2021 might not have met the subjective prong until after 2023, whereas older incidents—such as those discussed above—had already percolated through to the executives' awareness. One of the reasonable steps Plaintiffs allege Defendants should have taken is to retrofit or replace non-air-conditioned prisons, or use existing air-conditioned spaces to prioritize more vulnerable inmates, so that they could house more vulnerable inmates safely. Doc. 28, pp. 101–103, ¶¶ 521–522(a, c, d, j). As to the former, Collier himself agreed that air conditioning the TDCJ system is feasible.[64] But Plaintiffs' ability to make that argument would be undermined if they are limited to Defendants' knowledge from only two years earlier, as that would leave them less time to expand their available air-conditioned housing capacity. Blocking discovery of an earlier time period will accordingly dramatically undercut Plaintiffs' ability to prove deliberate indifference.

Accordingly, the critical importance of the evidence weighs against Defendants' motion for protective order and their objections.

### 2. The Importance of the Issues at Stake

Returning to the first factor, the issues in this case concern whether Defendants knowingly devised and administered a prison system they knew would harm people due to dangerous conditions of confinement, and whether that danger did in fact harm and kill not only these four people, but also killed dozens more and injured hundreds more in the preceding decades. *See supra*

---

[62] Ex. 12, Email from Linthicum re: Heat Related Deaths, pp. 1, 3.
[63] *See generally* Ex. 1, TDCJ's Second Supp. Resp. to Webb's Interrogatories, pp. 2–9.
[64] Ex. 8, *Tiede v. Collier* Hearing Transcript. Aug. 2, 2024 (Collier), 258:13–16, 263:7–11.

pp. 3–10. Tens of thousands of prisoners and their families continue to be injured by these individuals' decisions—decisions they started making decades ago. This case raises important issues.

### 3.   The Amount in Controversy

Four people are dead because of Defendants' intentional decisions.[65] Mr. Southards was 36; Ms. Hagerty was 37; Mr. Skinner was 45; and Mr. Castillo was 32.[66] They left behind devastated parents and children. Doc. 28, pp. 4–17, ¶¶ 9–17. The amount in controversy is thus significant and weighs in favor of compelling fulsome discovery.

### 4.   The Parties' Relative Resources and Access to Information

As to the third and fourth factors, Plaintiffs' counsel have access to significant information and indeed have produced about 40,000 pages, which thus far exceeds the volume of documents Defendants have chosen to produce in this case. However, these documents come from TDCJ and UTMB themselves, and most relevant materials in prior heat death litigation was disclosed subject to protective orders—some of the critical evidence used herein is only available today because it was specifically released by a court in public hearings.[67] Thus, Plaintiffs are in the unenviable position of asking Defendants to produce back to them documents Plaintiffs' own attorneys already have or had, but may be prohibited from using in this case. Otherwise, Plaintiffs unsurprisingly do not have access to TDCJ and UTMB's internal records in the absence of Defendants' cooperation,

---

[65] Doc. 28, p. 93, ¶ 482; *see* Ex. 5, Order in *Tiede v. Collier*, No. 1:23-cv-1004, Doc. 202 (W.D. Tex. Mar. 26, 2025), pp. 23, 25, 29.

[66] Ex. 28, Southards Urgent Care Record, p. 1; Ex. 26, Hagerty Urgent Care Record, p. 1; Ex. 27, Skinner Death Summary, p. 1; Ex. 25, Castillo Urgent Care Record, p. 1.

[67] *See, e.g.*, Ex. 1, TDCJ's Second Supp. Resp. to Webb's Interrogatories, pp. 160–265 (document, bearing public file stamp, marked attorneys eyes only).

whereas Defendants do.[68] Defendant TDCJ has a more than $5.8 billion-dollar annual budget, UTMB has a budget of over $3.7 billion, whereas Plaintiffs are individuals without such resources.[69] Thus, the twin factors of the parties' relative resources and access to information favor denying Defendants' motion for protective order.

## 5. *Whether the Burden or Expense of Discovery Outweighs its Likely Benefit*

Finally, Defendants have presented the burden of certain requests to the agencies—not to the officials with immunity—but Defendants have already objected to those requests and Plaintiffs have not moved to compel because indeed no conference has taken place on any requests. Defendants' motion is the first time Plaintiffs are learning, for example, that there are allegedly 540,000 responsive grievance files and 3.7 terabytes of responsive electronic documents. The actual burden Defendants seek to avoid cannot be quantified because the parties have not conferred on an electronic discovery plan or any of the specific requests at issue.

