**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **TONA SOUTHARDS-NARANJO,** *et al.* | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 1:25-cv-990** |
| | § | |
| **TEXAS DEPARTMENT OF** | § | |
| **CRIMINAL JUSTICE,** *et al.*, | § | |
| *Defendants.* | § | |

---

**DEFENDANTS' OBJECTIONS TO MAGISTRATE JUDGE LANE'S REPORT AND RECOMMENDATION TO DENY MOTION FOR SEVERANCE AND TRANSFER**

---

Defendants Texas Department of Criminal Justice ("TDCJ"), University of Texas Medical Branch ("UTMB"), Texas Board of Criminal Justice ("TBCJ"), Bryan Collier ("Collier"), Lanette Linthicum ("Linthicum"), Michael Britt ("Britt"), Audrey England ("England"), Donald Muniz ("Muniz"), Daniel Dickerson ("Dickerson"), Jerry Sanchez ("Sanchez"), Owen Murray ("Murray"), Austine Aigbokhan ("Aigbokhan"), Mahaghony Walker ("Walker"), and Gene Miller ("Miller") (collectively, "Defendants") file the following objections to United States Magistrate Judge Lane's Report and Recommendation to deny Defendants' motion to sever and transfer venue.  D.E. 59.

## I.    STATEMENT OF THE CASE

This case should have been brought as four separate cases, and none of them should have been brought in this Court.  Plaintiffs are the heirs and representatives of four former inmates—Jon Southards ("Southards"), Elizabeth Hagerty ("Hagerty"), John Skinner ("Skinner"), and John Castillo ("Castillo") (together, the "Decedents")—who died in TDCJ custody at four different prison units, in different areas of the state, and under different circumstances.  Both individually and on the Decedents' behalf, Plaintiffs filed this lawsuit alleging that TDCJ, UTMB, TBCJ (together, the "Agency Defendants"), and eleven TDCJ and UTMB officials—Collier, Linthicum, Britt, England,

1

Muniz, Dickerson, Sanchez, Murray, Aigbokhan, Walker, and Miller (together, the "Individual Defendants")—were responsible for the Decedents' deaths. *See* D.E. 28 ("Compl.").

While Plaintiffs allege that all four Decedents died from heat exposure, that connection alone is insufficient for joinder of their otherwise unrelated claims. And while the Western District's Austin Division is technically a proper venue because TDCJ and UTMB have offices here, it is certainly not the most convenient venue. None of the Plaintiffs or Individual Defendants live in Austin, and none of the Decedents' deaths took place here. Southard died at the Estelle Unit in Coryell, Texas, within the territory of the Southern District's Houston Division. Skinner died at the Wainwright Unit in Lovelady, Texas, within the territory of the Eastern District of Texas, Lufkin Division. Hagerty and Castillo died at the Lane Murray Unit and Hughes Unit in Gatesville, Texas, respectively, within the Western District's Waco Division. The best option is obvious: the Court should sever Plaintiffs' case into four cases by Decedent and transfer each case to the venue in which the death occurred.

On November 12, 2025, Defendants filed a motion to sever and transfer, which the Court referred to United States Magistrate Judge Mark Lane for a report and recommendation pursuant to 28 U.S.C. § 636(b). *See* D.E. 33 ("Motion"); Text Order dated April 24, 2026. Judge Lane held a motion hearing on July 24, 2025, during which he did not require any argument from Plaintiffs and expressed his belief that that Defendants are really seeking severance and transfer as "tactics" because they "desperately want[] to get out of the Austin Division of the Western District of Texas." *See* Exhibit A at 30:13-30:16, 31:3-31:5. The next business day, Judge Lane submitted a Report and Recommendation to deny Defendants' motion. D.E. 59 ("R&R"). As described below, the Court should overrule the R&R because it misapplies the relevant legal standards and ignores critical facts.

## II.      STANDARD OF REVIEW

There is no doubt that district courts may assign magistrate judges to work on motions in a case, but the Article III judge must retain final decision-making authority. *See United United States v.*

*Dees*, 125 F.3d 261, 268–69 (5th Cir. 1997).  When a party objects to the recommendation of a magistrate judge, the district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.").