Accordingly, this factor weighs in favor of denying Defendants' motion for three reasons.

First, Defendants repeatedly emphasize the raw number of the written discovery requests, but most of the requests forming this tally are either obviously not a burden or not outside the

---

[68] *See, e.g.*, *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 842-43 (S.D. Tex. 2011); *Villarreal v. Hidalgo Cnty.*, No. 7:22-CV-00003, 2022 WL 824851, at *4 (S.D. Tex. Mar. 18, 2022); *Booth v. Galveston Cnty.*, 352 F. Supp. 3d 718, 747 (S.D. Tex. 2019); *Arceneaux v. Klein Indep. Sch. Dist.*, No. CV H-17-3234, 2018 WL 2317565, at *6 (S.D. Tex. May 22, 2018); *Benjamin v. Baytown Police Dep't*, No. 4:17-CV-01198, 2018 WL 1033255, at *2 (S.D. Tex. Feb. 21, 2018); *Brown v. City of Houston*, 297 F. Supp. 3d 748, 766 (S.D. Tex. 2017); *Custer v. Houston Police Dep't*, No. CV H-17-1338, 2017 WL 5484114, at *4 (S.D. Tex. Nov. 15, 2017); *Hall v. City of Waller*, No. CV H-16-3269, 2017 WL 2772576, at *4 (S.D. Tex. June 27, 2017).

[69] Ex. 68, TDCJ Agency Operating Budget 2026, p. 7 *available at* https://www.tdcj.texas.gov/documents/bfd/FY26_Agency_Operating_Budget.pdf; Ex. 69, The University of Texas Medical Branch at Galveston Operating Budget Fiscal Year Ending August 31, 2026, p. 20 *available at* https://www.utsystem.edu/sites/default/files/documents/report-state/2025/annual-operating-budget-ut-medical-branch-galveston/fy-2026-budget-university-of-texas-medical-branch-at-galveston.pdf.

limited scope they ask to impose on this case. All fourteen Defendants received the same 21 requests for documents they used for their interrogatory responses or defenses, their CV, expert materials, and discovery responses from third parties, accounting for 294 requests for production.[70] Another 412 requests for production, mostly two or three copies to the agency Defendants, are expressly limited to these four decedents.[71] (It is unclear why Defendants believe these requests should be curtailed to a two-year period or to a specific set of four prisons, as obviously each decedents' history within TDCJ is likely relevant to evaluating why each person died, whether they had a known disability, and whether Defendants were aware of their susceptibility to indoor heat.) And 129 additional requests for production are limited to the four prisons where Plaintiffs' decedents died.[72] Likewise, 140 of the requests for admission are simply the same identical requests asking each Defendant about the spelling of their name, jurisdictional questions, and whether they contend another entity should be named.[73] The remaining requests for admission are an identical set of 73 requests for twelve defendants about whether the National Weather Service correctly calculates heat index, whether they knew particular medications or conditions placed a person at heightened risk from heat before these decedents died, and whether the lack of air conditioned housing caused specific people to die—mostly the people TDCJ previously admitted

---

[70] *See* Doc. 44-1 (requests 1–2, 337–356); Doc. 44-2 (requests 1–2, 240–259); Doc. 44-3 (requests 1–2, 104–123); Doc. 44-4 (requests 1–2, 11–30); Doc. 44-5 (requests 1–2, 15–34); Doc. 44-6 (requests 1–2, 46–65); Doc. 44-7 (requests 1–2, 17–36); Doc. 44-8 (requests 1–2, 15–34); Doc. 44-9 (requests 1–2, 46–65); Doc. 44-10 (requests 1–2, 15–34); Doc. 44-11 (requests 1–2, 15–34); Doc. 44-12 (requests 1–2, 41–60); Doc. 44-13 (requests 1–2, 18–36); Doc. 44-14 (requests 1–2, 12–30).

[71] *See* Doc. 44-1 (requests 14–221); Doc. 44-2 (requests 14–171); Doc. 44-3 (requests 3–26, 47–86); Doc. 44-4 (request 3); Doc. 44-5 (request 3); Doc. 44-6 (requests 14–17); Doc. 44-7 (requests 3–4); Doc. 44-8 (request 3); Doc. 44-9 (requests 14–17); Doc. 44-10 (request 3); Doc. 44-11 (request 3); Doc. 44-12 (requests 13–16); Doc. 44-13 (requests 3–4); Doc. 44-14 (request 3).

[72] Doc. 44-1 (requests 241–296); Doc. 44-2 (requests 182–214); Doc. 44-3 (requests 47–86).