## III.   ARGUMENT

### A.   The R&R misapplies the severance factors.

Courts consider the following factors to determine if severance is warranted:  (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present common questions of law or fact; (3) whether different witnesses and documentary proof are required for separate claims; (4) whether settlement or judicial economy would be promoted; and (5) whether prejudice would be averted by severance.  *Def. Distributed v. Bruck*, 30 F.4th 414, 431 (5th Cir. 2022).  Contrary to the R&R's conclusion, each factor weighs in favor of severing the case by Decedent.

Different occurences.  Plaintiffs' complaint arises from four different occurences; namely, four different deaths at different prison units, under the supervision of different unit-level Defendants, and under different circumstances.  Indeed, the primary reason Plaintiffs' complaint is 117 pages long is because it goes into great detail alleging the *distinct* alleged conditions in which each of the four Decedents were confined before their deaths and the *distinct* set of medical conditions which—coupled with inadequacies by specific unit-level Defendants—led to each of their deaths.  Compl. ¶¶ 187-473.

Despite all of these differences, the R&R nevertheless concludes that all four deaths arise from the same occurrence simply because of Plaintiffs attribute the deaths to a common statewide policy.  R&R at 5.  By that logic, however, all cases challenging the application of statewide policy would be properly tried together, regardless of whether those affected by the policy are similarly situated or if other independent localized factors contributed to the alleged harm.  It would be one thing if Plaintiffs

3

sought injunctive relief in the form of a statewide policy change. But they do not; nor would they have standing to do so. Where, as here, a case challenges the prior application of a statewide policy by different officials, in different locations, under different circumstances, each application must be considered a separate occurrence.

Different questions of law and fact. Plaintiffs' claims against each Decedent raise distinct questions of law and fact. To determine whether the Individual Defendants violated the Eighth Amendment, the Court must consider whether the Decedents' unique conditions of confinement were "so serious as to deprive [them] of the minimal measure of life's necessities," and, if so, whether the Individual Defendants acted with "deliberate indifference" to the risks posed by those unique conditions. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019). And, to determine whether the Agency Defendants violated the ADA/RA, the Court must consider whether each of the Decedents was a qualifying individual with a disability and, if so, whether each of the Decedents was intentionally discriminated against on the basis of their disabilities. *See Windham v. Harris Cty., Tex.*, 875 F.3d 229, 235 (5th Cir. 2017). These are Decedent-specific legal questions, and the relevant facts for answering them will vary greatly; i.e, the distinct conditions experienced by the Decedents, the subjective beliefs of the Individual Defendants with respect to those distinct conditions; the specific medical conditions of each of the Decedents, and the specific accommodations granted or denied to each of the Decedents.

The fact that some questions apply to all Decedents—i.e., whether statewide heat policies were enacted with deliberate indifference—is insufficient to override the Decedent-specific questions, especially since, according to Plaintiffs, these questions are already being decided in another case. *E.g.*, Compl. ¶¶ 41-43, 93-94. Moreover, the R&R is incorrect that there will be "causation questions which will require the same expertise to unravel." R&R at 5-6. Causation is a highly specific inquiry, especially when it comes to determining whether a single factor (i.e., heat) caused or contributed to an

4

individual person's death.  As discovery has already revealed, the Decedents' medical histories vary significantly, the cause of their deaths must be assessed independently.

Different evidence.  Different witnesses and documentary proof are required for Plaintiffs' claims related to each Decedent.  As mentioned, each of the four deaths took place at dfferent units, at different times, under the supervision of different officials, and under different circumstances.  The only witnesses with direct, fisthand knowledge of those circumstacces are the correctional and medical staff at each of the Decedents' former units, none of whom will overlap.  Nor will there be overlap in expert testimony, since each Decedent's cause of death will require an independent review.  Moreover, almost all of the relevant documents—i.e., medical, housing, classification, and autopsy records—will be unique to each Decedent.  There will be some overlap in testimony and documents concerning heat policy at above the unit level, to be sure, but the R&R wildly overstates this overlap in concluding that "much, if not all, of the evidence and witnesses will be common to all four cases."  R&R at 6.  By contrast, the R&R understates the likelihood of coordiation between the parties to avoid duplication. *Id.* at 7 ("The court has little reason to believe the parties will be able to effectively coordinate discovery among simultaneous, ongoing cases.").  Despite ongoing discovery disputes, there has been a concerted effort to streamline discovery in this case; for example, Defendants have agreed that all documents disclosed in the ongoing *Tiede* case can be used in this case.  Given the mutual interest in efficiency, the parties would have every reason to avoid redundancy if the case were severed.