[73] Doc. 44-29–Doc. 44-42 (requests 1–10).

died from indoor heat.[74] Obviously all of these topics go to deliberate indifference. Illustrating that the number of admissions was not a burden, all Defendants simply responded jointly to the 84 unique requests for admission. *See* Doc. 44-46. Nor were they cumulative. Because Defendants declined to admit practically any facts in the complaint[75] or the requests for admissions, so Plaintiffs must proceed with discovery on all of those issues, including those issues found by courts against some of these Defendants before. Indeed, those requests were an opportunity for them to save both sides significant expense if they had chosen not to once again relitigate these issues.

Second, Defendants highlight that Plaintiffs asked for the same document in overlapping requests to the agency Defendants, but their own objection practice demonstrates why this is likely necessary. For example, Plaintiffs asked for all documents concerning Jon Southards, but Defendants complain in a lengthy objection that this request is too vague and too broad, then state that they have produced documents after "a reasonably diligent search" without explaining what documents they are withholding about Mr. Southards, contrary to Rule 34(b)(2)(C). Doc. 44-47, pp. 8–9; *see* Doc. 44, p. 7. Anticipating this, as the undersigned counsel have had an unusual number of experiences with TDCJ secretly withholding documents and information, or providing misleading documents and information, which has resulted in three instances of court admonitions or sanctions,[76] Plaintiffs also asked for specific sets of files for Mr. Southards such as the

---

[74] Doc. 44-29–Doc. 44-31 & Doc. 44-32–Doc. 44-41 (requests 11–83).

[75] Notably, many of Defendants' denials in their answer refer to documents that Defendants now contend should be outside the scope of discovery. *See, e.g.*, Doc. 31, p. 4, ¶ 36 (referring to Collier's 2019 testimony); *id.* at 6, ¶ 62 (referring to 2017 order denying summary judgment in *McCollum*); *id.* at 6, ¶ 65 (referring to Linthicum's 2005 memo); *id.* at 6–7, ¶ 66 (referring to Linthicum's 2009 memo); *id.* at 7, ¶ 67 (referring to 2011 letter from Palestine Regional Medical Center).

[76] *See, e.g.*, Ex. 9, Trial Tr., Mar. 31, 2026, *Texas CURE v. Lumpkin*, No. 1:23-cv-1004 (W.D. Tex.), p. 212 (TDCJ's executive director's counsel acknowledging a responsive document was received by TDCJ in November, but not revealed to those plaintiffs until during trial in March); Ex. 5, *Tiede v. Collier*, No. 1:23-cv-1004, Doc. 202 (W.D. Tex. Mar. 26, 2025), pp. 54–56 (TDCJ

pathologist's file (which was evidently produced today), the videos of his housing area on the day of his death (which has not been produced), his disciplinary history (which was only produced from 2021), and a few dozen other types of documents concerning Mr. Southards. Doc. 44-1, pp. 10–20. These requests identified exactly what documents Plaintiffs expected to receive, and provided a framework to confer upon and, if necessary, seek Court relief on specific sets of missing documents. But Defendants refused to even attempt to follow FED. R. CIV. P. 34(b)(2)(C), which makes their responses currently worthless, as they do not alert Plaintiffs or the Court to which sets of those specific documents Defendants intend to produce, intend to withhold, or claim they do not possess.[77]

Third, Defendants are clear in their motion, and were clear in conferring on this motion, that they are not seeking a ruling on any particular request, so their evidence of burden is a non-sequitur. Obviously, Plaintiffs do not intend to require the Defendants to read 540,000 grievance files or spend 2 million hours on discovery. However, Plaintiffs did not have the ability to predict how many documents will be responsive or what Defendants will willingly produce unless Plaintiffs ask. All Plaintiffs can do is attempt to craft requests for important information in this complex case and attempt to confer with Defendants about those requests if they have unintended consequences—and indeed Plaintiffs told Defendants they were prepared to greatly narrow

---

provided a fabricated document); Ex. 38, *Cole v. Collier*, No. 4:14-cv-1698, Doc. 1504 (S.D. Tex. Dec. 11, 2019), pp. 2–3 (TDCJ failed to disclose temperatures, created a false document, and misrepresented facts); Ex. 71, *McCollum v. Livingston*, No. 3:12-cv-2037, Doc. 227 (N.D. Tex. Jan. 26, 2015), pp. 10, 15, 19–20 (TDCJ withheld documents and information, and misrepresented the existence of both); *see also* Ex. 54, *Webb v. Livingston*, No. 6:13-cv-711, Doc. 110 (E.D. Tex. April 22, 2014), p. 2 (noting UTMB told the court documents did not exist, but later produced them).