Settlement and judicial economy.  Severing Plaintiff's claims against each Decedent would substantially increase the possibility of settlement.  The likelihood of all seven Plaintiffs agreeing to a global settlement is far less than the likelihood of the represenattive of a specific Decedent agreeing to settle his or her specific claims.  Moreover, TDCJ and UTMB—which would be paying and/or indemnifying any settlement—will only agree to a settlement which disposes of an entire case, not merely certain claims within the case, and the agencies will likely value each claims differently.  If

TDCJ/UTMB assesses a high risk for some claim(s) and lower risk for others, it will be unlikely to settle the action until the low-risk claim(s) are resolved—which could be as late as summary judgment or a Rule 50 motion at trial. However, if the cases are severed, TDCJ/UTMB may be more willing to engage in early settlement discussions for the higher-risk claim(s). The R&R dismisses this concern, holding that "Defendants' stated refusal to settle a case in parts is entirely their own decision" and "[t]he court will not make decisions to accommodate Defendants' preferred settlement practices." R&R at 7. But it is not merely a preferred practice. Under Article IX, Section 16.04 of Texas's General Appropriations Act ("GAA"), the State can use GAA funds to pay a settlement if it disposes of the entire case. Thus, without severance, TDCJ/UTMB cannot jointly settle claims related to one, two, or even three Decedents, even if doing so would benefit the parties and promote judicial economy.

In finding that judicial economy is better served by keeping the case consolidated, the R&R concludes that "it would waste judicial resources to require multiple courts to decide duplicative discovery motions, expert motions, and summary judgment motions and to preside over multiple trials where the same issues are being tried." This again misconstrues the nature of Plaintiffs' claims. Upon severance, discovery and motion practice would be focused primarily on the circumstances of the individual Decedent's deaths, and, as mentioned, any disputes over statewide policy could be coordinated to avoid duplication. As for the R&R's concern about the "creating constitutional uncertainty" by having different courts assess the same statewide policy decisions, that concern is not unique to this case, since the same statwide policies are frequently challenged in different parts of the state, and it is often left to the Fifth Circuit to resolve any discrepencies in findings. And to the extent the court in one or more of the severed cases is worried about consistency, it is free to issue a stay until statewide issues are resolved in one of the other cases.

Prejudice. A substantial risk of prejudice will be averted through severance. If the claims related to all four Decedents go to trial together, it will be difficult for the jury to separate the claims

6

and assess the evidence for each independently. For example, if the jury finds sufficient evidence to find liability with respect to one Decedent but not the others, it may nevertheless believe that this is sufficient to hold Defendants liable for all four deaths. But there is an even larger concern. Plaintiffs only have standing to seek redress for the alleged wrongful deaths of the four Defendants—and nobody else. By trying all four cases together, however, it will be nearly impossible to avoid creating the impression that this is some type of class action seeking redress for *all* allegedly heat-related deaths in Texas prisons. And if the jury adopts that impression, it may be apt to award astronomical and incommensurate damages.[1] The R&R notes that the Court can "craft jury instructions and a verdict form that will mitigate the prejudice Defendants assert," but jury instructions or verdict form can only go so far, expecially where, as here, the policy issues at play have received years of significant negative media attention. The only way to ensure that Defendants each get a fair trial is to have the claims related to each of the Decedents tried separately. At least, if the cases are severed, there is a chance the jury will be able to focus on the specific facts of each death without viewing the litigation as a refernedum on statewide practice.

### B.    The R&R misapplied the transfer factors.

A civil action is properly brought in "(1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought." 28 U.S.C. § 1391(b). However, even where the venue in which a case is filed is technically proper, that venue is by no means set in stone. Rather, "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).

---

[1] Plaintiffs knows this, of course, which is their complaint also lists other deaths. *E.g.*, Compl. ¶¶ 48-60.

The purpose of § 1404(a) is to prevent the waste "of time, energy and money" and "to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Continental Grain Co. v. The FBL-585*, 364 U.S. 19, 26-27 (1960).

In assessing whether transfer is appropriate under § 1404(a), the court must consider four private-interest factors and four public-interest factors. *Id.* at 509. "The private interest factors are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (internal quotation omitted). "The public interest factors are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Id.* (internal quotation omitted). No single factor is dispositive, and the Fifth Circuit has "cautioned against a raw counting of the factors that weighs each the same." *In re TikTok Inc.*, 85 F.4th 352, 358 (5th Cir. 2023) (quoting *In re Redmax, Ltd.*, 720 F.3d 285, 290 n.8 (5th Cir. 2013)).