[77] *See, e.g.*, Doc. 44-47, pp. 8–20 (requests 15–66 providing no response to the specific requests other than referring to the response to the general request, request 14, for Mr. Southards, which does not identify what, if anything, is being withheld versus produced pursuant to objections).

23

specific requests before Defendants' responses were even due. Plaintiffs also asked if Defendants could identify particularly burdensome requests that might need to be narrowed. That is the normal discovery process. But Defendants did not wish to engage in that process; they would only accept a blind agreement by Plaintiffs to limit discovery to specific prisons and a specific time period, and now choose to point to the most problematic requests—that they never alerted Plaintiffs to—as ammunition for that goal rather than simply conferring on those requests.

Defendants cannot show their preferred, bright-line limits of all discovery are tailored to the claims and defenses in this case. Indeed, there is little discussion of the facts giving rise to the claims and defenses anywhere in their motion, so they have not presented the Court with enough information to justify their requested relief.

## C. If the Court grants relief, then it will need to dramatically modify the scheduling order.

Defendants seek to follow a novel procedural posture—unlike all the cases they cite,[78] no dispositive motion has been filed on qualified immunity in this case. The conclusory assertion of qualified immunity in an answer is not a reason to arbitrarily limit discovery into the disputed allegations in Plaintiffs' complaint—much less limit discovery indefinitely when no such analysis of the complaint has even been requested.[79] Regardless, if the Court decides to accept bright line limits on discovery, then the Court will need to open a second discovery period for the ADA and

---

[78] *See Pearson v. Callahan*, 555 U.S. 223, 229 (2009); *Asante-Chioke v. Dowdle*, 103 F.4th 1126, 1130 (5th Cir. 2024); *Carswell v. Camp*, 54 F.4th 307, 309 (5th Cir. 2022); *Hinojosa v. Livingston*, 807 F.3d 657, 661 (5th Cir. 2015); *Backe v. LeBlanc*, 691 F.3d 645, 646 (5th Cir. 2012); *Lion Boulos v. Wilson*, 834 F.2d 504, 506 (5th Cir. 1987); *Webb v. Livingston*, 618 Fed. Appx. 201, 204 (5th Cir. 2015); *Webb v. Livingston*, No. 6:13CV711, 2014 WL 1049983, at *1 (E.D. Tex. Mar. 17, 2014).

[79] *Al-Saraji v. City of Dallas*, No. 3:10-CV-1918-O ECF, 2011 WL 13233170, at *5 (N.D. Tex. Mar. 29, 2011) ("at some point, the Court must be free to move forward with the case. Accordingly, although Defendants may still assert their qualified immunity defense in a motion for summary judgment, discovery is open to all matters.").

Rehab Act claims, as well as any other issues not necessary to qualified immunity, after qualified immunity is resolved. Thus, Plaintiffs request that the Court direct the parties to confer on and propose a bifurcated schedule if it chooses to grant any part of Defendants' motion.

## VI.    CONCLUSION

Accordingly, Defendants' motion for protective order should be denied.

Dated: May 20, 2026.

Respectfully submitted,

**EDWARDS LAW**
603 W 17th St.
Austin, Texas 78701
Tel.  512-623-7727
Fax.  512-623-7729

By____/s/ Jeff Edwards_____
        JEFF EDWARDS
        State Bar No. 24014406
        jeff@edwards-law.com
        MIKE SINGLEY
        State Bar No. 00794642
        mike@edwards-law.com
        DAVID JAMES
        State Bar No. 24092572
        david@edwards-law.com
        LISA SNEAD
        State Bar No. 240622.04
        lisa@edwards-law.com

**ATTORNEYS FOR ALL PLAINTIFFS**


**WEBB, CASON & MANNING**
710 Mesquite St.
Corpus Christi, Texas 78401
(361) 887-1031

        Matthew Manning
        State Bar No. 24075847
        Matt@wcctxlaw.com


25

Parker Webb
State Bar No. 24085648
Parker@wcctxlaw.com

**ATTORNEYS FOR PLAINTIFF SALAZAR
ONLY**

**<u>CERTIFICATE OF SERVICE</u>**

By my signature below, I certify that a true and correct copy of this document has been served on all counsel of record via the Court's electronic case filing system.

<u>/s/ Jeff Edwards</u>
Jeff Edwards

26