Because the R&R's transfer analysis is very short and does not address all of the public and private interest factors, it is difficult to ascertain the weight it attributed to each. R&R at 9-10. This is especially concerning given Judge Lane's accusatory position during oral argument, suggesting that Defendants really moved to transfer because they "desperately want[] to get out of the Austin Division of the Western District of Texas." *See* Exhibit A at 31:3-31:5; *see also id.* at 24:1-24:3 ("I mean, this is more about you want to get out of Austin, and you want to get out of this—well, I'll spare that thought"). There is no evidence to support this accusation, and Defendants have no doubt this Court would be fair if the case remained here. But even if change of venue would benefit Defendants, that is not a reason to deny transfer. All that matters is whether, applying the relevant factors, "the gains

in convenience from transferring this case are significant, and [whether] those gains will actually materialize from the transfer." *Clark*, 94 F.4th at 508. The R&R should be overruled because it incorrectly applies the transfer factors and attributes undue weight to the Plaintiffs' choice of venue.

Where this Court correctly applied all the public and private factors, it has recently transferred at least two similar inmate wrongful death cases out of Austin to the districts where the deaths occurred. *See Freeman v. TDCJ*, 1:23-cv-1295, at D.E. 50 (W.D. Tex., Austin Div. April 12, 2024) (D.E. 33-1); *Richardson v. TDCJ*, 1:24-cv-368, at D.E. 57 (W.D. Tex. Tex. Austin Div. Feb. 27, 2025) (D.E. 33-2). In both cases, venue was technically proper because TDCJ was named as a defendant for ADA/RA claims and has offices in Austin. *Id.* And in both cases, the plaintiff complained about application of statewide TDCJ policy. *Id.* However, in both cases, this Court held that transfer was nonetheless appropriate to other districts, because, *inter alia*, the plaintiffs did not reside in the Austin Division, the deaths occurred elsewhere, and it was inconvenient for witnesses to travel to Austin. *Id.* The same considerations warrant transfer here.

### 1. Plaintiffs' choice of the Austin Division should not be given any deference because they live elsewhere, and the operative events occurred elsewhere.

While a plaintiff's choice of venue is ordinarily given some deference in determining whether transferring transfer is appropriate, "[t]he plaintiff's choice is given the least weight when the venue chosen is neither her home forum nor the location were the operative facts of the case took place." *Ventress v. Radiator Specialty Co.*, No. CIV. 11-1419, 2012 WL 1247205, at *2 (E.D. La. Apr. 13, 2012); *see also Neylon v. BNSF Ry. Co.*, No. 4:17-CV-00533, 2017 WL 5634712, at *2 (N.D. Tex. Nov. 7, 2017) ("The weight accorded the choice of venue is diminished where the plaintiff brings suit outside his home forum."); Exhibit A at 9 ("Plaintiffs' choice of forum is diminished where [he] brings suit outside his home forum.") *Zuazua v. C.R. England, Co.*, No. SA-21-CA-544, 2021 WL 8442046, at *2 (W.D. Tex. Aug. 20, 2021) (deference afforded a plaintiff's chosen venue is greatly diminished where "the operative facts have little or no connection with the forum chosen by the plaintiff.").

Here, *none* of the seven Plaintiffs reside within the Austin Division's geographical territory. Compl. ¶¶ 9-14. Four live in Harris County (Southern District, Houston Division), and the remainder are located in Kaufman County (Eastern District, Beaumont Division), Neuces County (Southern District, Corpus Christi Division), and Liberty County (Eastern District, Beaumont Division). *Id.* And, as described multiple times in Defendants' Motion and above, none of the operative facts took place in the Austin Division. So why did Plaintiffs bring their lawsuit here, as opposed to any of the districts where they reside and/or the Decedents died? One answer is that this Court has already made adverse findings against TDCJ in the ongoing *Tiede v. Collier* case involving prison heat—a point Plaintiffs repeat throughout their complaint. *E.g.*, Compl. ¶¶ 41-43, 50, 75-76, 82-89. But, of course, the perceived propensity of a Court to rule in one party's favor is not a proper factor in determining appropriate venue. Plaintiffs' choice of the Austin Division as the venue for this case—if not called out as the flagrant forum shopping which it appears to be—should at the very least not be given any weight in determining whether transfer is appropriate.

### 2. The private and public interest factors favor transfer.

<u>Private factor #1:  the relative ease of access to source of proof</u>. The first factor, which the R&R did not even consider, "focuses on the location of documents and physical evidence relating to the case." *TikTok*, 85 F.4th at 358 (quotation omitted). "The question is relative ease of access, not absolute ease of access." *In re Radmax, Ltd.*, 720 F.3d 285, 288 (5th Cir. 2013). The availability of evidence electronically minimizes the weight of this factor on the transfer analysis. *Id.* at 358–59 (citing *In re Planned Parenthood Fed'n Am., Inc.*, 52 F.4th 625, 630 (5th Cir. 2022)). Here, almost all of the evidence in this case will be available electronically, and thus the weight of this factor is decreased. To the extent physical records exist, however, it is probable that they would be available at the individual units where the Decedents died, none of which are in the Austin Division. Thus, the first private factor weighs in favor of transfer, and the R&R erred in not considering it at all in its analysis.

Private factor #2: the availability of compulsory process to secure witness attendance. "The second factor focuses on the availability of compulsory process to secure the attendance of witnesses." *TikTok*, 85 F.4th at 360 (quotation omitted). This factor favors transfer when the current district does not have subpoena power over witnesses but the proposed venue(s) "enjoy absolute subpoena power for both depositions and trial. *Id.* (quotation omitted). The subpoena power of a federal court for hearings, trials, and depositions extends "within 100 miles of where the person resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(c)(1)(A). The only exception is that for persons who are a party, a party's officer, or (in the case of trial) would not incur substantial expense by attending, in which case subpoena power extends "within the state where the person resides, is employed, or regularly transacts business." Fed. R. Civ. P. 45(c)(1)(B).

The R&R erred by concluding that the Austin Division and the proposed transferee venues "share equal subpoena power for trial." R&R at 10. While it is unknown at this early juncture whether any party or non-party witnesses would be unwilling to testify, the fact remains that the vast majority of the potential witnesses reside outside this Court's trial subpoena range. None of the Individual Defendants reside within 100 miles of Austin, and those (such as Collier) who are longer employed by TDCJ could not be compelled to travel here because they are not officers of a party and their travel for a lengthy trial would result in substantial expense. Compl. ¶¶ 21-31; Ex. B; D.E. 33-3. The most likely non-party witnesses are correctional and medical staff who worked at the units where the Decedents died, none of which are within 100 miles of Austin. Ex. B.[2] And to the extent Plaintiffs seek testimony from higher ranking UTMB and TDCJ personnel, such personnel work at UTMB headquarters in Galveston and/or TDCJ headquarters in Huntsville, which are both more than 100

---

[2] Defendants fully expect dismissal of the ADA/RA claims against TDCJ and UTMB on summary judgment, after which non-party witnesses who work for those agencies will no longer be officers of a party, and subpoena range will be limited to 100 miles. But even if the agencies are not dismissed before trial, it is likely that many of the nonparty TDCJ and UTMB personnel who worked at the Decedents' units will have retired or moved to other jobs by that time, in which case, again, the 100 mile rule would apply.

miles from Austin. *Id.* Thus, if the case remains in Austin, there is a high probability that compulsory process would be unavailable for several witnesses. By contrast, if the case was severed by Decedent and each was transferred to the district where the unit of death took place, the relevant unit-level witnesses would all be within the transferee courts' subpoena range. Thus, the second private factor favors transfer.

Private factor #3: the costs of attendance for willing witnesses. Testifying imposes external costs on witnesses, even those willing to testify. "It is more convenient for witnesses to testify at home. . . ." *TikTok*, 85 F.4th at 361. "[A]dditional distance means additional travel time . . . meal and lodging expenses," additional time "witnesses must be away from their regular employment," and increased "personal costs associated with being away from work, family, and community." *Id.* This factor "attempts to internalize and minimize" these costs by "favoring the venue that is more convenient from the perspective of willing witnesses." *In re Clarke*, 94 F.4th 502, 514 (5th Cir. 2024).

Here, it would be significantly less expensive for unit-level correctional and medical witnesses to attend trial in the districts where their units are located. The Estelle Unit, where Southard died, is located approximately 172 miles from Austin, but only 85 miles from Houston (transferee venue). The Wainwright Unit, where Skinner died, is located approximately 182 miles from Austin, but only 69 miles from Lufkin (transferee venue). The Lane Murray Unit, where Hagerty died, is located approximately 101 miles from Austin, but only 41 miles from Waco (transferee venue). And the Hughes Unit, where Castillo died, is located approximately 103 miles from Austin, but only 42 miles from Waco (transferee venue).[3] These discrepancies will be of great significance to the unit-level

---

[3] While the distance between Waco and Austin is only 100 miles, the relative cost of traveling that extra distance was a key factor this Court considered in transferring a similar wrongful death case from the Austin Division to the Waco Division, where the death occurred and the majority of unit-level witnesses worked. *See* Exhibit A at 10 ("[T]he Court finds it appropriate to consider the increased burden on witnesses to testify in Austin rather than Waco. . . Defendants also make a strong argument that the Waco division is clearly more convenient for the witnesses currently identified. Defendants establish that the witnesses presently will suffer decreased travel costs, lodging costs, and time away from work if required to testify in Waco instead of Austin.").

Individual Defendants and non-party witnesses, the vast majority of whom live in the vicinity of the units where the deaths occurred. *See* Ex. B; D.E. 33-3, 33-4, 33-5. If this case remains in Austin, these witnesses will need to drive far longer each day and/or incur the significant additional expense of lodging, not to mention the potential loss of income from taking additional days off work for travel. *Id.* However, if the case were transferred, they could easily make the round-trip each day and would not need to miss work other than for the days when they are needed at trial. *Id.* They would also obviously save significant money on gas.

In assessing the convenience of witness attendance at trial, Judge Lane found significant that "Austin is the most centrally located venue compared to the transferee venues." R&R at 10. But, in doing so, he presumed that the entire case would be transferred without having first been severed. If the case were severed as requested, the centrality of Austin would be irrelevant, since the vast majority of witnesses would stay close to where they live and work. And even if the case were not severed, Judge Lane overstates the centrality of Austin, since none of the Defendants reside or have headquarters here. Ex. B. To the extent centrality is the goal, the case should either be moved to the Waco Division (where 2 of the 4 units of death—along with all or most of unit-level witnesses—are located) or Houston Division (where 8 of the 14 Defendants reside or have headquarters). *Id.* Either way, the third private interest factor weighs in favor of transfer.

Private factor #4: other practical problems. The fourth factor considers "all other practical problems that make trial of a case easy, expeditious and inexpensive." *TikTok,* 85 F.4th at 362.

Here, in addition to mitigating the cost for witnesses to appear at trial, transfer will generally render trial more expeditious and inexpensive for the Agency Defendants. Sufficient staffing is critical to ensuring TDCJ and UTMB can fulfill their missions and protect inmate welfare. *See* D.E. 33-3, 33-4, 33-5. Requiring unit-level Defendants and non-party witnesses to travel long distances to attend a faraway trial would risk staffing gaps at the units where they work, which in turn poses clinical

challenges and patient safety risks. *Id.* This risk would be exacerbated if the claims related to all four Decedents were tried together, since that trial would be much longer, and would require all parties and witnesses to be in Austin for much longer. Allowing the proceedings in this case to occur in the districts where the unit-level Individual Defendants and non-party witnesses work/reside would alleviate these staffing concerns because the employees would be able to travel to and from court quickly and make it considerably easier for them to fulfill their work obligations. *Id.* Finally, by reducing the distance between witnesses and the courtroom, there is a lower likelihood that any witnesses will be delayed due to traffic, which could delay proceedings. Thus, the fourth private interest factor weighs in favor of transfer, and the R&R erred by not considering this factor at all.

Public factor #1: the administrative difficulties flowing from court congestion. Because one court's assessment of another court's docket is inherently speculative, "docket conditions . . . [are] not decisive" in determining whether transfer is appropriate. *Clarke*, 94 F.4th at 515 (quoting 8 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3854). While the transferor court may be able to estimate the efficiency of its own docket, its assessment of a transferee's docket is "at its core… an uninformed guess." *Id.* Here, because the parties lack sufficient information with which to compare the relative congestion between the Austin Division and the transferee venues, the first public interest factor does not weigh for or against transfer.

Public factor #2: the local interest in having localized interests decided at home. "[T]he local-interest inquiry is concerned with the interest of *non-party citizens* in adjudicating the case." *Clark*, 94 F.4th at 511. Thus, to identify localized interests properly, courts "look not to 'the parties' significant connections to each forum . . . but rather the significant connections between a particular venue and the events that gave rise to a suit.'" *TikTok*, 85 F.4th at 364 (quoting *Def. Distributed*, 30 F.4th at 435); *see also Clark*, 94 F.4th at 511 ("We focus on the *events*—not the *parties*.").

14

Where, as here, a plaintiff's claims arise primarily from events and injuries which occurred at a prison, courts routinely transfer venue to the district and division where the prison is located, even where the case implicates statewide policy. *See, e.g.*, D.E. 33-1 at 13-14 ("Non-party citizens in Austin have a much lower interest in adjudicating this case than those in Waco who reside near the prison where the events took place."); D.E. 33-2 at 1 (granting transfer to Houston from Austin because, *inter alia*, "Plaintiff's claims against Defendants arise exclusively from events which occurred at TDCJ's Wayne Scott Unit in Fort Bend County.") *Balawajder v. Scott*, 160 F.3d 1066 (5th Cir. 1998) (affirming transfer of prisoner's lawsuit to district where prison was located because claims dealt with alleged interference with religious practices at that prison in accordance with statewide policy); *Naranjo v. Thompson*, No. 11-CV-00105, 2013 WL 12177075, at *1 (W.D. Tex. June 24, 2013) ("[E]vents in the prison itself, which is located in Pecos, provide the basis of the instant lawsuit. As such, all evidence relevant to the lawsuit will derive from the prison and location itself. Thus, the Court's Venue is proper in the Western District of Texas, Pecos Division."); *Fanning v. Director, TDCJ-CID*, Civ. No. 5:18-CV-91, 2018 WL 3584494, at *2 (E.D. Tex. Jul. 26, 2018) (transferring inmate's case challenging prison conditions from the Eastern District's Texarkana Division to the Beaumont Division because that was where prison where underlying events took place was located); *Just. v. Stephens*, No. CV H-15-2845, 2016 WL 3453460, at *4 (S.D. Tex. June 15, 2016) ("Venue for violations of Plaintiff's rights by the Polunsky prison officials is proper in the Eastern District of Texas, Lufkin Division, because a substantial part of the events or omissions giving rise to Plaintiff's claims allegedly occurred there").[4]

This case should be no different. Plaintiffs' claims arise exclusively from Defendants' alleged failure to provide the Decedents with heat-mitigation measures at their units of assignment—none of

---

[4] At oral argument, Judge Lane attempted to distinguish other prison death cases in which transfer was granted on the grounds that those cases involved more than one death. Ex. A at 23:7-23:16 ("I have a different animal here. I have four deaths alleged in one complaint.") However, if the case is severed by Decedent as requested, that distinction immediately vanishes. And even if the case is not severed, the fact that it involves four inmate deaths is irrelevant to the "localized interest" analysis because none of the deaths occurred in the Austin area.

which are within the Austin Division's territory. Ex. B. Indeed, the Austin Division's territory does not contain *any* prisons whatsoever. *See* D.E. 33-1 at 14 ("Underscoring the difference in interest is that the Austin Division has zero TDJC [prisons], while the Waco Division has five."). Judge Lane concludes that "Austinites, like all Texans, do have an interest in the safety of their state's prisons and the policy and practices that govern them" because, "[s]imilar to all Texas populations, many Austinites have family members and friends incarcerated in Texas prisons." R&R at 10. But the second public interest factor assesses the *relative* interest in the outcome of the case between citizens of the transferor and transferee districts. While all Texas citizens have some level of interest in statewide prison policy, the citizens of a district where a prison death occurred have a far greater connection to the lawsuit arising from that death because, among other things, that is the district where the prison's employees live, the allegedly wrongful application of policy took place, and the alleged injuries were sustained. By Judge Lane's logic, citizens in all Texas districts have an equal local interest in cases challenging application of statewide prison policy at specific prisons, but that is simply not the case. The second public factor—which is "one of the most important factors in venue determinations" (*TikTok*, 85 F.4th at 364)—weighs heavily in favor of transfer.

Public factor #3: the familiarity of the forum with the law that will govern the case. In assessing good cause for transfer, a court also considers the two courts' "familiarity with the law that will govern the case." *Volkswagen Corp. of Am., Inc.*, 545 F.3d at 315. Familiarity with governing law weighs most heavily when "the [transferee] venue is in a different State [than the transferor court]— in which case that State's familiarity with the applicable law would be especially probative to the transfer analysis." *Planned Parenthood*, 52 F.4th at 632, n.5. For this factor, a district court examines the law it will have to apply in the case, including whether it "would be bound to [the transferee court's] law concerning such claims." *Def. Distrib.*, 30 F.4th at 436.

16

Here, because transfer would be from one division in Texas to others and involves application of federal law, the third public interest factor is neutral and does not weigh for or against transfer. Judge Lane mentions that "this court is familiar with the many of the issues in this case as it is presiding over the *Tiede* litigation" (R&R at 10), but the relevant inquiry is knowledge of the governing law, not the underlying facts. And even if a court's knowledge of underlying facts were relevant, the facts in *Tiede*—which challenges current TDCJ policy and seeks a statewide injunction requiring statewide air-conditioning in Texas prisons—are very different than the facts in this case, which seeks retrospective redress for four specific inmate deaths in 2023.

Public factor #4:  the avoidance of unnecessary problems of conflicts of laws.  The final public interest factor "seeks to avoid 'unnecessary problems of conflict of laws or in the application of foreign law.'" *Def. Distrib.*, 30 F.4th at 436 (quotation omitted). Here, because there are no conflict of laws or applications of foreign law, the final public interest factor does not weigh for or against transfer.

*    *    *    *    *

Assessing the private and public interest factors together, it is plainly obvious that the gains in convenience from transferring this case are significant, and that those gains will actually materialize from the transfer. *Clark*, 94 F.4th at 508.  In particular, transfer will eliminate or decrease witness's lodging costs, decrease their time away from work and family, alleviate staffing concerns for TDCJ and UTMB, and allow non-party citizens with a substantially higher interest in the case to decide it.

This is not a close call.  None of the Plaintiffs or Defendants reside or have headquarters in Austin.  The prisons where the events giving rise to Plaintiffs' claims took place are not in Austin. And the communities primarily impacted by these prisons are not in Austin.  While this case can properly be brought in Austin because of TDCJ and UTMB's small offshoot offices here, it is clearly more convenient for it to be adjudicated in districts where the events giving rise to this case—namely,

17

the conditions experienced by Decedents and their deaths—took place. The Court should therefore overrule the R&R and order transfer of each severed case to the district where the deaths took place.

### C.      Transfer is appropriate even if the Court chooses not to sever.

For the most part, Defendants assumed in the proceeding section that the Court would sever the case by Decedent before transferring each severed case to the venue where the death occurred. That is certainly the cleanest result, as each transferee venue would only receive a case arising from events in its jurisdiction. However, even if the Court decides not to sever the case into separate cases by decedent, transfer would still be appropriate. As mentioned, none of the Plaintiffs or Individual Defendants reside in the Austin Division, it would be inconvenient for most witnesses to attend trial in Austin, and an Austin jury has a much lower local interest in the outcome of the litigation. These factors weigh heavily against keeping the case here, severed or not. The only question remaining if the case remains unsevered is *where* the case should be transferred. Given that two of the four deaths took place within the Western District's Waco Division and the unit-level witnesses for those two deaths likely reside nearby, that venue would probably be the most convenient. But even the Eastern District's Lufkin Division or Southern District's Houston Division would be more convenient than here because at least one of the four deaths occurred in each of those venues.

### III.      CONCLUSION

For the foregoing reasons, the Court should overrule the R&R, sever this lawsuit into four cases by Decedent and transfer each case to the venue in which the death occurred. Specifically, Plaintiffs' claims related to Southards's death should be transferred to the Southern District's Hoston Division, Plaintiffs' claims related to Skinners' death should be transferred to the Eastern District's Lufkin Division, and Plaintiffs' claims related to Hagerty and Castillo's deaths should be transferred to the Western District's Waco Division.

18

Respectfully submitted,

**KEN PAXTON**
Attorney General of Teas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

**BRIANA M. WEBB**
Chief, Law Enforcement Defense Division

/s/ *Michael J. Calb*
**MICHAEL J. CALB**
Special Counsel
Attorney-In-Charge
Texas State Bar No. 24126986
Michael.Calb@oag.texas.gov

Law Enforcement Defense Division
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2080

**COUNSEL FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I, Michael J. Calb, Assistant Attorney General, affirm that on August 10, 2026 a true copy of the foregoing has been served on all counsel of record via the Court's electronic filing system.

/s/ *Michael J.Calb*
**MICHAEL J. CALB**
Assistant Attorney General

19